UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVON WASHINGTON, PARIIS TILLERY,
JOHN DOE, and STEVEN ESPINAL, *on
behalf of himself and all others similarly
situated*,

                       Plaintiffs,

       -against-

THE CITY OF NEW YORK; NEW YORK
CITY DEPARTMENT OF CORRECTION
("DOC") COMMISSIONER CYNTHIA
BRANN; DOC BUREAU CHIEF BRIAN
SULLIVAN; DOC DEPUTY WARDEN
SHARLISA WALKER; DOC CAPTAIN
EDWARD WILLIAMS; DOC CORRECTION
OFFICERS FRANK FOES #1-12; COUNTY
OF ALBANY; ALBANY COUNTY SHERIFF
CRAIG D. APPLE, SR.; ALBANY COUNTY
CORRECTIONAL FACILITY
SUPERINTENDENT MICHAEL LYONS;
LIEUTENANTS ANTHONY TORRISI,
MARK VALVO, FRANK FOE #13 a.k.a.
"SUPERMAN," and FRANK FOES #14-16;
CAPTAIN "JOHN" HARRIS; SERGEANTS
DAN POOLE, MICHAEL GRIMES, "JOHN"
COLANGIONE, and FRANK FOES #17-18;
CORRECTION OFFICERS MATTHEW
LABOMBARD, JOSIAH HALEY, MICHAEL
BELIVEAU, VINCENT ADAMS, JOSEPH
KELLY, WILLIAM REDDY, DAMIEN
ANZALONE, RYAN LAWSON, JARRED
JAROSZ, FRANK HARRIS, THUAN TON,
TIMOTHY KEHN, TRENT SHAVER,
EUGENE RATIGAN, ANTHONY
DEGONZA, KELLY THOMPSON, FRANK
FOE SHIELD #99, FRANK FOE SHIELD
#323, and FRANK FOES #19-21; and NURSE
MELISSA "MISSY" MYLROIE,

                       Defendants.

No. 18-CV-12306 (CM)

**FIRST AMENDED
CLASS ACTION
COMPLAINT
WITH JURY DEMAND**

## TABLE OF CONTENTS

PAGE NO.

NATURE OF THE ACTION ....................................................................................1

PARTIES ................................................................................................................3

JURISDICTION AND VENUE ...............................................................................7

JURY DEMAND .....................................................................................................7

FACTUAL ALLEGATIONS ...................................................................................7

    I.      NEW YORK CITY'S BAN ON SOLITARY CONFINEMENT FOR YOUNG PEOPLE ...................................................................................................7

    II.     THE SUBSTITUTE JAIL ORDER PROCESS......................................13

    III.    NEW YORK CITY'S POLICY AND CUSTOM OF RENDERING DIFFICULT DETAINEES UPSTATE TO PUNISH THEM BY, AMONG OTHER THINGS, PUTTING THEM IN SOLITARY CONFINEMENT ..........15

    IV.    ALBANY COUNTY'S POLICY AND CUSTOM OF TORTURING RIKERS DETAINEES ............................................................................18

    V.     ALBANY COUNTY'S POLICY AND CUSTOM OF PUTTING ALL RIKERS DETAINEES IN SOLITARY CONFINEMENT................................................22

    VI.    NEW YORK CITY HAS RECEIVED REPEATED NOTICE OF ALBANY'S TORTURE AND ABUSE OF DOC INMATES, AND CONTINUES TO TRANSFER DETAINEES THERE TO BE TORTURED ..................................23

    VII.   ALBANY COUNTY'S SYSTEMIC INTERFERENCE WITH COMMUNICATIONS WITH COUNSEL............................................26

    VIII.  THE EXPERIENCES OF THE NAMED PLAINTIFFS .....................28

         Davon Washington................................................................................28

               A.     Davon Washington is Detained at Rikers Island Starting in March 2016 ...................................................................................28

               B.     The March 28, 2018 Transfer of Davon Washington from Rikers to the Albany County Jail .............................................28

C.    Defendants Physically and Sexually Assault Davon Washington at the Albany County Jail................................................................30

D.    Davon Washington Is Held in Solitary Confinement at the Albany County Jail For Nine Months..............................................34

E.    Albany County Jail Guards Beat Davon Washington in Retaliation for a Legal Visit on October 5, 2018...........................35

Steven Espinal.......................................................................................................36

A.    Steven Espinal Is Detained at Rikers Island Starting on November 18, 2017.......................................................................36

B.    The February 13, 2018 Transfer of Steven Espinal from Rikers to the Albany County Jail ................................................38

C.    Defendants Physically and Sexually Assault Steven Espinal at the Albany County Jail.................................................................40

D.    Steven Espinal Remains in Solitary Confinement at the Albany County Jail, After Nearly a Year There .........................................44

E.    Defendants Brutally Assault Steven Espinal Again on July 4, 2018..................................................................................47

F.    Notices of Claim ........................................................................48

John Doe .................................................................................................................49

A.    John Doe Was Detained at Rikers Island on December 18, 2015 .......................................................................49

B.    After a Visit from a High-Ranking DOC Security Official, John Doe Is Transferred to the Ulster County Correctional Facility on an SJO ..........................................................................................49

C.    John Doe Is Transferred from Ulster County to the Albany County Jail .....................................................................................50

D.    Defendants Brutalize and Sexually Assault John Doe..................50

E.    Doe Is Denied Medical Attention and Made to Sleep in His Own Bodily Waste..............................................................................54

F.    John Doe Is Placed in Solitary Confinement at the Albany County Jail .....................................................................................55

G.       Defendants Attempt to Intimidate John Doe ...............................56

Pariis Tillery...........................................................................................................57

A.       Pariis Tillery Is Detained By DOC Starting on March 4, 2017 .....57

B.       The August 9, 2018 Transfer of Pariis Tillery from Rikers to
the Albany County Jail...............................................................58

C.       Defendants Physically Assault Pariis Tillery at the Albany
County Jail ...............................................................................59

D.       Pariis Tillery Is Held in Solitary Confinement at the Albany
County Jail from August 9, 2018 to January 23, 2019 .................63

IX.     THE EXPERIENCES OF OTHER NEW YORK CITY DETAINEES
TRANSFERRED TO ALBANY ...........................................................65

Richard Roe ...........................................................................................65

David Doe ...............................................................................................66

X.      CLASS ALLEGATIONS ....................................................................66

CAUSES OF ACTION ...................................................................................... 68-97

Plaintiffs, by and through their attorneys, Emery Celli Brinckerhoff & Abady LLP and the Law Offices of Goldman & Associates, for their Complaint allege as follows:

## NATURE OF THE ACTION

1.      Early one morning, without warning, a van comes to the jail for the young men.  They have been in that jail for months or even years, but they have not been convicted of any crimes.

2.      The young men are shackled and put in the back of the van.  The van has no windows.  They do not know where they are going.

3.      The van drives for hours.  It eventually comes to a stop at the end of a road at the back of an airfield.  The doors open in a place the young men have never seen before.

4.      A dozen guards in green fatigues and body armor are there waiting.  They tell the young men to get out of the van one by one.  The guards take the young men inside a building and put them in cages.

5.      The guards deliver commands that are bizarrely detailed and confusing. Take off your shirt with your right hand and pass it backward over your left shoulder, they say. When the young men, disoriented, get it wrong, the guards "respond" with blows and punches.

6.      The guards yell that the young men are hiding things in their bodies.  They punch and kick the young men.  Get it out, the guards say.  The guards curse and threaten to kill them.  Get it out, the guards demand.  Some of the young men are shot with tasers in-between beatings.  Guards insert their fingers and batons into the young men's rectums.  We will get it out for you, they threaten.  The young men lie naked on the floor, crying, pleading, covered in their own urine and feces.  Get it out, get it out.  The guards will not stop.

7.     The commander finally tells the guards that it is enough.  The guards leave.  The young men are left in cages, alone.  They sit there by themselves around the clock, in isolation, for weeks, months, even years.

8.     There are no rules, no procedures, and no laws in this place.  The young men are far from their families, far from their lawyers, cut off from the outside world.  They fear that they could be killed at any moment and no one would know what happened to them.  Their fear is not unreasonable: that is what the guards tell them might happen.

9.     These young men are not in the custody of a repressive foreign regime; they are not suspected terrorists rendered by the CIA.  The "black site" to which they have been taken without warning is not a decrepit Iraqi prison or an air base in the Polish countryside.  They are pretrial detainees in the custody of the City of New York, and the black site is the Albany County Correctional Facility.

10.    This case is about young men from New York City who have been shipped up to Albany County to be beaten and punished for crimes they have not been convicted of committing.  It is about the City's policy of knowingly sending these young men to Albany to be tortured; it is about Albany County's policy of torturing them; and it is about the correction officers who carry out the torture.

11.    More than anything else, however, this case is about the rest of us, living outside the jail walls.  It is about the authority that is being quietly exercised—and viciously abused—on our behalf.

12.    We, the People, have decided through our Constitution that not even the most despised detainees may be tortured.  Not even someone who has assaulted a correction officer.  Not even an alleged gang member.  Not even someone who is hiding contraband in his

body.  We are a society of laws, and due process—the idea that sets us apart from repressive regimes worldwide—forbids this.

13.     In New York City, the law forbids subjecting teenage pretrial detainees to 23 or 24-hour solitary confinement, even if the teenagers are difficult to control, break rules, or hurt others.  Locking college-age young men in cages for 23 hours a day with no human contact is not just cruel.  It is a form of torture.  It does not reduce violence or promote jail safety.  It simply inflicts permanent damage on developing minds too young to be beyond redemption.

14.     Our commitment to due process and the rule of law binds us even when it is hard.  It governs even in the darkest corners of far-away jails and it protects even—indeed, especially—the least popular, the most reviled of our fellow human beings.

15.     People are being tortured in our names.  This time it is happening much closer to home, and it is happening to Americans.  It is time for the torture to stop.  It is time to bring these young men home to New York City.

## PARTIES

16.     Plaintiff Davon Washington is a 22-year-old man who resides in the Bronx, New York.  He was previously detained pending trial at the Albany County Correctional Facility ("the Albany County Jail") in Albany County, New York, while in the custody of the New York City Department of Correction ("DOC").  He was released from custody on December 24, 2018.

17.     Plaintiff Steven Espinal is a 19-year-old man who is currently detained pending trial at the Albany County Jail while in the custody of DOC.

18.     Plaintiff John Doe is a 24-year-old man who is presently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). He was previously detained pending trial at the Albany County Jail while in the custody of DOC.

19.     Plaintiff Pariis Tillery is a 25-year-old man who is currently detained pending trial at the Anna M. Kross Center in New York City. He was previously detained pending trial at the Albany County Jail while in the custody of DOC.

20.     Defendant City of New York is a municipal corporation duly organized under the laws of the State of New York.

21.     The following Defendants are officers, employees, and/or agents of the City of New York. At all relevant times, each of them was acting within the scope of his or her employment as an employee, servant, and/or agent of the City. At all relevant times, each of them was acting under color of state law. Each of them is sued in his or her individual capacity:

      a.     DOC Commissioner Cynthia Brann;

      b.     DOC Bureau Chief Brian Sullivan;

      c.     DOC Deputy Warden Sharlisa Walker;

      d.     DOC Captain Edward Williams;

      e.     Correction Officers Frank Foes #1-12, DOC correction officers whose names are unknown.

22.     Defendant County of Albany ("Albany County") is a municipal corporation duly organized under the laws of the State of New York.

23.     The following Defendants are officers, employees, and/or agents of Albany County. At all relevant times, each of them was acting within the scope of his or her

employment as an employee, servant, and/or agent of the County.  At all relevant times, each of them was acting under color of state law.  Each of them is sued in his or her individual capacity:

    a.     Craig D. Apple, Sr., the Sheriff of Albany County;

    b.     Michael Lyons, the Superintendent of the Albany County Jail;

    c.     Anthony Torrisi, a Lieutenant in the Albany County Sheriff's Office who works at the Albany County Jail;

    d.     Mark Valvo, a Lieutenant in the Albany County Sheriff's Office who works at the Albany County Jail.

    e.     Frank Foe #13 a.k.a. "Superman," a Lieutenant in the Albany County Sheriff's Office who works at the Albany County Jail whose name is unknown, but who is widely known in the Jail as "Superman" because of his appearance;

    f.     Lieutenants Frank Foes #14-16, whose names are unknown, all of whom are Lieutenants in the Albany County Sheriff's Office who work at the Albany County Jail;

    g.     "John" Harris, whose first name is unknown, a Captain in the Albany County Sheriff's Office who works at the Albany County Jail;

    h.     Dan Poole, a Sergeant in the Albany County Sheriff's Office who works at the Albany County Jail;

    i.     Michael Grimes, a Sergeant in the Albany County Sheriff's Office who works at the Albany County Jail;

j.     "John" Colangione, whose first name is unknown, a Sergeant in the Albany County Sheriff's Office who works at the Albany County Jail;

k.     Sergeants Frank Foes #17 and #18, whose names are unknown, Sergeants in the Albany County Sheriff's Office who work at the Albany County Jail; and

l.     The following correction officers in the Albany County Sheriff's Department who work at the Albany County Jail:

    i.     Matthew LaBombard;

    ii.    Josiah Haley;

    iii.   Michael Beliveau;

    iv.    Vincent Adams;

    v.     Joseph Kelly;

    vi.    William Reddy;

    vii.   Damien Anzalone;

    viii.  Ryan Lawson;

    ix.    Jarred Jarosz;

    x.     Frank Harris;

    xi.    Thuan Ton;

    xii.   Timothy Kehn;

    xiii.  Trent Shaver;

    xiv.   Eugene Ratigan;

    xv.    Anthony DeGonza;

> xvi.     Kelly Thompson;
>
> xvii.    Frank Foe, Shield #99, whose name is unknown;
>
> xviii.   Frank Foe, Shield #323, whose name is unknown; and
>
> xix.     Frank Foes #19-21, whose names are unknown.

24.     Defendant Melissa Mylroie, known as "Missy," is a nurse at the Albany County Jail.  She is sued in her individual capacity.  At all relevant times she was acting within the scope of her employment as an employee of CFG Health Systems, LLC, as agent and servant of Albany County, and under color of state law.

## JURISDICTION AND VENUE

25.     This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988.

26.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

27.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because certain defendants reside in this District and because a substantial part of the events giving rise to the claims occurred in this District.

## JURY DEMAND

28.     Plaintiffs demand trial by jury.

## FACTUAL ALLEGATIONS

I.      **New York City's Ban on Solitary Confinement for Young People**

29.     In August 2014, the United States Department of Justice ("DOJ") issued an investigative report on conditions at Rikers Island.  DOJ found, among other things, that the

City improperly relied on solitary confinement as a tool to manage adolescent detainees,
"expos[ing] them to a risk of serious harm" and raising serious constitutional concerns.  DOJ
found that putting adolescents in solitary created a "vicious cycle."  Disruptive and unstable
detainees became *more* disruptive and unstable when they were put in solitary, isolated from
social support and necessary services, and given little incentive to improve their behavior.[1]

30.     In October 2014, the *New Yorker* told the story of Kalief Browder, who
spent three years on Rikers Island as a teenager after being accused of stealing a backpack.[2]
Kalief spent nearly 17 consecutive months in solitary confinement before the charges against
him were dismissed.  While in solitary, he became paranoid and repeatedly attempted suicide.
After he got out, he had constant flashbacks to his time in solitary and made more suicide
attempts.  Kalief killed himself less than a year after the article appeared.

31.     Both developments brought public attention to the City's gross
overreliance on solitary confinement for young pretrial detainees.  And they happened against a
backdrop of growing societal recognition of the harm of solitary confinement, particularly for
young people.

32.     There is clear scientific consensus that long-term solitary confinement
inflicts grave psychiatric injury.  According to the American Psychiatric Association, solitary is
associated with increased risk of self-mutilation and suicidal ideation, greater anxiety,

---

[1]     *See* U.S. Dep't of Justice, CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island, Aug. 4, 2014, https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/SDNY %20Rikers%20Report.pdf.

[2]     Jennifer Gonnerman, *Before the Law*, The New Yorker, Oct. 6, 2014, https://www.newyorker.com /magazine/2014/10/06/before-the-law.

depression, and paranoia.[3]  About half of all prison suicides happen among the roughly 5 to 6 percent of inmates held in solitary.[4]

33.    Cognition tends to deteriorate in solitary.  Many people held in solitary experience hallucinations and delusions, and some suffer full-blown psychosis, losing touch with the world around them.  One eminent psychologist and criminologist has described the isolated detainees' mental state as "isolation panic"—a feeling of desperation, abandonment, and helplessness that feeds rage, panic, and loss of control.[5]

34.    These risks are particularly acute for young people.  Immature adolescent brains are even less well equipped than fully developed adult brains to handle the rigors of prolonged isolation.  A 2014 study of detainees in New York City jails found that the two biggest predictors of self-harm were being under age 19 and having been placed in solitary confinement at least once.[6]

35.    Solitary also poses unique threats to young people.  Some serious mental illnesses, like bipolar disorder and schizophrenia, do not typically manifest themselves until a person is in her early-to-mid-20s.  Solitary confinement can provoke or accelerate the onset of these serious mental illnesses for teenage detainees.

36.    Recent developments in constitutional law recognize that the penal system must treat teenagers differently than adults because their immature brains function differently.[7]

---

[3]    *Solitary Confinement of Juvenile Offenders*, Am Psych. Ass'n, https://www.apa.org/advocacy/criminal-justice/solitary.pdf.
[4]    Am. Civ. Liberties Union, Caged In: Solitary Confinement's Devastating Harm on Prisoners with Physical Disabilities 25 (2017), https://www.aclu.org/report/caged-devastating-harms-solitary-confinement-prisoners-physical-disabilities.
[5]    Hans Toch, Mosaic of Despair: Human Breakdowns in Prison (1992).
[6]    Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442 (2014), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3953781.
[7]     *See Roper v. Simmons*, 543 U.S. 551 (2005) (death penalty for juveniles violates Constitution); *Graham v. Florida*, 560 U.S. 48 (2010) (juvenile life without parole for non-homicide crimes violates Constitution); *Miller v.*

37.     In this context, in January 2015, the New York City Board of Correction (the "Board") adopted a regulation banning solitary confinement (or "punitive segregation") for detainees age 21 and younger in New York City (the "Under Age 22 Solitary Ban").

38.     The Board is an independent body of the City that is responsible for overseeing and evaluating the performance of DOC.  The Board is required to establish Minimum Standards for the treatment of detainees held by the City.[8]  Those Minimum Standards are regulations with binding legal effect, codified in the Rules of the City of New York, which DOC is obligated to follow.[9]

39.     In promulgating the Under Age 22 Solitary Ban, the Board found: "[P]unitive segregation is a severe penalty that should not be used in certain circumstances in [DOC] facilities.  In particular, punitive segregation reflects a serious threat to the physical and psychological health of adolescents, with respect to whom it should *not* be imposed."[10]

40.     The Under Age 22 Solitary Ban immediately forbid the placement of detainees under age 18 in solitary.  It further provided that, as of January 1, 2016, detainees ages 18 through 21 "shall be excluded" from solitary, "provided that sufficient resources are made available to [DOC] for necessary staffing and implementation of necessary alternative programming."[11]

---

*Alabama*, 567 U.S. 560 (2012) (juvenile life without parole for any offense violates Constitution).

[8]     *See* Charter of the City of New York § 626.
[9]     Rules of the City of New York tit. 40.
[10]    *Id.* tit. 40 § 1-17(a) (emphasis added).
[11]    *Id.* tit. 40 § 1-17(b)(1)(ii).

41.     The Under Age 22 Solitary Ban received glowing press coverage and praise from advocates for detainees' rights.  Mayor de Blasio trumpeted that the City would now "be at the forefront of national jail reform efforts."[12]

42.     In July 2015, the City submitted to a consent decree in *Nunez v. City of New York* designed to reduce excessive force by officers against detainees on Rikers Island, respond to DOJ's concerns, and reform the City's jails.  To that end, the City agreed in the consent decree to additional reforms relating to solitary confinement for young people.[13]

43.     In practice, however, DOC has long been reluctant to reduce its use of solitary confinement and has resisted implementing the Under Age 22 Solitary Ban.[14]  For a very long time, solitary confinement had been a primary tool used at Rikers Island to deal with violent, mentally ill, or difficult young inmates.[15]  Long-serving senior DOC officials, rank-and-file staff, and the correction officers' union were slow to embrace reform.

44.     After the Under Age 22 Solitary Ban was passed, DOC requested and received a series of variances from the Board to delay the implementation of the ban on solitary for detainees aged 18 to 21.  DOC claimed it needed more time to develop alternative programming.

45.     Finally, in October 2016, the Board determined that DOC had been provided with sufficient resources to implement alternative programming, and the variances

---

[12]     *See, e.g.*, Mark Berman, *New York City Will No Longer Put Its Youngest Prison Inmates in Solitary Confinement*, Wash. Post, Jan. 13, 2015, https://www.washingtonpost.com/news/post-nation/wp/2015/01/13/new-york-city-will-no-longer-put-its-youngest-prison-inmates-in-solitary-confinement/?utm_term=.be30f8ac1c66.
[13]     *See* Consent Decree § XVI, *Nunez v. City of New York*, No. 11-CV-5845 (S.D.N.Y. July 1, 2015), *available at https://www.justice.gov/opa/file/624846/download*
[14]     *See, e.g.*, Letter from Commissioner Joseph Ponte to Stanley Brzenoff, Chair, N.Y.C. Bd. of Corr., Jan. 8, 2016, *available at* https://www1.nyc.gov/assets/boc/downloads/pdf/Limited%20Variance%20-%20Elimination%20of%20Punitive%20Segregation%2018-21.pdf.
[15]     *See* DOJ Report, *supra* note 1, at 46-51.

ended.  For the past two years, it has been unlawful for the City to keep a detainee under the age of 22 in solitary confinement.

46.      Regulations passed by the Board also limit the amount of time DOC detainees over age 21 can spend in solitary confinement.  For example, an adult detainee cannot spend more than 30 consecutive days in solitary confinement unless he has been sentenced for a serious assault on correctional staff.  The maximum sentence for a serious assault on staff is 60 days in solitary confinement.[16]

47.      Even with the Under Age 22 Solitary Ban in effect and the limits on solitary for adults, DOC—one of the largest jail systems in the world—still has powerful tools at its disposal to manage, isolate, and control difficult detainees to the extent it deems necessary.

48.      The regulation passed by the Board in 2015 also forbid detainees between 18 and 21 from being placed in "Enhanced Supervision Housing" ("ESH"), a secure unit that is less restrictive than solitary (the "Under Age 22 ESH Ban").[17]  Detainees in ESH are entitled to at least seven hours outside their cells each day, during which they can socialize with other detainees.  They can also receive some social visitors, and they have access to services and programs accessible to detainees in the general population, including education and chaplains.[18]

49.      Since the Under Age 22 ESH Ban was passed, DOC has continuously requested and received variances from the Board waiving its compliance with this requirement.  Therefore, it is currently permissible for DOC to send detainees between ages 18 and 21 to ESH, which is the most restrictive setting for detainees in that age group in DOC custody.

---

[16]      Rules of the City of New York tit. 40 §§ 1-16(d)(1) to (4).
[17]      *Id.* § 1-16(c)(1)(ii).
[18]      *What is Enhanced Supervision Housing?*, N.Y.C. Dep't of Corr., *available at* https://www1.nyc.gov/assets/doc/downloads/press-release/esh-enhanced_supervision_housing_011415_final.pdf

50.     DOC maintains a restrictive housing unit at its West Facility on Rikers Island, which, on information and belief, is designed to accommodate violent detainees who have not been adequately controlled in other settings, as well as detainees who are in protective custody for their own safety.

51.     On information and belief, the North Infirmary Command facility at Rikers also includes a highly secure unit designed to house difficult detainees under restrictive conditions.

## II.     The Substitute Jail Order Process

52.     New York State law allows for the transfer of pretrial detainees between facilities in different counties through a procedure known as a "substitute jail order" ("SJO"). SJOs are issued by the New York State Commission of Correction ("SCOC"), a state body.[19]

53.     SCOC can only issue an SJO under certain specified conditions.  All involve imminent threats to safety and basic needs, like a natural disaster that makes a jail unfit to hold detainees, or an inability to provide "vital services" like food or medical care at a jail. Most relevant here, SCOC can issue an SJO "when the safety or security of a [detainee] or group of [detainees] is threatened by their confinement in a facility and the facility administrator reasonably believes that the public interest, as well as the safety of the [detainees], would be better served by their being housed in another . . . facility."[20]

54.     State regulations create a mandatory procedure to get an SJO.  The administrator of the original jail—which, for New York City jails, is Defendant Commissioner Brann—is responsible for finding another suitable jail to receive the detainee in question.  He or

---

[19]     *See generally* N.Y. Corr. Law § 504.
[20]     9 NYCRR § 7210.5.

she must first look for available options within his county.  If none exist, he or she may look to see whether a jail outside the county can accommodate the detainee.  The administrator must consider the proximity of the other jail, the inconvenience to the detainee's family and friends, the impact on his access to legal counsel, and the ability of the receiving jail to keep the detainee safe.[21]

55.    The administrator of the original facility is responsible for finding a receiving jail, providing the relevant information to SCOC, and getting the substitute jail order from SCOC.  The original facility must make the logistical arrangements for the transfer.[22]  The original jurisdiction pays the receiving jurisdiction's expenses of holding the detainees.

56.    The regulations also allow for an urgent transfer from jail to jail under "extraordinary circumstances" in which "the safety or security of a [detainee] cannot be maintained."  Under those circumstances, the administrator of the original facility may make a written request to the New York State Commissioner of Corrections (the "State Commissioner") to make another facility available to hold the detainee.  The State Commissioner must respond with a written determination that another facility is available to hold the detainee.[23]  The detainee is transferred not to the custody of the receiving facility, but to the custody of the State Commissioner, who must house the detainee in the "most proximate facility."

57.    Irrespective of the procedure by which a detainee is transferred, notice to the detainee is always required.  The administrator of the receiving jail "*shall* provide [the detainee] *immediately* with a written notification of the reasons for his transfer."[24]  The

---

[21]     *Id.* § 7210.6.
[22]     *Id.*
[23]     *Id.* § 7210.6(e).
[24]     *Id.* § 7210.8 (emphasis added).

transferred detainee "shall be entitled to all the rights and privileges available to other [detainees] of the receiving facility."[25]

58.     SJOs are a lucrative business for upstate county jails with excess capacity. In 2013, housing other counties' detainees on SJOs brought Albany County more than $3 million in revenue.  Sheriff Apple explained: "We have the space.  We're trying to run our jail as a business . . . ."[26]

### III.     New York City's Policy and Custom of Rendering Difficult Detainees Upstate to Punish Them By, Among Other Things, Putting Them in Solitary Confinement

59.     The City continues to fall chronically short in preventing DOC officers from using unnecessary force against detainees.  Earlier this year, the independent monitor evaluating the City's compliance with the *Nunez* consent judgment found: "[DOC] has not yet made significant progress toward the primary goal of reducing the use of unnecessary and excessive force.  The use of force has continued to increase rather than diminish, even as the inmate population has decreased."[27]

60.     Over the past few years, the City has dramatically increased its use of SJOs to send upstate young detainees whom it deems undesirable.  It has done so to circumvent its own ban on solitary confinement for detainees 21 and younger.  And it has done so even

---

[25]     *Id.* § 7210.9.  In 2017 a bill was introduced in the New York City Council to amend the New York City Administrative Code to provide City detainees with additional notice before they could be transferred out of the City by SJO.  The bill would require—except in emergency circumstances—that, before any transfer, the detainee and his criminal defense lawyer be given notice and the detainee be given a chance to make three personal phone calls at no cost.  *See* A Local Law to Amend the Administrative Code of the City of New York, in Relation to Requiring Notice and Review for Transferring Inmates to Facilities Outside New York City, Int. 1693-2017, *available at* https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3137808&GUID=ABF42E83-4564-42C8-9B40-A9196B7D2197.

[26]     Kenneth C. Crowe II, *County Jails Board Inmates to Cut Down on Expenses*, Albany Times-Union, Dec. 2, 2013, https://www.timesunion.com/local/article/County-jails-board-inmates-to-cut-down-on-expenses-5024752.php.

[27]     Steve J. Martin et al., Fifth Report of the *Nunez* Independent Monitor 4 (Apr. 18, 2018), *available at* https://www1.nyc.gov/assets/doc/downloads/pdf/Fifth_Monitor_Report.pdf.

though ESH and other facilities are available within New York City as secure units for detainees who require that level of segregation.

61.     A *New York Times* investigation published on July 22, 2018, found that "[t]ransfers of inmates 21 and younger increased sharply starting in 2015, the year the city adopted the solitary ban, and except for a drop in 2017, the number of such transfers has remained well above the levels seen before the ban."[28]

62.     On information and belief, the City has sent dozens of detainees 21 and younger to be held upstate since October 2015.  Between March 8, 2018 and August 15, 2018 alone, 21 SJOs were issued transferring detainees from the City to the Albany County Jail.

63.     It is official City policy that solitary confinement "represents a serious threat to the physical and psychological health of adolescents."[29]  And, because DOC has stopped requesting variances from the ban on solitary confinement for detainees aged 18-21, it has been established as a matter of City law that DOC has "sufficient resources" to implement "necessary alternative programming" to maintain order without using solitary.[30]

64.     Nonetheless, the City continues to send detainees under 22 upstate on SJOs, expecting—indeed, knowing—that they will be put in solitary confinement to punish them.

65.     In response to public scrutiny over the *New York Times* investigation, Mayor de Blasio endorsed and ratified the City's practice.  "Occasionally we have to remove a

---

[28]     Ashley Southall & Jan Ransom, *New York City's Young Inmates Are Held in Isolation Upstate, Despite Ban*. N.Y. Times, July 22, 2018, https://www.nytimes.com/2018/07/22/nyregion/inmate-solitary-young-nyc.html.
[29]     Rules of the City of New York tit. 40, § 1-17(a).
[30]     *Id.* § 1-17(b)(1)(ii).

prisoner from our correction system because there is an immediate threat to them and something that requires them being moved to another jurisdiction," the Mayor said on July 23, 2018.

66.     Many of the young detainees transferred from Rikers on SJOs ("Rikers detainees" or "New York City detainees") have been charged with assaulting correction officers on Rikers Island.  To the extent that these detainees face a "threat" at Rikers, to use the Mayor's words, that threat comes from retaliation by DOC staff—the very staff hired by the City to maintain order in its jails.  The City's admission that it cannot keep detainees safe from unlawful violence by its own officers is disturbing.

67.     Rikers detainees are generally not told in advance that they are being sent out of New York City on an SJO.  They are simply told one morning by DOC correction officers to gather their personal effects.  They are strip-searched and shackled and loaded into a van. Because this is the same thing that happens when a detainee is moved from jail to jail on Rikers Island, most assume that they are simply being transferred to another facility on Rikers. Sometimes DOC correction officers even tell the detainees they will be coming right back.  The detainees are not permitted to call anyone before they leave.

68.      Correction officers from DOC's Emergency Services Unit, or "ESU," are generally responsible for transferring detainees.  Once detainees are loaded into the van, the van keeps driving.  It has no windows, so detainees cannot see where they are going.  For many of the young detainees who are sent out of New York City on an SJO, the van finally stops in Albany County.

69.     The Albany County Jail is about a three-hour drive from New York City, 160 miles from Rikers Island.  Being held at the Albany County Jail makes it more difficult for detainees to communicate with their lawyers about their pending criminal cases.  It also cuts

detainees off from their friends and families, many of whom are indigent and do not have the money or time off work to take long trips to Albany to visit during narrow visiting hours that are frequently early in the morning.

70.     Albany County charges the City $175 a day for each City detainee it houses at the Albany County Jail.[31]

## IV.     Albany County's Policy and Custom of Torturing Rikers Detainees

71.     New York City detainees from Rikers Island brought to Albany on SJOs are generally subject to the same routine of torture on arrival, with some variations, after which they are almost uniformly put in solitary confinement.

72.     When the van doors open, a group of approximately ten Albany County correction officers are there waiting.  They are wearing green paramilitary uniforms with riot gear, helmets, and visors.  This group of officers is called the "Green Team."  Some of the Green Team members have the iconic skull logo of the Punisher—a comic-book antihero who exacts violent revenge on those who have wronged him—on the chest of their body armor.[32]

73.     The Green Team is usually under the command of Lieutenant Anthony Torrisi.

74.     Each New York City detainee is removed from the van one-by-one and escorted inside the jail by both the Albany County Jail Green Team officers and DOC ESU officers.  The continued involvement of ESU officers is necessary because the detainee is still wearing DOC restraints that need to be returned to Rikers, to which ESU has the keys.

---

[31]     Southall & Ransom, *supra* note 28.
[32]     Whichever officers suit up in green fatigues and riot gear on a given day comprise the "Green Team."  It is not a separate unit with a fixed membership.

75.     Each New York City detainee is escorted to the intake area inside the Albany County Jail.  The ESU officers unshackle him and literally hand him over to the Green Team, who then put him in Albany handcuffs.  The detainee is put in a booking cell with several Green Team officers, where Torrisi begins commanding a choreographed routine of torture.

76.     "This isn't Rikers," Torrisi routinely tells the detainee.  "We do what we want here."  The detainee is given a series of arbitrary and increasingly convoluted commands, in the nature of: "Face the wall with your right foot behind your left and your right hand higher than your left," or "Take off your jumper with your right hand and pass it back to us over your left shoulder."

77.     If the detainee gets confused, as he invariably will, he gets punched.

78.     Torrisi then tells the detainee, in sum and substance: "We're going to take these cuffs off you.  When the cuffs come off, you start swinging."  The detainee's cuffs are removed, and he is then tackled to the floor and beaten until Torrisi orders the Green Team to stop.

79.     The DOC ESU officers who brought the New York City detainees to Albany are, on information and belief, often present inside the intake area of the Albany County Jail when these things happen.  On information and belief, they can see and hear what is happening and are able to intervene to stop it if they so choose, but they choose not to.

80.     After intake, each Rikers detainee is taken to the "BOSS Chair," a body scanner designed to detect contraband stored in body cavities.  The detainee then goes through a metal detector and is brought to a medical x-ray room to be x-rayed for contraband.

81.     The Rikers detainee is then taken upstairs to the solitary confinement cell block known as "4 East" and put in a cell which, on information and belief, has already been assigned to them.

82.     At some point during this process—often after the x-ray, but sometimes during an initial strip search in the intake pen—Torrisi claims to have seen contraband, whether real or imagined, inside the Rikers detainee's rectum.

83.     Jails have legitimate security needs and must prevent detainees from bringing contraband or weapons inside.  If a search identifies contraband in a detainee's body, the appropriate responses may include placing the detainee in isolation and waiting until the detainee expels the contraband or seeking the assistance of a medical professional to remove the item with the detainee's consent.

84.     It is unreasonable, unsafe, and inconsistent with standard correctional practice for a guard who has no medical training to attempt to forcibly remove contraband from a detainee's rectum without his consent in a nonmedical environment.

85.     For example, DOCCS, which runs all New York State prisons, allows manual searches of body cavities other than the rectum to be conducted only by medical personnel with the approval of the Deputy Commissioner or Chief Medical Officer of DOCCS, in an examination room with appropriate medical equipment using appropriate medical techniques.[33]

86.     DOCCS guidelines provide that "rectal cavity searches will not be authorized" under any circumstances.[34]

_____

[33]     *See* N.Y. State Dep't of Corr. & Cmty. Supervision Directive No. 4910, § III.H, Nov. 7, 2017, *available at* http://www.doccs.ny.gov/Directives/4910.pdf.
[34]     *Id.* § III.H.3.

87.    DOC's own policies and procedures forbid *any* manual cavity searches by uniformed correctional staff.  DOC staff may not engage in "any probing or touching of the genital or anal cavities" when strip-searching detainees.  Rather, if DOC staff suspect the presence of contraband in a body cavity after visual inspection of the cavity, they must isolate the detainee until he or she removes or passes the suspected contraband.[35]

88.    But the Green Team is not even engaged in a legitimate effort to conduct manual body cavity searches at all.  Rather, it assaults and sexually assaults Rikers detainees under the pretext of attempting to forcibly remove real or imagined contraband from their rectums, but with the real purpose of terrifying and intimidating the Rikers detainees.

89.    Green Team officers sometimes use Tasers against cuffed Rikers detainees; insert their fingers into detainees' rectums; and even sodomize detainees with foreign objects.  These actions have no legitimate security purpose.  Rather, they are assaults designed to assert the dominance of correctional staff and humiliate, intimidate, and degrade detainees.

90.    After undergoing this violent ritual on arrival at the Albany County Jail, Rikers detainees often have visible injuries.  Invariably, Defendant Nurse Mylroie, widely known as "Missy," is the assigned medical provider.  She refuses to give the detainees medical care, unhelpfully telling them that they are fine as long as they can walk and talk, and instructs them to take Motrin.

91.    After being beaten, Rikers detainees are written up for "assaulting staff," among other infractions.  The written tickets generally say that the detainee "turned off the wall" or "turned around" to assault staff.

---

[35]    *See* N.Y.C. Dep't of Corr. Directive No. 4508R-E, § V.G.1 & app. B, May 15, 2009.

92.     That any of the Rikers detainees chose to spontaneously assault multiple officers wearing helmets and full riot gear while locked in a confined space is entirely unlikely. That *all* of them did so rises to the level of systematic fabrication.

93.     After they are assaulted upon arrival at the Albany County Jail, Rikers detainees are given a disciplinary hearing at which they are told it does not matter what they say because they will be found guilty regardless.

94.     No testimony is taken at the hearings, and the hearings are not recorded or transcribed in any way.  The detainees are found guilty of infractions at the hearing and sentenced to long periods of solitary confinement, often for well more than a year.

95.     Several Rikers detainees have observed a "wheel" with a spinning arrow on the table in the hearing room.  The wheel resembles the crude device that comes with board games like Twister.  The detainees do not know the wheel's purpose, but some have seen hearing officers spin the wheel during the hearing, and they suspect that the officers may be using the wheel to assign punishments arbitrarily.

## V.     Albany County's Policy and Custom of Putting All Rikers Detainees in Solitary Confinement

96.     The Rikers detainees spend their remaining time at the Albany County Jail in solitary confinement.  They are in their cells by themselves for a minimum of 23 hours a day, with no meaningful social interaction, environmental stimulation, or human contact.  They are offered one hour of "recreation" by themselves in an indoor cage and a 15-minute shower every other day.  Most decline the "recreation" time in the cage because the cage is functionally indistinguishable from their cells.

97.     The Albany County Jail's solitary confinement unit, known as "4 East," consists of approximately 20 cells arrayed on multiple tiers.  A typical cell is about 6 feet by 8 feet.

98.     Sheriff Apple told the *New York Times* that it was the Albany County Jail's policy to put any detainee who has ever assaulted correctional staff, regardless of where or when, in solitary confinement.[36]

99.     On information and belief, every single New York City detainee who has been brought to the Albany County Jail on an SJO in the past two years has been beaten and put in solitary confinement.  Plaintiffs are unaware of any New York City detainee who was integrated into the general population at the Albany County Jail.

100.    On information and belief, the vast majority of the detainees housed in 4 East at the Albany County Jail over the past two years have been from New York City.

101.    In response to a grievance about conditions on 4 East submitted by Plaintiff Doe in June 2018, Major Brian Mooney, the Albany County Jail's chief administrative officer for grievances, wrote: "Due to the violent and assaultive behavior displayed by the inmates housed from Rikers Island, the facility has adopted new protocols to ensure the safety of all staff that come into contact with them."

## VI.     New York City Has Received Repeated Notice of Albany's Torture and Abuse of DOC Inmates, and Continues to Transfer Detainees There to Be Tortured

102.    The City and its policymakers are aware of the increased rate of transfers of Rikers detainees to the Albany County Jail after the City banned solitary confinement for detainees 21 and younger.

---

[36]     Southall & Ransom, *supra* note 28.

23

103.    The City and its policymakers are aware that detainees routinely fail to receive notice or an opportunity to be heard before being transferred outside the City on an SJO. And they are aware that Rikers detainees have repeatedly alleged that guards at the Albany County Jail have beaten them.

104.    The City has failed to investigate or remediate these conditions and has continued sending detainees, including many aged 21 and younger, to the Albany County Jail without notice, to be beaten and put in solitary confinement.

105.    In August 2017, four New York City Council Members introduced a bill to amend City law to require that Rikers detainees be provided with notice before being transferred outside the City on an SJO. That bill is being considered by the relevant Council committee.[37]

106.    On February 16, 2018, criminal defense counsel for a Rikers detainee who had been transferred to Albany with Mr. Espinal wrote to DOC's general counsel to inform DOC that his client had been subjected to "multiple beatings" and "mistreatment" at the Albany County Jail. The letter expressed concern for the detainee's safety and requested his transfer out of Albany to a "safer environment."

107.    On March 3, 2018, Plaintiff Espinal filed a notice of claim with the Comptroller of the City of New York. In that notice, Plaintiff Espinal explained that, upon his arrival in the Albany County Jail, he had been brutally assaulted, tased, and held in a restraint chair for an extended period of time.

---

[37]    A Local Law to Amend the Administrative Code of the City of New York, in Relation to Requiring Notice and Review for Transferring Inmates to Facilities Outside New York City, *supra* note 25.

108.     On April 12, 2018, a Rikers detainee named Julian Cepeda filed an Article 78 petition against DOC and Commissioner Brann, among others, challenging his transfer to the Albany County Jail as a matter of state law.  In his petition, Mr. Cepeda alleged, among other things, that on the day of his arrival at the Albany County Jail, he was "brutally beaten and sexually assaulted, where an officer put on a latex glove and stuck his finger in Petitioner['s] buttocks."  Mr. Cepeda further alleged that he "made [a] medical complaint about rectal bleeding and visible swollen area to medical staff" but was denied medical attention.

109.     On July 10, 2018, Plaintiff Espinal's criminal defense counsel, Ruben Fernandez of The Bronx Defenders, notified DOC Commissioner Brann and numerous other officials in writing about the abuses and conditions that Mr. Espinal had been subjected to at Albany County Jail.  The DOC general counsel's office responded by denying responsibility for Mr. Espinal's treatment while he is held at the Albany County Jail.

110.     On July 22, 2018, the *New York Times* published its lengthy story on the treatment of Rikers detainees at the Albany County Jail.  The *Times* explained that detainees were transferred out of New York City without notice and put in solitary confinement at the Albany County Jail.  The *Times* reported on several detainees' allegations that they had been beaten on arrival at the Albany County Jail.[38]  In response, Mayor de Blasio defended the City's practice of sending young detainees to Albany to be put in solitary confinement.

111.     On October 31, 2018, Mr. Cepeda, represented by attorney Robert Quackenbush of the Legal Aid Society Prisoners' Rights Project, filed an amended Article 78 petition again alleging that he had been assaulted without provocation during the admission

---

[38]     Southall & Ransom, *supra* note 28.

process at the Albany County Jail.  Mr. Cepeda further alleged that he was 20 years old and would be held in solitary confinement in Albany until May 11, 2019.

112.    On November 19, 2018, the City opposed Mr. Cepeda's petition and filed an affidavit sworn to by Defendant Williams.  In his affidavit, Defendant Williams explained that Albany County has shown a unique willingness to accept City inmates with "violent infraction histories."  Defendant Williams testified that "only" the Albany County Jail, and "no other" facility closer to New York City, would agree to house Mr. Cepeda or was "equipped" to house Mr. Cepeda.

113.    On December 3, 2018, Plaintiff Tillery, represented by attorney Quackenbush, filed a similar Article 78 petition against DOC and Commissioner Brann challenging his transfer to the Albany County Jail as a matter of state law.  He alleged, among other things, that he had been subject to excessive and unlawful force during the intake process at the Albany County Jail.

## VII.    Albany County's Systemic Interference with Communications with Counsel

114.    Because the Albany County Jail is 160 miles from New York City, it is not feasible for Rikers detainees' criminal defense lawyers to pay regular visits to discuss the detainees' pending criminal cases in New York City courts.

115.    Plaintiffs hereby incorporate by reference the Declaration of Ruben Fernandez, to be filed with the Court on the date of this Amended Complaint, which explains why it is effectively impossible for appointed criminal defense attorneys in New York City to effectively counsel their clients in Albany about serious pending charges.

116.    At a bare minimum, it is critical that Rikers detainees and their criminal defense attorneys be permitted to hold confidential telephone calls.  Such consultation is

necessary for the Rikers detainees to participate in and direct their defense of the criminal charges against them.

117.    State law governing county jails requires that "all prisoners shall have access to legal counsel," including "telephone communications."  It further provides that "telephone communications between prisoners and their legal counsel shall not be monitored except visually."[39]

118.    However, there is no such thing as a confidential, unrecorded legal telephone call to or from the Albany County Jail.

119.    Detainees in solitary confinement at the Albany County Jail are generally not permitted to use the telephone at all.

120.    The Albany County Jail will arrange for detainees in solitary confinement to speak with their attorneys under exigent circumstances.  But those calls are monitored by jail staff.

121.    Albany County Jail officials have repeatedly represented, including to the Legal Aid Society Prisoners' Rights Project, that all detainee calls to or from the Albany County Jail—even with counsel—are monitored.

122.    In a letter dated August 6, 2018, Chief Deputy Sheriff William Rice stated that Albany County has "no policies or directive[s] addressing confidential telephone communications between incarcerated persons [and] counsel."

123.    Albany County Jail correction officers have made comments to Plaintiffs Espinal and Tillery about the details of Espinal and Tillery's private conversations with their attorneys.  Plaintiffs Espinal and Tillery did not voluntarily disclose those details to their jailors.

---

[39]    9 NYCRR §§ 7031.2(a), (b).

The only way the correction officers could have learned those details was by listening to the conversations without Plaintiffs Espinal and Tillery's consent.

## VIII.   The Experiences of the Named Plaintiffs

124.    Plaintiffs' experiences are emblematic of the punitive and arbitrary nature of SJO transfers off Rikers Island and the routinized torture, sexual assault, deliberate indifference to serious medical needs, and unlawful solitary confinement that New York City detainees experience in Albany County.

### *Davon Washington*

**A.    Davon Washington is Detained at Rikers Island Starting in March 2016**

125.    Davon Washington is a 22-year-old African American young man.

126.    Davon was diagnosed as a child with depression.  He spent time in his childhood in a group home and in foster care.

127.    At the age of 19, Davon was arrested and taken into custody by the New York City DOC.

128.    Davon arrived at Rikers Island on or around March 24, 2016.

129.    While at Rikers Island, Davon received mental health services, including counseling and medication for attention deficit disorder.  He also received educational services in support of his efforts to obtain a GED, and he attended high school at the Island Academy.

**B.    The March 28, 2018 Transfer of Davon Washington from Rikers to the Albany County Jail**

130.    While at Rikers Island, in or about March 2018, Davon lodged complaints with the Legal Aid Society Prisoners' Rights Project, alleging, among other things, that he was groped by a DOC staff member and denied adequate mental health and medical care.

28

131.    On information and belief, Legal Aid representatives contacted DOC about Davon's complaints on or about March 16, 2018 and March 26, 2018.

132.    On or about March 22, 2018, DOC ESU officers woke Davon up in the early morning and ordered him to "pack up."  Davon complied, and he was removed from his cell for the day.  However, he was returned the same cell at the end of the day.

133.    On March 28, 2018, ESU officers woke Davon up in the early morning and again ordered him to pack up.

134.    The ESU officers told Davon, in apparent reference to a deputy warden at the jail where Davon was housed, that Deputy Walker "can't be around you."

135.    The ESU officers strip-searched Devon, placed him in the BOSS Chair, and put him through a metal detector.

136.    When Davon asked where he was going, ESU responded, "Off Rikers." ESU told him, in an apparent reference to Defendant Walker: "You're going to Albany because Deputy Walker don't want you."

137.    ESU placed Davon in a transport van with one other detainee.

138.    Prior to being removed from Rikers, Davon was given no written notification for the basis of the transfer, received no hearing, and was not permitted to call his family or lawyers to inform anyone of his whereabouts.  He was not even told he *was* going to be transferred.

139.    Defendant Williams obtained the SJO transferring Davon to Albany County.

140. The Substitute Jail Order issued by the SCOC is dated March 22, 2018. It states that DOC, "as a result of safety considerations," is "unfit for the confinement of Devon [*sic*] Washington."

141. ESU officers drove Davon and the other detainee in the van for several hours.

142. When Davon exited the van, he saw a squad of approximately 12 law enforcement officers standing in front of him, wearing green fatigues and riot gear, including helmets and body armor. Davon would later learn that these were correction officers from the Albany County Jail.

143. Several green-suited officers grabbed Davon and took him to the Intake area of the Albany County Jail. Approximately two to three ESU officers also entered the Albany County Jail escorting Davon.

144. The ESU officers removed Davon's Rikers cuffs and restraints, and he was placed in Albany County Jail cuffs and shackles.

145. Davon followed all orders given to him and was cooperative during this procedure.

C.   **Defendants Physically and Sexually Assault Davon Washington at the Albany County Jail**

146. Several Albany County Jail correction officers then moved Davon into a small room, Booking Cell #2.

147. Approximately eight to ten Albany County Jail correction officers and supervisors, including Defendants Torrisi, Valvo, "Superman," Lawson, Haley, LaBombard, Anzalone, and Shield #323, were waiting for him in the room.

148.   Defendant Torrisi told Davon to put his head on the wall.  Davon complied.

149.   Defendant Torrisi asked Davon, in sum and substance: "What are you doing here?"  When Davon stated "I don't know," Defendant Torrisi smacked Davon in the face with his open hand.

150.   Defendant Torrisi then stated, "Who's the biggest gang?", in an apparent reference to alleged gang affiliation, and again smacked Davon in the face several times with an open hand.

151.   Defendant Torrisi stated to Davon, in sum and substance: "We're going to give you instructions, follow them correctly.  Once we take these cuffs off, you better start swinging."

152.   Defendants then removed Davon's handcuffs and began to punch Davon all over his body.

153.   On information and belief, the ESU officers were still in the intake area of the Albany County Jail and were aware of what was happening.

154.   Davon fell to the ground and curled up in the fetal position.

155.   Defendants either kicked and stomped on Davon or simply stood by and did nothing to intervene while Davon lay on the ground and was beaten.

156.   Defendant Torrisi stated: "Wake him up.  I want him to feel everything. He likes to assault officers."

157.   Four defendants then lifted Davon up and placed him face-first against the wall.  They then instructed Davon to take his left shoe off with his right hand and pass it over his right shoulder.  They then continued to give him other instructions to undress in a specific way.

31

158.    Davon was nervous and found it hard to comply with the instructions regarding his right and left hands.  Every time he made a mistake, such as by using his left hand instead of his right hand, one of the Defendants would punch him.

159.    When Davon was naked, Defendants asked: "We're gonna ask you once: do you have anything you are not supposed to have?"

160.    Anticipating that he might go through a metal detector, Davon told Defendants that he had a bullet fragment in his foot.  In response, Defendants stomped directly on Davon's foot, causing him extreme pain.

161.    Defendants then instructed Davon to spread his buttocks and cough. Davon complied.

162.    Defendants stated, "I see plastic," referring to an alleged item of contraband in Davon's rectum, and continued to beat Davon while he was naked.

163.    Defendants then pushed Davon to the floor.  One of the Defendants forcefully inserted two fingers into Davon's rectum.  Defendants then stated, in reference to the supposed contraband: "He pushed it back up."

164.    Defendants removed Davon from the cell, placed him in the BOSS chair, and put him through the metal detector to search for contraband.  Davon complied with all instructions.  There was no indication that he was in possession of any contraband.

165.    Davon was bleeding from his nose and mouth.  Defendants shouted at him to stop bleeding onto the BOSS chair.

166.    Defendants ordered Davon to submit to a medical x-ray to search for contraband.  Davon complied.

167.    Defendant Mylroie asked Davon if he had any injuries and he responded that he did.  Defendants Lawson and "Superman," who were standing nearby, then punched Davon in the face, stating "Ask him again, any injuries?"  Davon then stated "No."

168.    Defendants escorted Davon to Cell #19 in the SHU located in 4 East Housing Unit.

169.    Defendants ordered Davon to undress until he was naked.  Davon complied.

170.    Defendants Torrisi, Lawson, and a correction officer with spiky hair punched and kicked Davon multiple times while he was handcuffed and shackled in Cell #19.

171.    Defendant Mylroie came to his cell at one point and asked if he wanted medical attention.  Davon had blood all over his face and was visibly injured.  Davon was scared and told her that he didn't need medical attention.

172.    Later in the day, Major Brian Mooney came to Davon's cell and stated to him, in sum and substance: "Don't mess around.  This is not Rikers."

173.    As a result of the beating, Davon was bleeding, his face was swollen, his tooth was chipped, his lip was split, his foot was hurting, and he was bruised all over his back and body.  He was in pain for many days after the assault.

174.    The Albany County Jail reports concerning the assault against Davon falsely claim that he turned around and attacked staff members inside the booking cell:

> At 1:17 p.m. Team 1 removed Inmate Washington from the Rikers transport.  Inmate was brought into booking for processing.  Inmate was escorted to Booking 2 Cell and read into SHU.  When officer removed the handcuffs from inmate, inmate turned around and started punching at officers.  Inmate was brought to the floor and restrained with body holds.  Inmate was placed back on the wall and the strip search was completed.

33

175.    Davon received an infraction ticket for the incident on or about March 28, 2018, which falsely accused him of "lunging" at staff and attempting to punch them when his handcuffs were removed.

176.    Davon appeared at the disciplinary hearing on April 8, 2018.

177.    Davon did not testify at the hearing because he feared further retaliation and violence.  According to the facility Inmate Disciplinary Report, his only statement at the hearing was that he had nothing to say about the incident.

178.    At the end of a hearing, Davon was sentenced to 360 days of punitive segregation—an extraordinarily long period— by the hearing officer, Defendant Grimes.

179.    Since the assault, Davon has continued to experience pain, emotional distress, and traumatic thoughts.

**D.    Davon Washington Is Held in Solitary Confinement at the Albany County Jail For Nine Months**

180.    From his arrival at the Albany County Jail on March 28, 2018 until his departure in or around December 2018, with the exception of court visits, Davon was kept in a small solitary cell for at least 23 hours a day.

181.    Davon had nothing to do in his cell: no meaningful human interaction, no education or programming, no music or television, and limited reading materials. He had limited access to phone calls, was not permitted to talk to other detainees, and did not leave his cell except to shower three times a week.

182.    Davon was permitted to spend one hour a day out of his cell in a metal cage placed in the hallway outside his cell.  The metal cage is placed next to a window.  It is an empty, chain-link cage with nothing in it.

34

183.    Davon was issued a number of disciplinary infractions for talking and "yelling," when he attempted to speak with the other detainees housed in the SHU.  One of these tickets resulted in him losing his commissary and phone privileges for 60 days.

184.    If the young detainees in 4 East try to speak with each other, the SHU officers turn on two large fans that make it both loud and extremely cold in the unit.

185.    Defendants denied Davon access to educational programming and materials.  Davon filed grievances about this educational denial.

186.    Davon was placed on psychiatric medication at Albany, including a medicine he had not previously required.

187.    Davon also lost a substantial amount of weight—approximately 18 pounds—while at the Albany County Jail.  When he arrived, he weighed 155 pounds, and as of October 5, 2018, he was down to 137 pounds.  The food portions were small and Davon was constantly hungry, particularly at night.  He was placed on Ensure and vitamins in an attempt to counteract the weight loss from inadequate nutrition.

188.    While at the Albany County Jail, Davon had no visits from his family because it was too far for them to travel.  However, at Rikers, his mother, sisters, brother, and other family members were able to visit him.

**E.    Albany County Jail Guards Beat Davon Washington in Retaliation for a Legal Visit on October 5, 2018**

189.    On October 5, 2018, Davon had a legal visit in the Albany County Jail with his counsel in this action.

190.    When the legal visit ended, multiple correction officers escorted Davon out of the visiting area.

191.    One of them was an individual who was also involved in the initial March 28, 2018 assault on Davon.

192.    After the visit, the officers did not take Davon to the search area, as is standard protocol.

193.    Instead, three officers took Davon directly back to his cell and pushed him into the back corner of the cell.  There are no cameras inside the cell.

194.    One of the officers then struck Davon in the face repeatedly on his face with an open hand, switching between striking the left and right sides of his face.

195.    He then stated, in sum and substance, referring to Davon's legal visit: "What did you think, that was going to stop us?" and "What you're doing is not going to work."

196.    The officers took Davon's legal paperwork from him.

### *Steven Espinal*

**A.      Steven Espinal Is Detained at Rikers Island Starting on November 18, 2017**

197.    Steven Espinal is a 19-year-old Latino teenager detained at the Albany County Jail, where he is currently in solitary confinement.

198.    Although he has criminal matters pending in the Bronx County Supreme Court, Steven has no adult criminal convictions.

199.    Steven was diagnosed as a teenager with bipolar disorder and attention-deficit/hyperactivity disorder.

200.    At the age of 18, Steven was arrested and put in the custody of the New York City DOC.

201.    He arrived at Rikers Island on November 18, 2017.

202.    While at Rikers, Steven worked and received mental health services, including counseling, and educational services in support of his efforts to obtain a GED.

203.    On February 10, 2018, Steven was detained at the George Motchan Detention Center ("GMDC").

204.    On this date, he and other detainees, all of whom were under 21 at the time, were allegedly involved in an altercation with a correction officer.

205.    The correction officer was reported to have suffered a fracture to his spine.

206.    The February 10, 2018 incident received widespread media coverage. Representatives of the Correction Officers Benevolent Association ("COBA") made public statement blaming the incident on Mayor de Blasio's policy of shielding detainees under 21 from solitary confinement.  COBA blamed the inability to isolate detainees under 21 for an increase in attacks on correction officers.

207.    On February 10, 2018, DOC ESU officers brought Steven in a van from GMDC to a different building on Rikers Island to be fingerprinted and rearrested.  There, the ESU officers hit Steven's head on a wall and smacked him in the face.

208.    On February 11, 2018, Steven was transferred from GMDC to the Otis Bantum Correctional Center ("OBCC"), a different facility on Rikers.

209.    On February 12, 2018, Steven was arraigned in Bronx Criminal Court and charged with first-degree assault and other related counts stemming from the alleged February 10 incident.

**B.    The February 13, 2018 Transfer of Steven Espinal from Rikers to the Albany County Jail**

210.    On February 13, 2018, a captain woke Steven up in the early morning and told him to get dressed because ESU was coming for him.  Steven asked where he was going. The captain said he would be coming right back.

211.    ESU officers came for Steven and another young man who was allegedly involved in the February 10 incident and put them in a transport van.

212.    After Steven was secured in the van, ESU officers drove to another location to pick up two more Rikers detainees who were also allegedly involved in the February 10 incident.

213.    Before being removed from Rikers, Steven was given no written notification of the basis of his transfer, received no hearing, and was not permitted to call his family or lawyers to inform anyone of his whereabouts.  He was not even told that he was going to be transferred.

214.    ESU officers drove Steven and the other three detainees in the van for several hours.  Steven did not know where he was being taken.

215.    At approximately 11:00am, the van door was opened.

216.    Steven saw a squad of approximately 12 law enforcement officers standing in front of him, wearing green fatigues and riot gear, including helmets and body armor. Steven would later learn that these were correction officers from the Albany County Jail.

217.    One of the green-suited officers said, "We want Espinal first."

218.    Several green-suited officers grabbed Steven and took him to the intake area of the Albany County Jail.  About two to three Rikers ESU officers also entered the Jail escorting Steven.

219.    The Rikers ESU team removed Steven's DOC handcuffs.

220.    One of the Albany County Jail officers took his photograph.

221.    Several Albany County Jail officers them re-handcuffed Steven in Albany County Jail cuffs and shackled him.

222.    Steven followed all orders given to him and was cooperative throughout this process.

223.    That same day, Steven's criminal defense attorney, Ruben Fernandez, attempted to contact Steven at Rikers by videoconference but was told by DOC staff that Steven had been transferred from one Rikers Island facility to another.  Steven's attorney was unable to contact Steven and did not know his location.

224.    DOC has represented in an August 15, 2018 letter to Steven's criminal defense counsel that it transferred Steven to the Albany County Jail on an emergency basis due to "extraordinary circumstances" under 9 NYCRR § 7210.6(e).

225.    However, on information and belief, no written correspondence between the City and the State Commissioner exists, as required by law to authorize such a transfer.[40]

226.    On March 28, 2018—a month and a half after Steven arrived in the Albany County Jail—SCOC issued an SJO on the basis that "the NYC Department of Correction is, as a result of safety considerations, unfit for the confinement of STEVEN ESPINA [*sic*]."

227.    Defendant Williams obtained the SJO transferring Steven to Albany County.

---

[40]    *See supra* ¶ 56.

C.     **Defendants Physically and Sexually Assault Steven Espinal at the Albany County Jail**

228.    After Steven was cuffed and shackled, several Albany County Jail correction officers moved him into Booking Cell #2.

229.    About eight to ten Albany County Jail correction officers and supervisors were waiting for him there.  Defendants Torrisi, Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton were present.

230.    Defendant Torrisi stated to Steven, in sum and substance: "This isn't Rikers.  This is Albany County.  We do what we want."

231.    Defendant Torrisi then punched Steven in the face two times.

232.    Defendant Torrisi then said to Steven, in sum and substance, "Once we take these cuffs off, you better start swinging."

233.    Defendants began the process of removing Steven's handcuffs but did not actually remove them.  They began punching Steven all over his body.

234.    Steven fell to the ground and curled up in the fetal position.

235.    Defendants kicked and stomped on Steven while he lay on the ground and/or stood by and did nothing to intervene.

236.    Defendant Torrisi then stated to the other officers, "That's enough.  Let's get him up, boys."

237.    The officers picked Steven up.  Defendant Torrisi told Steven to face the wall and said, in sum and substance, "As soon as I take the cuffs off, put your hands high up on the wall."  Steven complied.

238.     Defendants gave Steven a series of confusing instructions about how to remove his clothing.  Steven did his best to comply.  When he was unable to do so, Defendants punched him in the ribs.

239.     Once his clothing was removed, Defendants provided Steven with an Albany County Jail jumpsuit, which he put on.

240.     In total, the assault on Steven in the intake area lasted for several minutes.

241.     Defendants then brought Steven to the BOSS chair and instructed him to pass through a metal detector to search for contraband.

242.     Defendants then brought Steven to an x-ray room and ordered him to submit to a medical x-ray to search for contraband.

243.     Defendants said that the x-ray had detected that Steven had a weapon in his body.

244.     Defendants then brought Steven to the 4 East housing unit.

245.     He was taken to a nurse at the back of the housing unit, who said that he was fine.

246.     Defendants then escorted Steven to Cell #3 in 4 East.

247.     Defendants ordered Steven to remove his jumper in the cell and pass it back to them.  Steven complied.

248.     Defendants then punched and kicked Steven multiple times.  An officer said, in sum and substance, "We're going to get that out of you," referring to the alleged contraband.

249.    When Steven was on the floor, an officer put on gloves.  Defendant Lawson held Steven's arms down.  The gloved officer forcefully inserted his fingers into Steven's rectum.

250.    The officer who had inserted his fingers into Steven's rectum said he could not feel anything.  Other officers said, in sum and substance, "He knows what he's doing. He's moving it up."

251.    Steven was bleeding from his rectum and in great pain.

252.    Defendants then told Steven to defecate on the floor and threatened to beat the alleged contraband out of his body if he failed to do so.  Defendants continued to assault Steven while he was lying naked on the floor.

253.    The officers then ordered Steven to stand up.

254.    One of the officers said, in sum and substance, "We're going to make you sh*t it out."

255.    While Steven was standing against the wall, Defendant Beliveau used a taser against him.

256.    Steven was standing with his back to the officers when he was tased from a few feet away.  He did not know what was happening.  He felt extreme pain and felt unable to move.  He fell to the ground.

257.    The assault on Steven in Cell #3 lasted for several minutes in total.

258.    After the assault, Steven was taken to the shower.  He was then brought to the restraint chair.

259.    The restraint chair is a physical restraint device that allows correction officers to fasten a detainee to a chair at the wrists, ankles, thighs, arms, and head.

260.    While Steven was in the restraint chair, officers slapped and smacked him the face.  They asked him, in sum and substance, "How does it feel not to be able to defend yourself?"

261.    Steven was held in the restraint chair overnight.  While in the chair, he passed out from pain and fatigue.

262.    On the morning of February 14, 2018, Steven woke up in the restraint chair.  Officers then brought him to the medical area.

263.    As a result of the beating, Steven was bleeding, was bruised all over his body, and was dizzy and dazed.  He was unable to urinate normally and saw blood in his urine. He could not hear out of one of his ears.

264.    On February 14, 2018, Steven was taken to Albany Medical Center, where he was catheterized because he was unable to urinate normally.

265.    In the intake area on the way to or from the hospital, Steven encountered Defendant Superintendent Lyons, who observed Steven's physical condition.

266.    Steven feared retaliation from Defendants if he reported that that Albany County Jail guards had assaulted him while these guards listened to his report. He told medical staff that he had lost consciousness the day before in a "fight."

267.    Albany Medical Center staff documented scratches to his face, tenderness to his neck, subrapubic tenderness, "multiple bruises and abrasions on the bilateral upper extremities," and "midline C spine tenderness" requiring a collar and CT scan of the head and neck.

268.    After his return from Albany Medical Center, Steven was sent back to solitary confinement in Cell #3 on 4 East.

269.    On February 16, 2018, Steven was transported to the Bronx for another in-person court appearance in the Bronx.  The judge ordered that Steven be given immediate medical attention.

270.    The Albany County Jail reports about the assault against Steven claim that he repeatedly "turned off the wall" to assault multiple staff members in riot gear while locked in a confined space:

> [W]hile conducting a CERT operation in Booking processing new Riker's [*sic*] Island Inmate Boarders, Inmate Espinal did not comply with staff orders during a strip search by turning off the wall towards staff & threatened to cut them.  He was taken to the floor & restrained by staff until he was brought under control.  After we completed the Booking process, he was taken to the X-ray room, where an X-ray was taken & showed positive for two objects in his rectum.  He was then taken to SHU . . . .   During his apparent attempt to remove the items, while covered in his own feces, after being given several direct orders to remain facing the wall, inmate turned from the wall & lunged at staff.

### D.    Steven Espinal Remains in Solitary Confinement at the Albany County Jail, After Nearly a Year There

271.    For two weeks, Defendants provided Steven with no notice of the basis for his punitive detention in solitary confinement.

272.    An infraction ticket dated February 13, 2018 that falsely accused Steven of assaulting staff was generated, but not served on Steven.

273.    A disciplinary hearing was held on February 26, 2018, at which Steven appeared.

274.    Prior to the hearing, a sergeant told Steven that "no matter what happened," he would remain in punitive segregation for however long he was at the Albany County Jail, so he should just "admit to everything" so that it can "go easy."

275.    Steven had no opportunity to prepare for the hearing and was not given an opportunity to identify or call witnesses.

276.    The hearing officer, Defendant Sergeant Foe #17, sentenced Steven to an extraordinary 600 days in solitary confinement.

277.    On April 10, 2018, Steven appeared on his Bronx criminal matter before Justice Armando Montano.  At that time, Justice Montano directed Steven's release from punitive segregation.

278.    Steven remains in solitary confinement, where he has been continuously since February 13, 2018, in violation of a court order.

279.    Steven has been kept in a small solitary cell for at least 23 hours a day. Steven has nothing to do in his cell: no meaningful human interaction, no education or programming, no music or television, and limited reading materials.

280.    He has limited access to phone calls, is not permitted to talk to other detainees, and other than access to showers three times a week, he is not permitted to leave his cell.

281.    Steven usually declines to spend his one hour a day of "recreation" in the cage outside his cell because it is not materially different from staying in his cell.

282.    Steven does not have a high school diploma and has been denied access to educational services since February 12, 2018.  He has informed DOC and its Institutional Service Unit both verbally and in writing that he wishes to participate in educational services.  He received on educational packet in September 2018 but no other materials.  Steven was told by corrections officers that he would receive no schooling while in the Albany County Jail.

283.     Steven is permitted visitors one hour a week on Tuesdays from 3:30-4:30. Because the Albany County Jail is such long a distance from his mother's house in Pennsylvania, she is unable to visit.

284.     Steven is only permitted to access mental health services in his cell, when a counselor will come to his cell and speak with him in the presence of a correction officer without privacy or confidentiality.

285.     Steven has not received sufficient access to his criminal defense counsel since February 13, 2018.  Orders to have Steven produced in court for attorney visits have gone unheeded.  On March 26, 2018, Justice Margaret Clancy signed an order to have Steven produced to speak to his attorneys on April 4, 2018.  On April 27, 2018, Justice Shari Michels signed an order to have Steven produced on May 1, 2018—a date on which other Rikers detainees housed at the Albany County Jail were to be brought to court.  Both orders were transmitted to the New York City DOC—and both orders went ignored.

286.     On March 2, 2018, and March 13, 2018, Steven was scheduled to appear in Bronx Supreme Court Criminal Term.  Courts in New York City were open, and detainees housed in detention centers closer to the Bronx courthouses were produced for their appearances. But Steven was not produced for his scheduled court appearances because of inclement weather.

287.     Since the assault, Steven has continued to experience pain, emotional distress, and traumatic thoughts.  He still has difficulty urinating normally and sometimes needs to be catheterized to have urine removed from his bladder.

288.     As recently as January 19, 2019, Steven was required to use a catheter and carry a drainage bag at all times at the direction of an outside urologist, as he is still experiencing difficulty urinating.

### E.        Defendants Brutally Assault Steven Espinal Again on July 4, 2018

289.    On the morning of July 4, 2018, a nurse was making medical rounds in 4 East at the Albany County Jail.

290.    Steven was in Cell #11.  He was sleeping and did not hear the nurse's questions.  As a result, he did not respond.

291.    Steven sometimes has difficulty waking up because he takes psychiatric medication that makes him tired.

292.    When Steven did not respond to the nurse's questions, several correction officers entered his cell.

293.    They pinned him to the bed, handcuffed him, and shackled him.

294.    The officers then beat Steven for failing to respond to the nurse.

295.    The officers grabbed Steven's hair and sprayed him in the face with pepper spray at close range.

296.    The officers kicked, punched, and elbowed Steven while he was handcuffed and shackled.

297.    After the assault, Steven had difficult opening his jaw, which was swollen and very painful.

298.    Steven also had a deep cut over his left temple.

299.    He had pain in his chest, neck, and back.

300.    Steven was taken to Albany Medical Center.  Upon arrival at the hospital, Steven was unable to open his jaw.

301.    Doctors noted an abrasion to the top of Steven's left shoulder, as well as "[h]ead trauma" and "[l]eft jaw pain and swelling post assault."

302.     Steven was given a CT scan of the head, neck, and cervical spine, which revealed no fractures.  The doctor found "asymmetrical soft tissue edema and contusion along the lateral aspect of the left mandible."

303.     A doctor also observed a laceration on the left side of Steven's face.

304.     The medical diagnosis given to Steven by Albany Medical Center was "assault."

**F.     Notices of Claim**

305.     Within ninety days after the February 13, 2018, assault upon Steven, written Notices of Claim, sworn by Steven, were served upon the City of New York at the Comptroller's Office at 1 Centre Street, New York, New York and upon the County of Albany at 112 State Street, Albany, New York.

306.     On October 5, 2018, a written notice of claim pertaining to the July 4, 2018 assault, sworn by Plaintiff, was served upon the County of Albany at 112 State Street, Albany, New York.

307.     An examination pursuant to General Municipal Law § 50-h was conducted by the County of Albany on November 21, 2018, at which counsel for the County inquired of Steven as to both the February 13 and the July 4 assaults.

308.     By written agreement, the County has stipulated to the timeliness of the October 5 notice of claim and has waived and forfeited any defense concerning its timeliness.

309.     Counsel for the City of New York was invited to participate in the 50-h hearing on November 21 but declined.

310.     At least thirty days have elapsed since the service of the Notices of Claim, and adjustment or payment of the claim has been neglected or refused.

311.   This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

***John Doe***

**A.   John Doe Was Detained at Rikers Island on December 18, 2015**

312.   John Doe is a 25-year-old Latino man from the Bronx.

313.   Doe was arrested on December 17, 2015, and was incarcerated in the custody of DOC, mainly on Rikers Island, beginning on that date.

**B.   After a Visit from a High-Ranking DOC Security Official, John Doe Is Transferred to the Ulster County Correctional Facility on an SJO**

314.   On or about January 16, 2018, Doe was housed in unit 9 South at the Manhattan Detention Complex ("MDC"), in Lower Manhattan.

315.   Defendant Sullivan came to see Doe in 9 South on or about January 16, 2018.

316.   Doe was in the cage outside his cell when Defendant Sullivan came.

317.   Defendant Sullivan asked Doe, in sum and substance, "Why are you not locked in?  Typical."

318.   Doe responded that he did not know he was supposed to lock into his cell.

319.   Defendant Sullivan said, in sum and substance, "That's OK.  Soon enough we won't have to deal with your bullshit anymore.  You're going somewhere good, somewhere that you'll like."

320.   Doe did not know what Defendant Sullivan was talking about.

321.   On January 17, 2018, Doe was transferred, along with other detainees, to the Ulster County Jail on a substitute jail order.

322.    Doe did not receive notice that he was going to be transferred out of New York City in advance.

323.    Doe did not know he was going to Ulster County until he got there.

**C.    John Doe Is Transferred from Ulster County to the Albany County Jail**

324.    Doe and the other Rikers detainees spent only about a week at the Ulster County Correctional Facility.

325.    Defendant Williams has acknowledged in an affidavit submitted in another proceeding that he knew Doe would only stay in Ulster County very briefly on his way to Albany.  Albany County indicated that it would not be able to receive the Rikers detainees until January 23, so Defendant Williams asked Ulster County whether it could briefly house them until Albany was ready for them.

326.    On or about January 24, 2018, Doe was transferred to the Albany County Jail.

327.    Doe arrived at the Albany County Jail at around 10:00 or 11:00 am on the date of his transfer.

328.    Doe was transported from Ulster to the Albany County Jail by New York City DOC ESU officers.

329.    When the door opened, Doe was met by the Green Team, dressed in riot gear and green vests.

330.    Defendant Torrisi was in command of the Green Team.

**D.    Defendants Brutalize and Sexually Assault John Doe**

331.    The Green Team escorted Doe to a booking cell in which he was subjected to a strip search.

332.    During the search process, Defendants gave bizarrely detailed and confusing instructions about the manner and sequence in which Doe should remove his clothing.

333.    As Doe tried to carry out the instructions, Defendants began to hit and kick him, claiming that Doe was carrying out their instructions improperly.

334.    After knocking Doe to the ground, Defendants picked him back up and told him to do a better job of listening to their instructions.

335.    Defendants then brought Doe to the BOSS Chair, which did not indicate the existence of any contraband in Doe's body.

336.    From the BOSS Chair, Defendants brought Doe to a room with an x-ray table.

337.    Defendants forcibly placed Doe on the x-ray table and held him down so that he could be x-rayed.

338.    Defendants said that the x-ray detected the presence of a razor secreted in Doe's rectum.

339.    In the x-ray room, Defendant Torrisi slapped Doe twice and said, in sum and substance, "Give me the weapon now, or this will be the worst day of your life."

340.    Another correction officer hit Doe one time in the x-ray room.

341.    From the x-ray room, Defendants took Doe to Cell #11 in 4 East.

342.    Doe was naked in Cell #11 with eight to ten correction officers, including Defendants Poole, Kelly, Reddy, Lawson, Anzalone, Jarosz, and Frank Harris.

343.    In Cell #11, Defendants told Doe, in sum and substance, to remove the razor they claimed to have seen in his body or they would kill him.

344.    Defendants removed Doe's handcuffs.

345.    Six to eight correction officers, including Defendant Torrisi, then began to assault Doe with their fists and batons.

346.    During the assault, Defendants kept telling Doe to remove the blade from his rectum.

347.    At one point, a correction officer sprayed Doe in the face at close range with pepper spray.

348.    During the beating, a correction officer told Doe, in sum and substance: "We kill people here.  Is that what you want?"

349.    During the events in Cell #11, Doe informed Defendants that he had a bullet in his right leg from being shot on a previous occasion.

350.    In response, one of the correction officers began to stomp on Doe's right leg in an effort to cause him further pain.

351.    At a certain point during the beating in Cell #11, Defendant Torrisi told Doe, referring to the alleged contraband in his rectum: "Either you give it to us, or we go in and get it."

352.    Doe responded by asking for food and water to stimulate his bowels.

353.    In response, Defendant Torrisi slammed Doe's head against the wall and caused Doe to bend over.

354.    Defendant Torrisi instructed a correction officer to put a baton in Doe's rectum.

355.    The officer jammed a baton into Doe's rectum and repeatedly pushed it in and out.

356.   When the officer removed the baton from Doe's rectum, Doe saw blood on the baton.

357.   Defendant Torrisi asked Doe whether he had ever felt 50,000 volts course through his body.

358.   At that point, an officer used a taser against Doe.

359.   Doe involuntarily urinated on himself.

360.   The taser wires remained attached to Doe.

361.   Defendant Torrisi said, in sum and substance: "We're going to kill you. This isn't Rikers anymore."

362.   Defendants tased Doe a second time.

363.   Doe involuntarily defecated on himself.

364.   While Doe was lying on the ground in his own urine and feces, a correction officer inserted his finger into Doe's rectum.

365.   Defendants then tased Doe a third time, at which point Doe involuntarily defecated on himself again.

366.   A correction officer disconnected the wires of the taser from Doe's body.

367.   Defendants then shot Doe again with a different Taser.  Again he involuntarily defecated on himself.

368.   At that point, Defendants told Doe that the weapon was no longer in his rectum.

369.   After Doe was tased for the last time, one of the correction officers hit him and said, in sum and substance, "That's for getting your sh*t on my shoes, you f*cking animal."

370.   Doe lost consciousness multiple times during the beating.

### E.    Doe Is Denied Medical Attention and Made to Sleep in His Own Bodily Waste

371.    After the beating in Cell #11, Defendants brought Doe back to the x-ray room to be x-rayed a second time.

372.    Doe asked for medical attention from the person in the x-ray room who appeared to be a medical professional, but his request was refused.

373.    After the second x-ray, Defendants provided Doe with a jail jumper but denied him the opportunity to clean himself and did not decontaminate him from the pepper spray they used against him.

374.    Doe was taken to Cell #14 in 4 East.

375.    That night, Doe was forced to sleep with the remnants of his own urine and feces stuck to his body.

376.    The next morning, on January 25, 2018, Doe again requested medical attention.

377.    Doe had an open wound on his forehead and two black eyes, and his left eye was swollen shut.

378.    Doe's face was bruised and swollen, and his ribs and chest were bruised.

379.    Doe's rectum was damaged and bled for weeks after the incident.

380.    Defendant Mylroie denied Doe medical attention and told him to take Motrin.

381.    Doe was not examined by a physician until approximately a week after the beating that occurred on January 24, 2018.

382.   The Albany County Jail reports concerning the January 24, 2018 assault on Doe falsely state that Doe "turn[ed] off the wall" to assault staff and "moved toward staff" in an aggressive manner:

> During a CERT operation processing new Riker's [*sic*] Island Inmate Boarders, Inmate [Doe] was uncooperative during the initial strip search in Booking by turning off the wall towards staff.  He was taken to the floor & restrained by staff.  He was placed back on wall & the strip search was completed without further incident.  He was then escorted to the X-ray room, where an X-ray was taken of him, which was positive for contraband.  Inmate was then escorted to SHU Cell 11 . . . .  He was again taken to the floor & restrained after he turned away from the wall & lunged at staff.  . . . Capt. Harris relieved Sgt. Poole & gave Inmate [Doe] several direct orders to remove the item.  Capt. Harris applied two separate five second taser cycles to inmate, when he did not comply with orders & moved toward staff with his hands & arms covered in feces.

**F.     John Doe Is Placed in Solitary Confinement at the Albany County Jail**

383.   Doe was issued an infraction ticket on January 24, 2018 that charged him with assaulting staff, among other offenses.

384.   A disciplinary hearing was held on February 6, 2018.

385.   At the hearing, Doe denied the charges and explained that he had been subjected to an unlawful search and that his rights had been violated.

386.   In response, the hearing officer, Lieutenant Frank Foe #15, said, in sum and substance, "OK, you talk a good game, but we are still going to find you guilty regardless."

387.   Lieutenant Foe #15 sentenced Plaintiff Doe to the extraordinary sum of 550 days in solitary confinement.

388.   Doe spent approximately the next ten months in solitary confinement without meaningful human contact.

389.    Doe had previously spent time in solitary confinement at Rikers Island, but the time in solitary in Albany was significantly more difficult because he had no outdoor recreation, no visitors, limited phone access, and very little contact with other detainees.

390.    During the time in his cell, Doe thought constantly about the assault that happened on the day he arrived.

391.    He was alone and felt terrified.

392.    Doe became paranoid that the correction officers at the Albany County Jail were tampering with his food.

393.    Doe usually chose not to take his one daily hour of "recreation" outside his cell because it was functionally no different than staying in his cell.

### G.    Defendants Attempt to Intimidate John Doe

394.    On or about January 26, 2018, Torrisi came to Doe's cell prior to a legal visit that Doe received from an attorney.

395.    Defendant Torrisi told Doe, in sum and substance, "If you snitch on us, we will come up here at four in the morning and put you in a body bag.  We will kill you.  We do that up here."

396.    Torrisi asked Doe if he was a gang member.

397.    When Doe said no, Torrisi punched him in the face and called him a liar.

398.    On or about March 18, 2018, Defendant Torrisi again punched Doe in the face in retaliation for Doe's complaints about having been sexually assaulted.

399.    Since the assault on January 24, 2018, Doe has continued to experience pain, emotional distress, and traumatic thoughts.  He frequently thinks about the assault, and ruminates about it.

400.     While he was detained at the Albany County Jail, John Doe was terrified as a result of the assault.  He was afraid to eat because he became scared that guards were poisoning his food.

401.     On October 29, 2018, Doe pleaded guilty to criminal possession of a controlled substance in the third degree.

402.     Doe is now serving his sentence in the custody of DOCCS.

403.     Doe considered the plea offer to be a poor one with a long sentence, but he chose to accept it anyway so he could get out of the Albany County Jail and into a different facility.

### *Pariis Tillery*

**A.      Pariis Tillery Is Detained By DOC Starting on March 4, 2017**

404.     Pariis Tillery is a 25-year-old African-American young man detained at the Albany County Jail, where he is currently in solitary confinement.

405.     Pariis received a GED and then completed two semesters at the New York City College of Technology.

406.     Although he has criminal matters pending in the Brooklyn County Supreme Court, Pariis has no adult criminal convictions.

407.     On or about March 4, 2017, Pariis was arrested and placed in the custody of the New York City DOC.

408.     Pariis was first detained at the Brooklyn Detention Center, where, on August 7, 2018, he was accused of assaulting a correction officer.

409.     On August 8, 2018, Pariis was transferred to Rikers Island.

**B.      The August 9, 2018 Transfer of Pariis Tillery from Rikers to the Albany County Jail**

410.     On August 9, 2018, Defendants Brann and Williams obtained an SJO transferring Pariis to Albany County.

411.     On August 9, 2018, a DOC captain woke Pariis up in the early morning and told him to get dressed because ESU was coming for him.  Pariis asked where he was going but was not given an answer.

412.     ESU officers came for Pariis and put him in a transport van.

413.     Before being removed from Rikers, Pariis was given no written notification of the basis of his transfer, received no hearing, and was not permitted to call his family or lawyers to inform anyone of his whereabouts.  He was not even told that he was going to be transferred.

414.     ESU officers drove Pariis in the van for several hours.  He was the only person in the van.  Pariis did not know where he was being taken.  He asked repeatedly where he was going but no one would tell him.

415.     When the van door opened, Pariis saw a squad of approximately 12 law enforcement officers standing in front of him, wearing green fatigues and riot gear, including helmets and body armor.  Pariis would later learn that these were correction officers from the Albany County Jail.

416.     Several green-suited officers grabbed Pariis and took him to the intake area of the Albany County Jail.  About two to three Rikers ESU officers who had brought Pariis from Rikers also entered the Jail.

417.     Pariis followed all orders given to him and was cooperative throughout this process.

**C.     Defendants Physically Assault Pariis Tillery at the Albany County Jail**

418.    After Pariis was cuffed and shackled, several Albany County Jail correction officers moved him into Booking Cell #2 and removed his handcuffs.

419.    About eight to ten Albany County Jail correction officers and supervisors were waiting for him there.  Defendants Lawson, Shield #323, Shield #99, and Albany County Correction Officers Frank Foes #19-21 were present.

420.    One Albany correction officer said to him: "Do the same thing you did on Rikers Island."

421.    Defendant Sergeant Foe #18 said to Pariis, "Do you know where you are at?"  When Pariis said "no," Defendant Sergeant Foe #18 punched Pariis in the face.  Eight or nine correction officers then proceeded to beat Pariis about his face and body.

422.    Pariis began to bleed from his nose.  Defendants placed a "spit mask" on his face, though Pariis was not spitting at anyone.

423.    Defendant Lawson, Shield #323, Shield #99, and Albany County Correction Officers Frank Foes #19-21 punched, kicked, and stomped on Pariis.

424.     Pariis fell to the floor, where Defendants continued to kick and punch him.

425.    After beating him for approximately 10 minutes, Defendants brought Pariis to the BOSS chair and instructed him to pass through a metal detector to search for contraband.  Pariis complied with all instructions.  The BOSS chair did not indicate the presence of contraband on Pariis's person.

426.    Defendants then stated to Pariis, in sum and substance: "Do you have something?  You Rikers guys are always lying.  If you do have something, we're going to beat you until you sh*t it out."

427.    Defendants then brought Pariis to an x-ray room and ordered him to submit to a medical x-ray to search for contraband.  Pariis complied.

428.    Defendants then escorted Pariis to Cell #14 in 4 East.

429.    Defendants instructed Pariis to remove his jumpsuit.  Pariis complied.

430.    Defendants then brandished a taser at Pariis.

431.    One Defendant stated to Pariis, "Take it out of your ass, you monkey."

432.    Defendants then hit, punched and kicked Pariis multiple times.  An officer said, in sum and substance, "We're going to get that out of you," referring to the alleged contraband.

433.    The assault on Pariis in Cell #14 lasted for a significant period of time.

434.    Pariis was taken back for another x-ray and then returned to his cell.

435.    Defendant Mylroie came to his cell and observed his bleeding nose and other visible injuries and told him he was fine.

436.    Pariis was in extreme pain after the assault and passed out.  He could not hear out of his left ear and his head hurt.  His nose was swollen, and he had two black eyes, dizziness, and bruises over much of his body.

437.    Pariis told correction officers that his head hurt and that he could not hear from his left ear.  He requested medical attention on August 10, 2018.

438.    Four days after he was assaulted, on August 13, 2018, Pariis was finally taken for treatment of the serious injuries he suffered during the August 9 assault.

439.     Despite the presence of correction officers with him at the hospital, Pariis told the medical personnel that he had been assaulted by correction officers at Albany County Jail.

440.     Albany County Jail medical records dated August 13, 2018, document that he had "Trauma to Head" and "Blood in Ear," as well as "ecchymosis to orbits."  The Albany County Jail records request that the outside medical provider rule out "skull fracture" and "cranial trauma."

441.     At the emergency room of Albany Memorial Hospital, Pariis was diagnosed with tympanic membrane perforation, head injury, and a concussion.  He was prescribed an antibiotic and given multiple CT scans for possible fractures in his skull, face, or body.

442.     Tympanic membrane perforation, or a ruptured eardrum, is a hole in the eardrum.  It is an injury commonly caused by severe trauma to the head.

443.     The Manual on Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (2004), commonly known as the Istanbul Protocol, is the authoritative United Nations document which sets forth international guidelines on how to investigate allegations of torture.  Chapter 5 of The Istanbul Protocol, titled "Physical Evidence of Torture," states: "Trauma to the ears, especially rupture of the tympanic membrane, is a frequent consequence of harsh beatings."  It goes on to describe how to conduct an examination of the tympanic membrane and ear for injuries and hearing loss related to abuse and torture.

444.     After his return from Albany Memorial Hospital, Pariis was sent back to solitary confinement in Cell #14 on 4 East.

61

445.    On or about August 14, 2018, Pariis's mother and grandmother traveled by bus from Brooklyn to Albany to visit him and observed his injuries from the beating.

446.    Albany County Jail medical records dated August 20, 2018 document that Pariis suffered a "L TM perforation, concussion, Head Injury" on August 9, 2018 and that he was "sent to ER on 8/13/18 because of ear pain L TM perf.  He was started on Augmentin and referred to ENT.  CT head/cspine/facial bones negative."

447.    One month after the assault on September 4, 2018, Pariis was taken to see a doctor at Albany Medical Center to assess the perforation to his left ear.  Albany Medical Center records from that visit document that Pariis had suffered "significant facial abrasions and periorbital ecchymoses" as a result of the assault.

448.    Periorbital ecchymosis, or "raccoon eye," is produced by blood tracking into periorbital tissues, which is a frequent symptom after traumatic injuries to the head and neck.

449.    Albany County Jail medical records dated November 18, 2018, document that Pariis continues to suffer from headaches from the assault.

450.    The Albany County Jail reports about the assault against Pariis claim that he repeatedly "turned around" to assault multiple staff members in riot gear while locked in a confined space:

> At the above date and time, Inmate Tillery was admitted to the SHU.  Inmate Tillery was escorted to Holding Cell 2 for the read in to be completed.  When the mechanical restraints were removed, Inmate Tillery immediately turned around and began throwing punches at officers.  Inmate was taken to the floor and restrained.  Once compliant, Inmate was placed back on the wall.  During the strip search, Inmate again turned towards staff, threw punches, and began spitting.  Spit mask applied,  Inmate restrained.

451.    After the assault, Defendant Lyons came to Pariis's cell and stated: "You are not on Rikers anymore, we run this jail."

452.    Since the assault on August 9, 2018, Albany County Jail guards have continued to taunt Pariis about the beating, stating that when he first arrived at Albany County Jail, "you were crying like a little girl."

453.    Pariis has also heard Defendant Torrisi use racial epithets toward another African-American detainee in SHU.  Defendant Torrisi stated to another detainee within Pariis's hearing: "You've got to be the stupidest ni**er I ever met.  Do you want to get beat up?"

### D.    Pariis Tillery Is Held in Solitary Confinement at the Albany County Jail from August 9, 2018 to January 23, 2019

454.    An infraction ticket that falsely accused Pariis of assaulting staff, dated August 9, 2018, was generated.

455.    A disciplinary hearing was held on August 24, 2018, at which Pariis appeared.

456.    Pariis had no opportunity to prepare for the hearing and was not given an opportunity to identify or call witnesses.  No testimony was taken at the hearing.  The hearing was not transcribed or recorded in any way.

457.    The hearing officer, Defendant Lieutenant Frank Foe #3, sentenced Pariis to 300 days in solitary confinement.

458.    Pariis remained in solitary confinement from August 9, 2018 to January 23, 2019.

459.    Pariis was kept in a small solitary cell for at least 23 hours a day.  Pariis had nothing to do in his cell: no meaningful human interaction, no education or programming, no music or television, and limited reading materials.

460.     Pariis initially had no access to phone calls and was denied the right to contact his lawyer for his pending criminal case, interfering with his ability to participate in his own defense.

461.     Pariis then gained limited access to phone calls, but was not permitted to talk to other detainees, and other than access to showers three times a week, he was not permitted to leave his cell.   The cost of collect phone calls from Albany was also prohibitive for Pariis's family, since the charge is $25 for 30 minutes.

462.     Pariis usually declined to spend his one hour a day of "recreation" in the cage outside his cell because it is not materially different from staying in his cell.

463.     Pariis was permitted visitors one hour a week.  To visit, his elderly mother had to take a long bus ride from New York City.  The cost of the transportation for the visit was often prohibitive for her.  Because of the distance, cost, a physical disability, and her age, she was rarely able to visit Pariis in Albany.  When he was detained in New York City, she visited Pariis frequently, as did other family members and friends.

464.     Pariis has family, including a one-year-old son, whom he did not see while held in the Albany County Jail because of the distance.  When he was in New York City, Pariis received visits from and had contact with his young son on a regular basis.

465.     At the Albany County Jail, Pariis was only permitted to access mental health services in his cell, when a counselor would come to his cell and speak with him in the presence of a correction officer without privacy or confidentiality.

466.     Since the assault by Defendants, Pariis has continued to experience headaches, dizziness, tinnitus, ear and other pain, emotional distress, and traumatic thoughts.

467.    On January 23, 2019—less than four weeks after this lawsuit was filed—Pariis had a scheduled court date in Brooklyn.  That morning, Albany jail staff told him to pack his things and said he was being transferred.  After court, Pariis was not returned to Albany, and was instead taken to the Anna M. Kross Center on Rikers Island, where he is now detained.

468.    No one explained to Pariis why he had been sent back to Rikers, how long he will remain there, or whether he will be subject to further transfers in the future.

## IX.    The Experiences of Other New York City Detainees Transferred to Albany

469.    Other New York City detainees transferred to Albany County have been subjected to the same brutality, following the same pattern.

### *Richard Roe*

470.    On January 24, 2018, a then-24-year-old African-American detainee Richard Roe arrived at the Albany County Jail from Ulster County along with Plaintiff John Doe.

471.    Albany County Jail officers, under the direction of Defendant Torrisi, beat Richard Roe in his assigned cell in 4 East.

472.    Richard Roe was later sentenced to 450 days in solitary confinement.

473.    Once again, official reports from the Albany County Jail falsely claim that officers had to use force defensively after the detainee "turned off the wall":

> CERT Team 1 escorted [the inmate] through the booking process, x-ray and escort to the SHU.  After a positive x-ray for contraband, inmate was placed on the wall in his cell and ordered to remove the object.  Inmate turned off the wall 2 times and was taken to the floor . . . .

*David Doe*

474.   Other detainees who arrived at the Albany County Jail with Plaintiff Steven Espinal on February 13, 2018 were also beaten.

475.   On January 24, 2018, 18-year old detainee David Doe arrived at the Albany County Jail from Rikers.

476.   Albany County Jail officers, under the direction of Defendant Torrisi, repeatedly punched David Doe in his face and body in a booking cell when he was unable to follow commands to remove his clothing in a specific way.

477.   After officers claimed to have seen an object in his rectum on an x-ray, the officers took David Doe to Cell #16 in 4 East.  There, they continued to beat David Doe until they claimed that the object had been removed.

478.   David Doe, who has since turned 19, remains at the Albany County Jail in solitary confinement.

## X.   Class Allegations

479.   The Plaintiff Class consists of every person who is or will be detained at the Albany County Jail after being transferred there on a SJO by the City.

480.   This action is properly maintainable as a class action because all four requirements of Federal Rule of Civil Procedure 23(a) are satisfied.

481.   *Numerosity*.  The members of the class are sufficiently numerous that joinder of all members is impracticable.  Between March 8, 2018 and August 15, 2018, 21 SJOs were issued transferring detainees from the City to the Albany County Jail.  On information and belief, there are presently about ten Rikers detainees at the Albany County Jail.  Based on past

practice, the City is likely to transfer 50 or more additional detainees to the Albany County Jail during the pendency of this case alone.

482.   *Commonality*.   There are questions of law and fact common to the class. These include, without limitation: (a) whether City's practice of transferring City detainees to the Albany County Jail unreasonably obstructs their Sixth Amendment right to counsel in light of the Albany County Jail's distance from New York City; (b) whether confidential attorney-client communications are reasonably available to City detainees at the Albany County Jail; (c) whether City detainees have constitutionally protected liberty interests in not being held in punitive segregation, either at all or for longer than certain periods of time; (d) whether Albany County has a policy or custom of subjecting City detainees to violent torture; and (e) whether the City is deliberately indifferent to an unreasonable risk to City detainees' safety by transferring them to the Albany County Jail.

483.   *Typicality*.   Steven Espinal's claims are typical of the claims of class members he seeks to represent.   The violations of his right to counsel and his procedural and substantive due process rights are shared by all City detainees transferred to Albany.   All members of the class will rely on similar legal theories, and all members of the class have suffered similar harms.

484.   *Adequacy of Representation*.   Steven Espinal is an adequate class representative.   He is in solidarity with his fellow detainees who are suffering, or will suffer, the same deplorable conditions.   He will fairly and adequately protect the interests of other class members.   Plaintiffs' counsel includes attorneys from Emery Celli Brinckerhoff & Abady LLP and the Law Offices of Goldman & Associates.   Counsel are experienced in federal civil rights

class action litigation, including the *Nunez* class action that led to a consent decree reforming

DOC, and have the resources necessary to pursue this litigation.

485.   This action is properly maintainable as a class action under Federal Rule

of Civil Procedure 23(b)(2) because Defendants City, Brann, and Williams have acted and/or

will act on grounds generally applicable to the class, thereby making final injunctive relief

appropriate with respect to Mr. Espinal and the class as a whole.

486.   Class members are entitled to injunctive relief to end the City's

unconstitutional policy, practice, and/or custom of transferring selected pretrial detainees to the

Albany County Correctional Facility, with the expectation that they will be held in solitary

confinement in violation of their due process rights and with deliberate indifference to the impact

on their right to counsel, their safety, and their mental health.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Procedural Due Process
(Plaintiffs Washington and Espinal Against Defendants City, Brann, and Williams)

487.   The Rules of the City of New York, title 40, § 1-17(b)(1)(ii), confer upon

pretrial detainees in City custody who are ages 21 and younger a constitutionally protected

liberty interest in not being subjected to solitary confinement.

488.   Plaintiffs Washington and Espinal were deprived of that liberty interest

when Defendants Brann and Williams obtained SJOs transferring them to Albany County.

489.   The deprivation occurred without due process of law because Plaintiffs

Washington and Espinal did not receive notice of the impending transfer, notice of the reasons

for the transfer, or an opportunity to be heard.

490.   Defendant City caused the deprivation because it has an official policy or

custom of transferring pretrial detainees ages 21 and younger to other jurisdictions on SJOs

without providing notice of the impending transfer, notice of the reasons for the transfer, or an opportunity to be heard.

491.    Defendant City is also liable for the deprivation because Defendant Brann acted in her capacity as the final municipal policymaker with respect to SJOs pursuant to state law.

492.    As a result of Defendants' unlawful conduct, Plaintiffs Washington and Espinal suffered the injuries hereinbefore alleged.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment – Substantive Due Process – Punitive Transfer
(All Plaintiffs Against Defendants City, Brann, and Williams; Plaintiff Washington
Additionally Against Defendant Walker; Plaintiff Doe Additionally Against Defendant
Sullivan)

493.    Defendants Brann and Williams obtained SJOs to transfer Plaintiffs outside the City for the purpose of punishing them and without legitimate penological justification, in violation of their substantive due process rights.

494.    As evidenced by the comments made to Plaintiff Washington, Defendant Walker caused Plaintiff Washington to be transferred outside the City on an SJO for the purpose of punishing him and without legitimate penological justification, in violation of his substantive due process rights.

495.    As evidenced by his comments to Plaintiff Doe, Defendant Sullivan caused Plaintiff Doe to be transferred outside the City on an SJO for the purpose of punishing him and without legitimate penological justification, in violation of his substantive due process rights.

496. Defendant City caused the violation of Plaintiffs' substantive due process rights because it has an official policy or custom of transferring selected pretrial detainees to the Albany County Jail for the purpose of punishing them.

497. Defendant City is also liable for the violation of Plaintiffs' substantive due process rights because Defendant Brann acted in her capacity as the final municipal policymaker with respect to SJOs pursuant to state law.

498. As a result of Defendants' unlawful conduct, Plaintiffs suffered the injuries hereinbefore alleged.

### THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – First Amendment Retaliation
(Plaintiff Washington Against Defendants City, Brann, Williams, and Walker)

499. On or about March 28, 2018, Defendants Brann and Williams requested that Plaintiff Washington be transferred outside the City on an SJO.

500. As evidenced by the comments made to Plaintiff Washington, Defendant Walker caused Plaintiff Washington to be transferred outside the City on an SJO.

501. Defendants Brann, Williams, and Walker did so for the purpose of punishing Plaintiff Washington for the exercise of his First Amendment rights, including by lodging repeated complaints with the Legal Aid Society Prisoners' Rights Project.

502. Defendants Brann, Williams, and Walker's actions were without legitimate penological justification.

503. Defendant City is liable for the violation of Plaintiff Washington's substantive due process rights because Defendant Brann acted in her capacity as the final municipal policymaker with respect to SJOs pursuant to state law.

70

504.     As a result of Defendants' unlawful conduct, Plaintiff Washington suffered the damages hereinbefore alleged.

**<u>FOURTH CAUSE OF ACTION</u>**

42 U.S.C. § 1983 – Fourteenth Amendment – Excessive Force Against Pretrial Detainee
(Plaintiff Washington Against Defendants City, Albany County, Apple, Lyons, Torrisi, Valvo,
"Superman," Lawson, Haley, LaBombard, Anzalone, and Shield #323)

505.     On or about March 28, 2018, Defendants Torrisi, Valvo, "Superman," Lawson, Haley, LaBombard, Anzalone, and Shield #323 used objectively unreasonable force against Plaintiff Washington, and/or failed to prevent others from doing so despite being aware of the use of objectively unreasonable force and having a reasonable opportunity to intervene to prevent it.

506.     Defendant Albany County caused the violation of Plaintiff Washington's rights because it has an official policy or custom of subjecting transfer detainees from New York City to violent torture at the Albany County Jail.

507.     Defendants Apple and Lyons were personally involved in the violation of Plaintiff Washington's constitutional rights because, among other things, they were aware of the regular practice of torture of Rikers detainees by officers under their command and failed to take remedial action, they were aware of the torture as it was happening and failed to take action to prevent it, they created Albany County's policy or custom pursuant to which the torture occurred, and they were deliberately indifferent to the security of detainees in their care.

508.     Defendant City caused the violation of Plaintiff Washington's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to excessive and unlawful force there.

71

509.     As a result of Defendants' unlawful conduct, Plaintiff Washington

suffered the injuries hereinbefore alleged.

### FIFTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Sexual Assault of Pretrial Detainee
(Plaintiff Washington Against Defendants City, Albany County, Apple, Lyons, Torrisi, Valvo,
"Superman," Lawson, Haley, LaBombard, Anzalone, and Shield #323)

510.     On or about March 28, 2018, Defendants Torrisi, Valvo, "Superman,"

Lawson, Haley, LaBombard, Anzalone, and Shield #323 sexually assaulted Plaintiff Washington

by digitally penetrating him in his rectum and/or failed to take reasonable steps to stop others

from doing so despite being aware of the sexual assault and having a reasonable opportunity to

intervene to prevent it.

511.     The forcible penetration of Plaintiff Washington was undertaken

maliciously, with the purpose of humiliating and degrading Plaintiff Washington, and not for any

legitimate penological purpose.

512.     Defendant Albany County caused the violation of Plaintiff Washington's

rights because it has an official policy or custom of subjecting transfer detainees from New York

City to violent torture, including sexual assault, at the Albany County Jail.

513.     Defendants Apple and Lyons were personally involved in the violation of

Plaintiff Washington's constitutional rights because, among other things, they were aware of the

regular practice of sexual assault by officers under their command and failed to take remedial

action, they were aware of the sexual assault as it was happening and failed to take action to

prevent it, they created Albany County's policy or custom pursuant to which the sexual assault

occurred, and they were deliberately indifferent to the security of detainees in their care.

514.     Defendant City caused the violation of Plaintiff Washington's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to sexual assault there.

515.     As a result of Defendants' unlawful conduct, Plaintiff Washington suffered the injuries hereinbefore alleged.

**SIXTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth Amendment – Unreasonable Search
(Plaintiff Washington Against Defendants City, Albany County, Apple, Lyons, Torrisi, Valvo, "Superman," Lawson, Haley, LaBombard, Anzalone, and Shield #323))

516.     On or about March 28, 2018, to the extent their actions can be characterized as a manual body cavity search, Defendants Torrisi, Valvo, "Superman," Lawson, Haley, LaBombard, Anzalone, and Shield #323 conducted an unreasonable manual body cavity search of Plaintiff Washington by digitally penetrating him in his rectum, and/or failed to take reasonable steps to stop others from doing so despite being aware of the unreasonable search and having a reasonable opportunity to intervene to prevent it.

517.     The manual body cavity search, to the extent Defendants' assault can be characterized as such, was unreasonable in light of the scope of the intrusion, the manner in which it was conducted, the purported justification for initiating it, and the place in which it was conducted.

518.     Defendant Albany County caused the violation of Plaintiff Washington's rights because it has an official policy or custom of subjecting transfer detainees from New York City to unreasonable manual body cavity searches, at the Albany County Jail.

519.     Defendants Apple and Lyons were personally involved in the violation of Plaintiff Washington's constitutional rights because, among other things, they were aware of the regular practice of unreasonable manual body cavity searches by officers under their command and

failed to take remedial action, they were aware of the unreasonable manual body cavity search as it was happening and failed to take action to prevent it, they created Albany County's policy or custom pursuant to which the unreasonable manual body cavity search occurred, and they were deliberately indifferent to the security of detainees in their care.

520.   Defendant City caused the violation of Plaintiff Washington's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to unreasonable manual body cavity searches there.

521.   As a result of Defendants' unlawful conduct, Plaintiff Washington suffered the injuries hereinbefore alleged.

### SEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Failure to Intervene
(Plaintiff Washington Against Defendants City and
New York City Correction Officers Frank Foes #1-3)

522.   Defendants New York City Correction Officers Frank Foes #1-3, the ESU officers who transported Plaintiff Washington to Albany, knew that Defendants Torrisi, Valvo, Lawson, Haley, LaBombard and Anzalone were going to violate, and were in fact violating, the constitutional rights of Plaintiff Washington by using objectively unreasonable force against him, sexually assaulting him, and/or conducting an unreasonable search of him.

523.   Defendants Foes #1-3 had a reasonable opportunity to intervene to prevent these violations.

524.   Defendants Foes #1-3 failed to take reasonable steps to intervene.

525.   Defendant City caused the violation of Plaintiff Washington's rights because it has an official policy or custom of transferring selected detainees to the Albany

County Jail with the knowledge and expectation that they will be subject to excessive and unlawful force there.

526.     As a result of Defendants' unlawful conduct, Plaintiff Washington suffered the injuries hereinbefore alleged.

### EIGHTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Procedural Due Process – Sham Hearing
(Plaintiff Washington Against Defendants Albany County, Apple, Lyons, and Grimes)

527.     On or about April 8, 2018, Defendant Grimes presided over a sham disciplinary hearing with a predetermined outcome, during which Plaintiff Washington was told that anything he did would not matter to the outcome, as a result of which Plaintiff Washington was sentenced to 360 days in solitary confinement.

528.     Defendant Albany County caused the violation of Plaintiff Washington's due process rights because it has an official policy or custom of keeping any detainee who has ever been accused of assaulting staff anywhere in solitary confinement, and an official policy or custom of conducting sham disciplinary hearings to keep the transfer detainees from New York City whom it subjects to violent torture in solitary confinement.

529.     Defendants Apple and Lyons were personally involved in the violation of Plaintiff Washington's constitutional rights because, among other things, they directed their staff to keep tortured transfer detainees in solitary confinement no matter what, were aware of their staff's regular practice of conducting sham disciplinary hearings with predetermined outcomes and failed to take corrective action, and created Albany County's policy or custom of keeping tortured transfer detainees in solitary confinement.

530.     As a result of Defendants' unlawful conduct, Plaintiff Washington suffered the injuries hereinbefore alleged.

## NINTH CAUSE OF ACTION

42 U.S.C. § 1983 – Fourteenth Amendment – Excessive Force Against Pretrial Detainee
(Plaintiff Espinal Against Defendants City, Albany County, Apple, Lyons, Torrisi, "John"
Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton – February 13, 2018 Incident)

531.    On or about February 13, 2018, Defendants Torrisi, "John" Harris,

Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton used objectively unreasonable force against

Plaintiff Espinal, and/or failed to take reasonable steps to stop others from doing so despite being

aware of the use of objectively unreasonable force and having a reasonable opportunity to

intervene to prevent it.

532.    Defendant Albany County caused the violation of Plaintiff Espinal's rights

because it has an official policy or custom of subjecting transfer detainees from New York City

to violent torture at the Albany County Jail.

533.    Defendants Apple and Lyons were personally involved in the violation of

Plaintiff Espinal's constitutional rights because, among other things, they were aware of the

regular practice of torture by officers under their command and failed to take remedial action,

they were aware of the torture as it was happening and failed to take action to prevent it, they

created Albany County's policy or custom pursuant to which the torture occurred, and they were

deliberately indifferent to the security of detainees in their care.

534.    Defendant City caused the violation of Plaintiff Espinal's rights because it

has an official policy or custom of transferring selected detainees to the Albany County Jail with

the knowledge and expectation that they will be subject to excessive and unlawful force there.

535.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the

injuries hereinbefore alleged.

**TENTH CAUSE OF ACTION**

42 U.S.C. § 1983 – Fourteenth Amendment – Sexual Assault of Pretrial Detainee
(Plaintiff Espinal Against Defendants City, Albany County, Apple, Lyons, Torrisi, "John"
Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton – February 13, 2018 Incident)

536.     On or about February 13, 2018, Defendants Torrisi, "John" Harris,

Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton sexually assaulted Plaintiff Espinal by

digitally penetrating him in his rectum and/or failed to take reasonable steps to stop others from

doing so despite being aware of the sexual assault and having a reasonable opportunity to

intervene to prevent it.

537.     The forcible penetration of Plaintiff Espinal was undertaken maliciously,

with the purpose of humiliating and degrading Plaintiff Espinal, and not for any legitimate

penological purpose.

538.     Defendant Albany County caused the violation of Plaintiff Espinal's rights

because it has an official policy or custom of subjecting transfer detainees from New York City

to violent torture at the Albany County Jail.

539.     Defendants Apple and Lyons were personally involved in the violation of

Plaintiff Espinal's constitutional rights because, among other things, they were aware of the

regular practice of sexual assault by officers under their command and failed to take remedial

action, they were aware of the sexual assault as it was happening and failed to take action to

prevent it, they created Albany County's policy or custom pursuant to which the sexual assault

occurred, and they were deliberately indifferent to the security of detainees in their care.

540.     Defendant City caused the violation of Plaintiff Espinal's rights because it

has an official policy or custom of transferring selected detainees to the Albany County Jail with

the knowledge and expectation that they will be subject to sexual assault there.

541.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the injuries hereinbefore alleged.

### ELEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth Amendment – Unreasonable Search
(Plaintiff Espinal Against Defendants City, Albany County, Apple, Lyons, Torrisi, "John"
Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton – February 13, 2018 Incident)

542.    On or about February 13, 2018, to the extent their actions can be characterized as a manual body cavity search, Defendants Torrisi, "John" Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton conducted an unreasonable manual body cavity search of Plaintiff Espinal by digitally penetrating him in his rectum, and/or failed to take reasonable steps to stop others from doing so despite being aware of the unreasonable search and having a reasonable opportunity to intervene to prevent it.

543.    The manual body cavity search, to the extent Defendants' assault can be characterized as such, was unreasonable in light of the scope of the intrusion, the manner in which it was conducted, the purported justification for initiating it, and the place in which it was conducted.

544.    Defendant Albany County caused the violation of Plaintiff Espinal's rights because it has an official policy or custom of subjecting transfer detainees from New York City to unreasonable manual body cavity searches, at the Albany County Jail.

545.    Defendants Apple and Lyons were personally involved in the violation of Plaintiff Espinal's constitutional rights because, among other things, they were aware of the regular practice of unreasonable manual body cavity searches by officers under their command and failed to take remedial action, they were aware of the unreasonable manual body cavity search as it was happening and failed to take action to prevent it, they created Albany County's policy or

custom pursuant to which the unreasonable manual body cavity search occurred, and they were deliberately indifferent to the security of detainees in their care.

546.    Defendant City caused the violation of Plaintiff Espinal's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to unreasonable manual body cavity searches there.

547.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the injuries hereinbefore alleged.

### TWELFTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Failure to Intervene
(Plaintiff Espinal Against Defendants City and New York City Correction Officers Frank Foes
#4-6 – February 13, 2018 Incident)

548.    Defendants New York City Correction Officers Frank Foes #4-6, the ESU officers who transported Plaintiff Espinal to Albany, knew that Defendants Torrisi, "John" Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton were going to violate, and were in fact violating, the constitutional rights of Plaintiff Espinal by using objectively unreasonable force against him, sexually assaulting him, and/or conducting an unreasonable search of him.

549.    Defendants Foes #4-6 had a reasonable opportunity to intervene to prevent these violations.

550.    Defendants Foes #4-6 failed to take reasonable steps to intervene.

551.    Defendant City caused the violation of Plaintiff Espinal's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to excessive or unlawful force there.

552.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the injuries hereinbefore alleged.

## THIRTEENTH CAUSE OF ACTION

Assault

(Plaintiff Espinal Against Defendants City, New York City Correction Officers Frank Foes #4-6,
Albany County, Torrisi, "John" Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton –
February 13, 2018 Incident)

553.    On or about February 13, 2018, by threateningly approaching Plaintiff

Espinal and threatening to hit, punch, kick, tase, and digitally penetrate him, Defendants Torrisi,

"John" Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton intentionally placed Plaintiff

Espinal in apprehension of imminent offensive contact.  Defendant Albany County is liable for

their conduct under *respondeat superior*.

554.    In addition and/or in the alternative, Defendants Torrisi, "John" Harris,

Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton had knowledge of the assault and provided

substantial assistance by, among other things, restraining and confining Plaintiff Espinal to

permit others to assault him.  Defendant Albany County is liable for their conduct under

*respondeat superior*.

555.    Because Plaintiff Espinal remained in the custody of the City at the time

of this incident, Defendant Albany County and its employees Defendants Torrisi, "John" Harris,

Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton were acting as agents and servants of the City.

The City is therefore liable for their conduct under *respondeat superior*.

556.    Defendants New York City Correction Officers Frank Foes #4-6 had

knowledge of the assault and provided substantial assistance by, among other things, uncuffing

Plaintiff Espinal and handing him over to others to be assaulted.  Defendant City is liable for

their conduct under *respondeat superior*.

557.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the

injuries hereinbefore alleged.

80

## FOURTEENTH CAUSE OF ACTION
Battery
(Plaintiff Espinal Against Defendants City, New York City Correction Officers Frank Foes #4-6, Albany County, Torrisi, "John" Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton – February 13, 2018 Incident)

558.    On or about February 13, 2018, by hitting, punching, kicking, tasing, and digitally penetrating in his rectum Defendant Espinal, Defendants Torrisi, "John" Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton committed a willful, unlawful, intentional battery against him.

559.    In addition and/or in the alternative, Defendants Torrisi, "John" Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton had knowledge of the battery and provided substantial assistance by, among other things, restraining and confining Plaintiff Espinal to permit others to batter him. Defendant Albany County is liable for their conduct under *respondeat superior*.

560.    Because Plaintiff Espinal remained in the custody of the City at the time of this incident, Defendant Albany County and its employees Defendants Torrisi, "John" Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton were acting as agents and servants of the City. The City is therefore liable for their conduct under *respondeat superior*.

561.    Defendants New York City Correction Officers Frank Foes #1-3 had knowledge of the battery and provided substantial assistance by, among other things, uncuffing Plaintiff Espinal and handing him over to others to be battered. Defendant City is liable for their conduct under *respondeat superior*.

562.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the injuries hereinbefore alleged.

**FIFTEENTH CAUSE OF ACTION**

42 U.S.C. § 1983 – Fourteenth Amendment – Deliberate Indifference to Serious Medical Need
(Plaintiff Espinal Against Defendants Against Defendants Albany County, Apple, Lyons,
Mylroie, Torrisi, "John" Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton)

563.    As a result of the assault and sexual assault on February 13, 2018, Plaintiff

Espinal was unconscious, had serious visible injuries lasting for several days, had blood in his

urine, and was later unable to urinate normally.

564.    Plaintiff Espinal did not receive adequate or reasonable medical care.

565.    Defendants Nurse Mylroie, Torrisi, "John" Harris, Beliveau, Adams,

Kelly, Jarosz, Lawson, and Ton were aware of a substantial risk of harm to Plaintiff Espinal and

knowingly disregarded that risk by denying him medical care and/or failing to get medical care

for him.

566.    Defendant Albany County caused the violation of Plaintiff Espinal's rights

because it has an official policy or custom of denying adequate medical care to the transfer

detainees from New York City whom it subjects to violent torture.

567.    Defendants Apple and Lyons were personally involved in the violation of

Plaintiff Espinal's constitutional rights because, among other things, they were aware of their

staff's regular practice of denying medical care to recently beaten transfer detainees and failed to

take remedial action, they were aware of Plaintiff Espinal's condition and failed to take action to

remedy it, they created Albany County's policy or custom of denying medical treatment, and

they were deliberately indifferent to the medical needs of detainees in their care.

568.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the

injuries hereinbefore alleged.

**SIXTEENTH CAUSE OF ACTION**

42 U.S.C. § 1983 – Fourteenth Amendment – Procedural Due Process – Sham Hearing
(Plaintiff Espinal Against Defendants Albany County, Apple, Lyons, and Sergeant Foe #17 –
February 13, 2018 Incident)

569.    On or about February 26, 2018, Defendant Sergeant Foe #17 presided over a sham disciplinary hearing with a predetermined outcome, during which Plaintiff Espinal was told that anything he did would not matter to the outcome, as a result of which Plaintiff Espinal was sentenced to 600 days in solitary confinement.

570.    Defendant Albany County caused the violation of Plaintiff Espinal's due process rights because it has an official policy or custom of keeping any detainee who has ever been accused of assaulting staff anywhere in solitary confinement, and an official policy or custom of conducting sham disciplinary hearings to keep the transfer detainees from New York City whom it subjects to violent torture in solitary confinement.

571.    Defendants Apple and Lyons were personally involved in the violation of Plaintiff Espinal's constitutional rights because, among other things, they directed their staff to keep tortured transfer detainees in solitary confinement no matter what, were aware of their staff's regular practice of conducting sham disciplinary hearings with predetermined outcomes and failed to take corrective action, and created Albany County's policy or custom of keeping tortured transfer detainees in solitary confinement.

572.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the injuries hereinbefore alleged.

## SEVENTEENTH CAUSE OF ACTION

42 U.S.C. § 1983 – Fourteenth Amendment – Excessive Force Against Pretrial Detainee
(Plaintiff Espinal Against Defendants City, Albany County, Apple, Lyons, Colangione, Kehn,
Shaver, Shaw, Ratigan, DeGonza, Thompson, and LaBombard – July 4, 2018 Incident)

573.     On or about July 4, 2018, Defendants Colangione, Kehn, Shaver, Shaw,

Ratigan, DeGonza, Thompson, and LaBombard used objectively unreasonable force against

Plaintiff Espinal, and/or failed to prevent others from doing so despite being aware of the use of

objectively unreasonable force and having a reasonable opportunity to intervene to prevent it.

574.     Defendant Albany County caused the violation of Plaintiff Espinal's rights

because it has an official policy or custom of subjecting transfer detainees from New York City

to violent torture at the Albany County Jail.

575.     Defendants Apple and Lyons were personally involved in the violation of

Plaintiff Espinal's constitutional rights because, among other things, they were aware of the

regular practice of torture by officers under their command and failed to take remedial action,

they were aware of the torture as it was happening and failed to take action to prevent it, they

created Albany County's policy or custom pursuant to which the torture occurred, and they were

deliberately indifferent to the security of detainees in their care.

576.     Defendant City caused the violation of Plaintiff Espinal's rights because it

has an official policy or custom of transferring selected detainees to the Albany County Jail with

the knowledge and expectation that they will be subject to excessive and unlawful force there.

577.     As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the

injuries hereinbefore alleged.

## EIGHTEENTH CAUSE OF ACTION
Assault
(Plaintiff Espinal Against Defendants Albany County, Apple, Lyons, Colangione, Kehn, Shaver, Shaw, Ratigan, DeGonza, Thompson, and LaBombard – July 4, 2018 Incident)

578.    On or about July 4, 2018, by threateningly approaching Plaintiff Espinal and threatening to hit, punch, and kick him, Defendants Colangione, Kehn, Shaver, Shaw, Ratigan, DeGonza, Thompson, and LaBombard intentionally placed Plaintiff Espinal in apprehension of imminent offensive contact. Defendant Albany County is liable for their conduct under *respondeat superior*.

579.    In addition and/or in the alternative, Defendants Torrisi, "John" Harris, Beliveau, Adams, Kelly, Jarosz, Lawson, and Ton had knowledge of the assault and provided substantial assistance by, among other things, restraining and confining Plaintiff Espinal to permit others to assault him. Defendant Albany County is liable for their conduct under *respondeat superior*.

580.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the injuries hereinbefore alleged.

## NINETEENTH CAUSE OF ACTION
Battery
(Plaintiff Espinal Against Defendants Albany County, Apple, Lyons, Colangione, Kehn, Shaver, Shaw, Ratigan, DeGonza, Thompson, and LaBombard – July 4, 2018 Incident)

581.    On or about July 4, 2018, by hitting, punching, and kicking Defendant Espinal, Defendants Colangione, Kehn, Shaver, Shaw, Ratigan, DeGonza, Thompson, and LaBombard committed a willful, unlawful, intentional battery against him.  Defendant Albany County is liable for their conduct under *respondeat superior*.

582.    In addition and/or in the alternative, Defendants Colangione, Kehn, Shaver, Shaw, Ratigan, DeGonza, Thompson, and LaBombard had knowledge of the battery and

provided substantial assistance by, among other things, restraining and confining Plaintiff

Espinal to permit others to batter him.  Defendant Albany County is liable for their conduct

under *respondeat superior*.

583.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the

injuries hereinbefore alleged.

### TWENTIETH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Procedural Due Process – Sham Hearing
(Plaintiff Espinal Against Defendants Albany County, Apple, Lyons, and Lieutenant Foe #14 –
July 4, 2018 Incident)

584.    On or about July 19, 2018, Defendant Lieutenant Foe #14 presided over a

sham disciplinary hearing with a predetermined outcome, during which Plaintiff Espinal was told

that anything he did would not matter to the outcome, as a result of which Plaintiff Espinal was

sentenced to 540 days in solitary confinement.

585.    Defendant Albany County caused the violation of Plaintiff Espinal's due

process rights because it has an official policy or custom of keeping any detainee who has ever

been accused of assaulting staff anywhere in solitary confinement, and an official policy or

custom of conducting sham disciplinary hearings to keep the transfer detainees from New York

City whom it subjects to violent torture in solitary confinement.

586.    Defendants Apple and Lyons were personally involved in the violation of

Plaintiff Espinal's constitutional rights because, among other things, they directed their staff to

keep tortured transfer detainees in solitary confinement no matter what, were aware of their

staff's regular practice of conducting sham disciplinary hearings with predetermined outcomes

and failed to take corrective action, and created Albany County's policy or custom of keeping

tortured transfer detainees in solitary confinement.

587.    As a result of Defendants' unlawful conduct, Plaintiff Espinal suffered the injuries hereinbefore alleged.

**TWENTY-FIRST CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment – Excessive Force Against Pretrial Detainee
(Plaintiff Doe Against Defendants City, Albany County, Apple, Lyons, Torrisi, Poole, Kelly,
Reddy, Lawson, Anzalone, Jarosz, and Frank Harris)

588.    On or about January 24, 2018, Defendants Torrisi, Poole, Kelly, Reddy, Lawson, Anzalone, Jarosz, and Frank Harris used objectively unreasonable force against Plaintiff Doe, and/or failed to prevent others from doing so despite being aware of the use of objectively unreasonable force and having a reasonable opportunity to intervene to prevent it.

589.    Defendant Albany County caused the violation of Plaintiff Doe's rights because it has an official policy or custom of subjecting transfer detainees from New York City to violent torture at the Albany County Jail.

590.    Defendants Apple and Lyons were personally involved in the violation of Plaintiff Doe's constitutional rights because, among other things, they were aware of the regular practice of torture by officers under their command and failed to take remedial action, they were aware of the torture as it was happening and failed to take action to prevent it, they created Albany County's policy or custom pursuant to which the torture occurred, and they were deliberately indifferent to the security of detainees in their care.

591.    Defendant City caused the violation of Plaintiff Doe's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to excessive and unlawful force there.

592.    As a result of Defendants' unlawful conduct, Plaintiff Doe suffered the injuries hereinbefore alleged.

87

## TWENTY-SECOND CAUSE OF ACTION

42 U.S.C. § 1983 – Fourteenth Amendment – Sexual Assault Against Pretrial Detainee
(Plaintiff Doe Against Defendants City, Albany County, Apple, Lyons, Torrisi, Poole, Kelly,
Reddy, Lawson, Anzalone, Jarosz, and Frank Harris)

593.    On or about January 24, 2018, Defendants Torrisi, Poole, Kelly, Reddy, Lawson, Anzalone, Jarosz, and Frank Harris sexually assaulted Plaintiff Doe by, among other things, penetrating him in the rectum with a baton and/or failed to take reasonable steps to stop others from doing so despite being aware of the sexual assault and having a reasonable opportunity to intervene to prevent it.

594.    The forcible penetration of Plaintiff Doe was undertaken maliciously, with the purpose of humiliating and degrading Plaintiff Doe, and not for any legitimate penological purpose.

595.    Defendants Apple and Lyons were personally involved in the violation of Plaintiff Doe's constitutional rights because, among other things, they were aware of the regular practice of sexual assault by officers under their command and failed to take remedial action, they were aware of the sexual assault as it was happening and failed to take action to prevent it, they created Albany County's policy or custom pursuant to which the sexual assault occurred, and they were deliberately indifferent to the security of detainees in their care.

596.    Defendant City caused the violation of Plaintiff Doe's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to sexual assault there.

597.    As a result of Defendants' unlawful conduct, Plaintiff Doe suffered the injuries hereinbefore alleged.

**TWENTY-THIRD CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth Amendment – Unreasonable Search
(Plaintiff Doe Against Defendants City, Albany County, Apple, Lyons, Torrisi, Poole, Kelly,
Reddy, Lawson, Anzalone, Jarosz, and Frank Harris)

598.    On or about January 24, 2018, to the extent their actions can be characterized as a manual body cavity search, Defendants Torrisi, Poole, Kelly, Reddy, Lawson, Anzalone, Jarosz, and Frank Harris conducted an unreasonable manual body cavity search of Plaintiff Doe by digitally penetrating him in his rectum, and/or failed to take reasonable steps to stop others from doing so despite being aware of the unreasonable search and having a reasonable opportunity to intervene to prevent it.

599.    The manual body cavity search, to the extent Defendants' assault can be characterized as such, was unreasonable in light of the scope of the intrusion, the manner in which it was conducted, the purported justification for initiating it, and the place in which it was conducted.

600.    Defendant Albany County caused the violation of Plaintiff Doe's rights because it has an official policy or custom of subjecting transfer detainees from New York City to unreasonable manual body cavity searches, at the Albany County Jail.

601.    Defendants Apple and Lyons were personally involved in the violation of Plaintiff Doe's constitutional rights because, among other things, they were aware of the regular practice of unreasonable manual body cavity searches by officers under their command and failed to take remedial action, they were aware of the unreasonable manual body cavity search as it was happening and failed to take action to prevent it, they created Albany County's policy or custom pursuant to which the unreasonable manual body cavity search occurred, and they were deliberately indifferent to the security of detainees in their care.

602.    Defendant City caused the violation of Plaintiff Doe's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to unreasonable manual body cavity searches there.

603.    As a result of Defendants' unlawful conduct, Plaintiff Doe suffered the injuries hereinbefore alleged.

**TWENTY-FOURTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment – Failure to Intervene
(Plaintiff Doe Against Defendants City and
New York City Correction Officers Frank Foes #7-9)

604.    Defendants New York City Correction Officers Frank Foes #7-9, the ESU officers who transported Plaintiff Doe to Albany, knew that Defendants Defendants Torrisi, Poole, Kelly, Reddy, Lawson, Anzalone, Jarosz, and Frank Harris were going to violate, and were in fact violating, the constitutional rights of Plaintiff Doe by using objectively unreasonable force against him, sexually assaulting him, and/or conducting an unreasonable search of him.

605.    Defendants Foes #7-9 had a reasonable opportunity to intervene to prevent these violations.

606.    Defendants Foes #7-9 failed to take reasonable steps to intervene.

607.    Defendant City caused the violation of Plaintiff Doe's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to violent torture there.

608.    As a result of Defendants' unlawful conduct, Plaintiff Doe suffered the injuries hereinbefore alleged.

## TWENTY-FIFTH CAUSE OF ACTION

42 U.S.C. § 1983 – Fourteenth Amendment – Deliberate Indifference to Serious Medical Need
(Plaintiff Doe Against Defendants Albany County, Apple, Lyons, Mylroie, Torrisi, Poole, Kelly,
Reddy, Lawson, Anzalone, Jarosz, and Frank Harris)

609.    As a result of the assault and sexual assault on February 13, 2018, Plaintiff

Doe was unconscious, had serious visible injuries lasting for several days, and was bleeding

severely.

610.    Plaintiff Doe did not receive adequate or reasonable medical care.

611.    Defendants Mylroie, Torrisi, Poole, Kelly, Reddy, Lawson, Anzalone,

Jarosz, and Frank Harris were aware of a substantial risk of harm to Plaintiff Doe and knowingly

disregarded that risk by denying him medical care and/or failing to get medical care for him.

612.    Defendant Albany County caused the violation of Plaintiff Doe's rights

because it has an official policy or custom of denying adequate medical care to the transfer

detainees from New York City whom it subjects to violent torture.

613.    Defendants Apple and Lyons were personally involved in the violation of

Plaintiff Doe's constitutional rights because, among other things, they were aware of their staff's

regular practice of denying medical care to recently beaten transfer detainees and failed to take

remedial action, they were aware of Plaintiff Espinal's condition and failed to take action to

remedy it, they created Albany County's policy or custom of denying medical treatment, and

they were deliberately indifferent to the medical needs of detainees in their care.

614.    As a result of Defendants' unlawful conduct, Plaintiff Doe suffered the

injuries hereinbefore alleged.

## TWENTY-SIXTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Procedural Due Process – Sham Hearing
(Plaintiff Doe Against Defendants Albany County, Apple, Lyons, and Lieutenant Foe #15)

615.    On or about July 19, 2018, Defendant Lieutenant Foe #15 presided over a sham disciplinary hearing with a predetermined outcome, during which Plaintiff Doe was told that anything he did would not matter to the outcome, as a result of which Plaintiff Doe was sentenced to 550 days in solitary confinement.

616.    Defendant Albany County caused the violation of Plaintiff Doe's due process rights because it has an official policy or custom of keeping any detainee who has ever been accused of assaulting staff anywhere in solitary confinement, and an official policy or custom of conducting sham disciplinary hearings to keep the transfer detainees from New York City whom it subjects to violent torture in solitary confinement.

617.    Defendants Apple and Lyons were personally involved in the violation of Plaintiff Doe's constitutional rights because, among other things, they directed their staff to keep tortured transfer detainees in solitary confinement no matter what, were aware of their staff's regular practice of conducting sham disciplinary hearings with predetermined outcomes and failed to take corrective action, and created Albany County's policy or custom of keeping tortured transfer detainees in solitary confinement.

618.    As a result of Defendants' unlawful conduct, Plaintiff Doe suffered the injuries hereinbefore alleged.

## TWENTY-SEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Excessive Force Against Pretrial Detainee
(Plaintiff Tillery Against Defendants City, Albany County, Apple, Lyons, Sergeant Foe #18,
Lawson, Shield #323, Shield #99, and Albany County Correction Officers Frank Foes #19-21)

619.    On or about August 9, 2018, Defendants Sergeant Foe #18, Lawson, Shield #323, Shield #99, and Albany County Correction Officers Frank Foe #19-21 used

objectively unreasonable force against Plaintiff Tillery, and/or failed to prevent others from doing so despite being aware of the use of objectively unreasonable force and having a reasonable opportunity to intervene to prevent it.

620.    Defendant Albany County caused the violation of Plaintiff Tillery's rights because it has an official policy or custom of subjecting transfer detainees from New York City to violent torture at the Albany County Jail.

621.    Defendants Apple and Lyons were personally involved in the violation of Plaintiff Tillery's constitutional rights because, among other things, they were aware of the regular practice of torture by officers under their command and failed to take remedial action, they were aware of the torture as it was happening and failed to take action to prevent it, they created Albany County's policy or custom pursuant to which the torture occurred, and they were deliberately indifferent to the security of detainees in their care.

622.    Defendant City caused the violation of Plaintiff Tillery's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to excessive and unlawful force there.

623.    As a result of Defendants' unlawful conduct, Plaintiff Tillery suffered the injuries hereinbefore alleged.

## TWENTY-EIGHTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Failure to Intervene
(Plaintiff Tillery Against Defendants City and
New York City Correction Officers Frank Foes #10-12)

624.    Defendants New York City Correction Officers Frank Foes #10-12, the ESU officers who transported Plaintiff Tillery to Albany, knew that Albany County correctional staff were going to violate, and were in fact violating, the constitutional rights of Plaintiff Tillery by using objectively unreasonable force against him.

625.    Defendants Foes #10-12 had a reasonable opportunity to intervene to prevent these violations.

626.    Defendants Foes #10-12 failed to take reasonable steps to intervene.

627.    Defendant City caused the violation of Plaintiff Tillery's rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to excessive and unlawful force there.

628.    As a result of Defendants' unlawful conduct, Plaintiff Tillery suffered the injuries hereinbefore alleged.

**TWENTY-NINTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment – Deliberate Indifference to Serious Medical Need
(Plaintiff Tillery Against Defendants Against Defendants Albany County, Apple, Lyons,
Mylroie, Sergeant Foe #18, Lawson, Shield #323, Shield #99, and Albany County Correction
Officers Frank Foes #19-21)

629.    As a result of the assault on August 9, 2018, Plaintiff Tillery was unconscious had serious visible injuries lasting for several days or longer.  These included periorbital ecchymosis, a swollen nose, and significant facial abrasions.  He also complained of an ability to hear out of his left ear.

630.    Plaintiff Tillery did not receive adequate or reasonable medical care.

631.    Defendants Nurse Mylroie, Sergeant Foe #2, Lawson, Shield #323, Shield #99, and Albany County Correction Officers Frank Foes #19-21 were aware of a substantial risk of harm to Plaintiff Tillery and knowingly disregarded that risk by denying him medical care and/or failing to get medical care for him.

632.    Defendant Albany County caused the violation of Plaintiff Tillery's rights because it has an official policy or custom of denying adequate medical care to the transfer detainees from New York City whom it subjects to violent torture.

633.     Defendants Apple and Lyons were personally involved in the violation of Plaintiff Tillery's constitutional rights because, among other things, they were aware of their staff's regular practice of denying medical care to recently beaten transfer detainees and failed to take remedial action, they were aware of Plaintiff Tillery's condition and failed to take action to remedy it, they created Albany County's policy or custom of denying medical treatment, and they were deliberately indifferent to the medical needs of detainees in their care.

634.     As a result of Defendants' unlawful conduct, Plaintiff Tillery suffered the injuries hereinbefore alleged.

### THIRTIETH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Procedural Due Process – Sham Hearing
(Plaintiff Tillery Against Defendants Albany County, Apple, Lyons,
and Lieutenant Frank Foe #16)

635.     On or about August 24, 2018, Defendant Lieutenant Frank Foe #16 presided over a sham disciplinary hearing with a predetermined outcome, as a result of which Plaintiff Tillery was sentenced to 360 days in solitary confinement.

636.     Defendant Albany County caused the violation of Plaintiff Tillery's due process rights because it has an official policy or custom of keeping any detainee who has ever been accused of assaulting staff anywhere in solitary confinement, and an official policy or custom of conducting sham disciplinary hearings to keep the transfer detainees from New York City whom it subjects to violent torture in solitary confinement.

637.     Defendants Apple and Lyons were personally involved in the violation of Plaintiff Tillery's constitutional rights because, among other things, they directed their staff to keep tortured transfer detainees in solitary confinement no matter what, were aware of their staff's regular practice of conducting sham disciplinary hearings with predetermined outcomes

and failed to take corrective action, and created Albany County's policy or custom of keeping

tortured transfer detainees in solitary confinement.

638.    As a result of Defendants' unlawful conduct, Plaintiff Washington

suffered the injuries hereinbefore alleged.

## THIRTY-FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Sixth Amendment – Denial of Right to Counsel
(All Plaintiffs Against Defendants Albany County, Apple, and Lyons)

639.    Defendant Albany County, Apple, and Lyons have a policy or custom of

monitoring all detainee phone calls, including telephone calls with counsel that are supposed to

be private and confidential, and of denying detainees access to confidential telephonic or

videographic communications with counsel.

640.    This policy or custom unjustifiably obstructed and/or continues to obstruct

Plaintiffs' access to their criminal defense counsel guaranteed by the Constitution.

641.    No legitimate penological justification exists for denying detainees access

to unrecorded and unmonitored confidential telephone calls between detainees and their counsel,

as evidenced by, among other things, the fact that New York State law requires such calls not to

be monitored.

642.    As a result of Defendants' unlawful conduct, Plaintiffs suffered the

injuries hereinbefore alleged.

## THIRTY-SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Sixth Amendment – Denial of Right to Counsel
(All Plaintiffs Against Defendants City, Brann, and Williams)

643.    Defendants Brann and Williams transferred Plaintiffs 160 miles away on

SJOs to a facility where it is not feasible for their attorneys to visit them with any regularity and

where confidential attorney-client communications are not reasonably available.

644.    Plaintiffs' transfer to Albany unjustifiably obstructed and/or continues to obstruct their access to their criminal defense counsel guaranteed by the Constitution.

645.    Defendant City caused the violation of Plaintiffs' rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with deliberate indifference to the interference with their ability to communicate with counsel and participate in the defense of their criminal cases.

646.    Defendant City is also liable for the deprivation because Defendant Brann acted in her capacity as the final municipal policymaker with respect to SJOs pursuant to state law.

647.    As a result of Defendants' unlawful conduct, Plaintiffs suffered the injuries hereinbefore alleged.

### THIRTY-THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Deliberate Indifference to Detainee Safety
(All Plaintiffs Against Defendants City, Brann, and Williams)

648.    Plaintiffs' conditions of confinement at the Albany County Jail posed an unreasonable risk to their safety and constituted an objective deprivation of due process.

649.    In transferring Plaintiffs to Albany on SJOs, Defendants Brann and Williams acted intentionally to impose this risk to Plaintiffs' safety, or recklessly failed to act with reasonable care to mitigate the risk to Plaintiffs' safety of which they knew or should have known.

650.    Defendant City caused the violation of Plaintiffs' rights because it has an official policy or custom of transferring selected detainees to the Albany County Jail with the knowledge and expectation that they will be subject to an unreasonable risk to their safety there.

651.     Defendant City is also liable for the deprivation because Defendant Brann acted in her capacity as the final municipal policymaker with respect to SJOs pursuant to state law.

652.     As a result of Defendants' unlawful conduct, Plaintiffs suffered the injuries hereinbefore alleged.

*        *        *

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

a.     Certification of the proposed class pursuant to Federal Rule of Civil Procedure 23;

b.     Compensatory damages in an amount to be determined at trial;

c.     Punitive damages against the non-municipal Defendants in an amount to be determined at trial;

d.     A declaration that the City's policy or custom of transferring young pretrial detainees outside the City on substitute jail orders to evade the ban on solitary confinement and/or to punish or retaliate against the detainees violates the United States Constitution;

e.     A declaration that Albany County's policy or custom of torturing pretrial detainees transferred from New York City on arrival at the Albany County Correctional Facility violates the United States Constitution;

f.     A declaration that the City's policy or custom of transferring pretrial detainees to the Albany County Correctional Facility with the knowledge and expectation that they will be subject to excessive and unlawful force violates the United States Constitution;

g.      An injunction ordering Defendants to cease holding Steven Espinal in solitary confinement, nullifying and voiding any substitute jail orders transferring him out of the City of New York, and ordering Defendants to return him to a correctional facility in the City of New York;

h.      An injunction prohibiting Defendants from retaliating against Steven Espinal or David Doe in response to the filing of this action, including but not limited to retaliation in the form of beatings or physical, sexual or verbal abuse;

i.      An injunction prohibiting Defendants City, Brann, and Williams from transferring class members to the Albany County Correctional Facility;

j.      An injunction requiring Defendants Albany County, Apple, and Lyons to make unrecorded, unmonitored legal telephone calls available as necessary to Plaintiff Espinal and other class members;

k.      Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

l.      Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      January 28, 2019

EMERY CELLI BRINCKERHOFF &
ABADY LLP

By:           /s/
        Katherine Rosenfeld
        Douglas E. Lieb
        600 Fifth Avenue, 10th Floor
        New York, New York 10020
        (212) 763-5000

LAW OFFICES OF GOLDMAN &
ASSOCIATES

By:     Steven Goldman
        190 East 161st Street, Suite 100
        Bronx, New York 10451
        (718) 538-5743

*Attorneys for Plaintiffs*