UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

DAVON WASHINGTON, PARIIS TILLERY,
JOHN DOE, and STEVEN ESPINAL, et al.,

Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

———————————————————— x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/30/19

18 Civ. 12306 (CM)

## DECISION AND ORDER ON THE CITY DEFENDANTS' MOTION TO DISMISS, THE ALBANY DEFENDANTS' MOTION TO SEVER, AND PLAINTIFF ESPINAL'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs Davon Washington ("Washington"), Pariis Tillery ("Tillery"), John Doe ("Doe"), and Steven Espinal ("Espinal") allege that they have been transferred from New York City Department of Correction ("DOC") facilities to the Albany County Correctional Facility ("ACCF") for the purpose of punishment, including placement in punitive segregation for extended periods of time, which is not permitted at DOC facilities.

Plaintiffs allege that the transfers have resulted in multiple constitutional violations by Defendants New York City ("the City"), DOC Commissioner Cynthia Brann ("Brann"), DOC Bureau Chief Brian Sullivan ("Sullivan"), DOC Deputy Warden Sharlisa Walker ("Walker"), DOC Captain Edward Williams ("Williams"), and multiple unnamed corrections officers ("COs") (collectively the "City Defendants), including, among others, violation of Plaintiffs' right to procedural due process, substantive due process, and access to counsel.

Plaintiffs also bring claims against Albany County and a host of Albany County COs, including the Sheriff and Superintendent of ACCF (collectively the "Albany Defendants"), and Melissa Mylroie ("Mylroie"), a nurse at ACCF, alleging that these defendants subjected them to

1

physical and sexual assault, unreasonable search, and sham disciplinary proceedings, and denied them access to counsel and medical care.

The City Defendants have moved to dismiss all of Plaintiffs' claims, while the Albany Defendants have moved to sever the claims against them and transfer those claims to the Northern District of New York. They do not move to dismiss any claims.

The City Defendants' Motion to Dismiss is DENIED. The Albany Defendants' and Defendant Mylroie's Motions to Sever are DENIED without prejudice. Finally, Plaintiff Espinal's Motion for a Preliminary Injunction is DENIED.

## FACTS

The relevant facts are drawn from the Amended Complaint (the "FAC") and are taken as true for the purpose of resolving this motion.

### I.    The Practice of Solitary Confinement

Solitary confinement is the practice of placing inmates in cells by themselves. While in solitary, inmates in have limited to no human contact. In recent years, the practice has come under significant criticism from researchers, policymakers, and even the judiciary for the dire impact that it can have on a detainee's mental health.

Research on the impact of solitary confinement illuminates its dangers. Solitary confinement is associated with an increased risk of suicidal tendencies, anxiety, depression, and paranoia. (Am. Compl., Dkt. No. 41, ¶ 32.) The impact of solitary is particularly harmful for youth, whose brains are not fully developed and who might experience accelerated onset of serious mental illnesses as a result of their time in isolation. (*Id.* ¶ 35.)

In August of 2014, the United States Department of Justice released an investigative report on conditions at Rikers Island, in which it observed that DOC's reliance on solitary confinement to discipline adolescent detainees risked "expos[ing] them to a risk of serious harm"

and created a "vicious cycle" of behavioral concerns.  (*Id.* ¶ 29.)  Two months later, the *New Yorker* told the story of Kalief Browder, a Rikers pre-trial detainee who spent 17 months in solitary confinement.  The story detailed the paranoia and suicidal tendencies Browder developed while in isolation, and the impact that experience continued to have on him.  Browder committed suicide less than a year after the article appeared.  (*Id.* ¶ 30.)

## II.     The 2015 Regulation Limiting Solitary Confinement

In January 2015, armed with firsthand knowledge and scientific research about the dangers of solitary confinement, the New York City Board of Correction (the "Board") adopted a regulation that banned solitary confinement for inmates under age 22.  (*Id.* ¶¶ 29-30, 34-35, 37); *see also* 40 RCNY § 1-17.  The Board is an independent body that is responsible for establishing minimum standards for the treatment of detainees held by the City; the standards are codified in the Rules of the City of New York and have binding legal effect.  (Am. Compl. ¶ 38.)

The January 2015 regulation, codified as 40 RCNY § 1-17,  banned solitary confinement for detainees under the age of 18 immediately, and for detainees aged 18-21 as of January 1, 2016, provided sufficient resources were made available to DOC by that time.  *See* 40 RCNY § 1-17(b)(1).  The 18-21 ban finally went into effect in October 2016.  (Am. Compl. ¶¶ 40, 44-45.)  40 RCNY § 1-17 also limited the amount of time any inmate could spend in solitary; adult inmates can spend no more than 30 days in a row in solitary unless the sentence is for a serious assault on correction staff, which carries a maximum of 60 days.  (*Id.* ¶ 46); *see also* 40 RCNY § 1-17(d).

Plaintiffs allege that the City is attempting to circumvent the ban on solitary for pretrial detainees under age 22 by sending "undesirable" young detainees -- particularly, but not limited to, those who have been involved in altercations with guards – 160 miles away, to Albany County Correctional Facility ("ACCF"), where they are subjected the harsh punishment of

3

punitive segregation – a punishment that could not be imposed upon them at DOC facilities. (*Id.* ¶¶ 60, 66.) Reports indicate that since the ban was adopted in 2015, transfers of inmates aged 21 and younger have increased sharply. (*Id.* ¶¶ 60-62.) This is despite the fact that Rikers has alternative forms of restrictive housing available for detainees between ages 18 and 21, such as Enhanced Supervision Housing. (*Id.* ¶¶ 60, 66.)

### III.    The Transfer Process

The transfer of detainees between facilities in New York is governed by both Corrections Law § 504 and 9 NYCRR § 7210.6.

In order to effectuate a transfer between facilities in different counties, the New York State Commission of Correction (the "SCOC") must issue a "substitute jail order" ("SJO"). (*Id.* ¶ 52.) SJOs are issued under specific circumstances, including when the safety or security of detainees or a group of detainees is threatened by their confinement in a particular facility, and the facility administrator believes that safety and the public interest require that these detainees be housed in another facility. (*Id.* ¶ 53.)

To obtain an SJO, the administrator of the original facility must follow procedures outlined in 9 NYCRR § 7210.6. (*Id.* ¶¶ 52-57.) First, the "faculty administrator determines that it is necessary to transfer an inmate . . . to another suitable place or facility." 9 NYCRR § 7210.6(a). Then, the administrator identifies "another facility *within the county* which may be designated as a substitute jail." *Id.* § 7210.6(b) (emphasis added). If there is no "suitable" place in the county, the administrator "shall determine whether the county jail of another county is able to accommodate the inmate." *Id.* In doing so, the administrator "shall take into account" factors such as the ability to house the inmate "in a manner consistent with *applicable standards*" (which in this case would obviously include no solitary confinement for inmates under age 22); "proximity" (a word that means "closeness") to the county jail; "potential inconvenience to the

family and friends" (who might want to visit but be unable to travel long distances); "access to legal counsel and other resources;" and the ability to "provide proper security and supervision of the inmate." *Id.* § 7210.6(c). The administrator must obtain "assurance that the facility administrator of the receiving facility will house the inmates." *Id.* § 7210.6(d). The facility administrator then provides the SCOC with the "pertinent information" needed to determine whether an SJO should be granted. *Id.* § 7210.6(d). The SCOC then approves the transfer, and the facility administrator makes the necessary arrangements to effectuate the transfer. *Id.*

An affidavit from former DOC Captain Edward Williams, submitted in an Article 78 proceeding, describes how this process works in practice. (Reply Decl. of Douglas E. Lieb ("Lieb Decl."), Dkt. No. 64, Ex. 1 ("Williams Aff.").)[1]  First, Williams would determine that he wanted to transfer the detainee and investigate what other facilities might be suitable. (*Id.* ¶¶ 5-6.) He then would contact the facility and wait to hear if it would accept the detainee. (*Id.* ¶¶ 10-11.) Once he received the facility's approval, he would submit a transfer request. (*Id.* ¶ 14.) The SCOC then issued the SJO approving the transfer. (*Id.*)

In circumstances in which, due to "extraordinary circumstances," the facility administrator "reasonably believes" that safety of the inmate or public safety and security would be preserved by transfer, the procedures are slightly different. They are outlined in § 7210.6(e). The rule says that the facility administrator must make a written request to the commissioner to "make available an institution" for the inmate. 9 NYCRR § 7210.6(e)(1). However, as a matter of practice, the facility administrator specifies the institution to which the inmate should be transferred. (Decl. of Katharine Rosenfeld ("Rosenfeld Decl."), Dkt. No. 38, Ex. 19) ("In order

---

[1] The Court considers this affidavit on the motion to dismiss because it is incorporated into the Complaint by reference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).

to ensure Mr. Espinal's continued safety and security, a determination was made pursuant to

Correction Law §504(2) and in accordance with 9 CRR-NY §7210.6(e)(l), that [ACCF] would

serve as the adjunct State correctional institution and application was made to the [SCOC] for

approval of the transfer.").[2] Upon the written determination of the commissioner that "such

institution is available," the facility administrator transfers the inmate to the custody of the

commissioner.  The legal custody of the inmate remains with the facility administrator.

9 NYCRR § 7210.6(e)(2).  In practice, the commissioner then houses the inmate in the

designated institution, even though the rule states that the inmate should be housed in the in the

"most proximate available institution," considering the security needs of the inmate.  *Id.*  The

rule does not mandate that the administrator consider the other factors listed in § 7210.6(c) when

transferring an inmate pursuant to § 7210.6(e).  Ultimately, if the facility administrator

determines that the original facility is inappropriate for the inmate for the longer term, the facility

administrator is responsible for finding another suitable facility and must ask the commission to

designate it as a substitute jail.  *Id.* § 7210.6(e)(3).

     When an inmate is housed in another facility, the original jurisdiction pays the receiving

jurisdiction's expenses of holding the detainee.  (Am. Compl. ¶ 55.)  This can be a lucrative

business for jails; in 2013, housing other counties' detainees on SJOs brought Albany County

more that $3 million in revenue.  The Sheriff of ACCF has stated that Albany Officials are

"trying to run our jail as a business."  (*Id.* ¶ 58.)

---

[2] While this letter was submitted in support of Plaintiff Steven Espinal's Motion for a Preliminary
Injunction, the Court can consider it on a motion to dismiss because it is incorporated into the FAC by reference.
(Am. Compl. ¶ 224.); *see also Tellabs, Inc.*, 551 U.S. at 322.

## IV.    The City's Transfer of Detainees to ACCF

Plaintiffs allege that the City has a policy and custom of sending difficult young detainees to ACCF in order to punish them. They allege that a specific pattern is followed when a young detainee is transferred upstate – a pattern to which every New York City detainee who has been brought to ACCF on an SJO in the past two years has been subjected. (*Id.* ¶ 99.)

First, prior to leaving Rikers, the detainee is strip-searched, shackled, and loaded into a van, which takes him to ACCF. (*Id.* ¶¶ 67-68.) He receives no advance notice of his transfer, even though such notice is required. (*Id.* ¶¶ 57, 67.)

Upon arrival at ACCF, the detainee is subjected to a "routine of torture." (*Id.* ¶ 71.) He is escorted to the intake area of the ACCF by DOC Emergency Services Unit ("ESU") Corrections Officers ("COs") – the New York City COs who transported him from Rikers to Albany. (*Id.* ¶ 74.) There, he is handed over to the "Green Team" – a group of ACCF COs wearing paramilitary uniforms. (*Id.* ¶¶ 72, 75.) The detainee is transferred from DOC handcuffs to Albany handcuffs, and ACCF COs take him to a booking cell. He is given a series of arbitrary and increasingly convoluted commands to follow; every time he gets confused, he is punched. (*Id.* ¶¶ 76-77.) Then, the detainee's cuffs are removed and the Green Team, directed by Defendant Torrisi, assaults him. (*Id.* ¶ 78.) The DOC ESU officers who brought the detainee to Albany are often present inside the intake area while this assault occurs, and can see and hear what is happening. (*Id.* ¶ 79.)

Next, the detainee is subjected to a body scanner (the "BOSS Chair"), a medical detector, and a medical x-ray, all of which are used to search for contraband in body cavities. (*Id.* ¶ 80.) He is then taken to a solitary confinement cell. (*Id.* ¶ 81.) At some point during this process, Defendant Torrisi claims to have seen contraband inside the detainee's rectum, and ACCF COs physically and sexually assault him under the pretext of attempting to remove the real or

imagined contraband.  (*Id.* ¶¶ 82, 88.)  These attacks often result in injuries, but the detainee is denied sufficient medical care by Defendant Mylroie, the assigned medical provider.  (*Id.* ¶ 90.)

After the assault, the detainee is written up for "assaulting staff," among other infractions. (*Id.* ¶ 91.)  He is given a disciplinary hearing, which Plaintiffs allege is a predetermined, sham hearing lacking a standard processes.  The hearing always results in the detainee's being found guilty of multiple infractions,  (*id.* ¶ 93), and the penalty is a long period of solitary confinement – often for over a year,  (*id.* ¶ 94).

While in solitary confinement at ACCF, the detainee remains in his cell for a minimum of 23 hours per day – he is provided with one hour of "recreation" by himself in an indoor cage, which many detainees decline because it is "functionally indistinguishable from their cells." (*Id.* ¶ 96.)  While at ACCF, detainees do not have access to unmonitored legal calls, and have difficulty accessing confidential legal communications.  (*Id.* ¶¶ 120-23.)

Plaintiffs allege that the City and its policymakers are aware of the increased transfer rates, the failure to provide notice of the transfers, and the mistreatment of Rikers detainees in Albany.  (*Id.* ¶¶ 102-03.)  They allege the City is on notice because: (1) letters to DOC's general counsel from Plaintiffs' attorneys – and attorneys for non-Plaintiff detainees – have alerted them to the beatings and mistreatment; (2) a notice of claim was filed with the City Comptroller describing Espinal's assault upon his arrival at ACCF; (3) Plaintiff and non-Plaintiff detainees have filed multiple Article 78 petitions asserting that their rights are being violated; and, (4) the *New York Times* published a story on July 22, 2018 detailing ACCF's treatment of Rikers detainees.  (*Id.* ¶¶ 105-13.)  The first of these notices – a letter describing an ACCF CO's assault on a Rikers detainee upon his arrival at ACCF – was sent by the detainee's criminal defense attorney to the City on February 16, 2018.  (*Id.* ¶ 106.)

8

V.     **The Four Plaintiffs' Experiences**

The named Plaintiffs in this case – Davon Washington, Steven Espinal, John Doe, and Pariis Tillery – all allege experiences that fit this pattern. (*Id.* ¶ 124.)

### A. Davon Washington

Washington was arrested and taken into DOC custody in March 2016, at the age of 19. (*Id.* ¶¶ 127-28.)  In March 2018, he lodged complaints with Legal Aid Society Prisoners' Rights Project, alleging that he was groped by DOC staff and denied adequate mental health and medical care; Legal Aid relayed these complaints to DOC on or about March 16 and March 26, 2018. (*Id.* ¶ 131.)

On March 28, 2018, Washington was ordered to pack his things, removed from his cell, and strip-searched. (*Id.* ¶ 133.)  During the search, a CO told him that Defendant Sharlisa Walker "can't be around you," and that he would be going "off Rikers" to Albany because "Deputy Walker don't want you." (*Id.* ¶ 136.)  Rikers COs then transported Washington to ACCF. (*Id.* ¶ 141-42.)  Washington was given no notice of the basis of the transfer, received no hearing, and was not permitted to call any family or lawyers to inform them of his whereabouts. (*Id.* ¶ 138.)  The SJO authorizing Washington's transfer, procured by Defendant Williams on behalf of Brann, cited "safety considerations" as the reason for the transfer. (*Id.* ¶¶ 139-40.)  There are no indications that Washington was transferred pursuant to "extraordinary circumstances," which leads to the inference that he was transferred pursuant to § 7210.6 (a-d).

Upon his arrival in Albany, Washington was greeted by members of the "Green Team," who, along with two to three Rikers ESU officers, brought him into the intake area of the jail. (*Id.* ¶ 143.)  The ESU officers removed Washington's cuffs and he was placed in Albany Cuffs. (*Id.* ¶ 144.)  The ACCF COs then brought him into booking cell #2, where eight to ten other COs were waiting for him, including Defendant Torrisi. (*Id.* ¶¶ 146-47.)  Defendant Torrisi told

Washington to put his head on the wall, and then hit him in the face while simultaneously asking Washington why he was transferred to ACCF. (*Id.* ¶ 149.) COs then removed his handcuffs and proceeded to hit, punch, kick, and stomp on Washington while he lay on the ground. (*Id.* ¶¶ 150-55.) The Albany COs then instructed Washington to get naked and continued to beat him. The COs forcefully inserted two fingers into Washington's rectum, attempting to remove purported contraband. (*Id.* ¶¶ 159, 162-63.) The Rikers ESU officers were still in the intake area and were aware of what was happening. (*Id.* ¶ 153.)

After this beating, Washington was searched for contraband; he sat in the BOSS chair, went through a metal detector, and underwent a medical x-ray. (*Id.* ¶¶ 164-66.) All the while, he was bleeding from his nose and mouth. When Washington told a nurse that he had injuries, two COs responded by punching him in the face. Immediately after, the nurse again asked him if he had injuries; this time, he said no. (*Id.* ¶ 167.)

Washington was then taken to a cell in the Segregated Housing Unit ("the SHU") – the housing unit for inmates in punitive segregation – where he was again ordered to get naked. (*Id.* ¶ 169.) He remained shackled. COs punched and kicked him until he had blood all over his face and was visibly injured. (*Id.* ¶ 171.) Out of fear, Washington denied medical attention when it was offered, but he was clearly injured – his face was bleeding and swollen, his tooth was chipped, and he was bruised all over his body. (*Id.* ¶¶ 171, 173.)

Washington received an infraction ticket for the incident, which accused him of attacking staff. (*Id.* ¶ 175.) A disciplinary hearing was held; Washington's only statement was that he had nothing to say about the incident. (*Id.* ¶ 177.) The hearing resulted in a sentence of 360 days in punitive segregation. (*Id.* ¶ 178.)

Washington was ultimately held in the SHU for around eight months, until his departure from ACCF in December 2018. (*Id.* ¶ 180.)   While in the SHU, he was denied access to educational programming.  He was also put on new psychiatric medications and he lost significant amounts of weight.  (*Id.* ¶¶ 185-87.)  His only time outside of his cell was one hour per day in an empty, metal, chain-link cage placed next to a window in the hallway outside his cell.  (*Id.* ¶ 182.)

Washington also alleges a separate incident of assault in October 2018, where three ACCF COs assaulted him after a legal visit with counsel in this action and threatened that what Washington was "doing" was not going to work. (*Id.* ¶¶ 189-96.)

### B. Steven Espinal

Espinal was arrested in November 2017 at the age of 18.  (*Id.* ¶¶ 200-01.)  On February 10, 2018, he and other detainees were involved in an altercation with a CO, which received widespread media coverage.  (*Id.* ¶¶ 204-06.)  The Court has viewed the video of the incident; it appears that Espinal was the initial perpetrator.

Espinal was arraigned in Bronx Criminal Court on February 12, 2018, on charges stemming from the February 10 incident.  (*Id.* ¶ 209.)

On February 13, 2018, Espinal was picked up by ESU early in the morning, placed in a van with two other detainees who were also alleged to have been involved in the February 10 incident, and driven to ACCF.  (*Id.* ¶¶ 210-12.)  He was given no notice of his transfer and he was not told where he was going.  (*Id.* ¶ 213.)

An SJO was issued on that very day, February 13, 2018, on the basis that DOC was "unfit" for Espinal's confinement due to "safety considerations."  The initial SJO was requested by Williams upon the application of Brann, and was effective through April 1, 2018.  (Decl. of

Mark D. Zuckerman ("Zuckerman Decl."), Dkt. No. 53, Ex. C.)[3]  Then, on March 28, 2018,

another SJO was issued, effective from April 1, 2018 *sine die* until rescinded.  (*Id.*)  In a letter

sent to Espinal's criminal attorney in August 2018, DOC represented that it had transferred

Espinal on an emergency basis pursuant to 9 NYCRR § 7210.6(e).  (Am. Compl. ¶ 224;

Rosenfeld Decl. Ex. 19.)

Upon his arrival at ACCF, Espinal encountered about 12 members of the Green Team.

(Am. Compl. ¶ 216.)  One of the ACCF COs said, "We want Espinal first," and the ACCF COs,

as well as two to three Rikers ESU officers, escorted him into the intake area.  (*Id.* ¶¶ 217-18.)

Espinal was placed in Albany cuffs and shackles, and transferred into booking cell #2, where

eight to ten ACCF COs and supervisors were waiting for him.  (*Id.* ¶¶ 219-221, 228.)

Immediately, Defendant Torrisi punched Espinal in the face, twice.  (*Id.* ¶ 231.)  Torrisi

said, in sum and substance, "This isn't Rikers.  This is Albany County.  We do what we want."

(*Id.* ¶ 230.)  The COs punched him all over his body while he was still cuffed.  When Espinal fell

to the ground, they kicked him and stomped on him.  (*Id.* ¶¶ 233-35.)  After Torrisi decided it

was "enough," he told Espinal to face the wall.  (*Id.* ¶ 236.)  Defendants then gave Espinal a

series of instructions about how to remove his clothes; when he misunderstood or failed to

comply, they punched him in the ribs.  (*Id.* ¶ 238.)  After all of his clothes were removed, Espinal

was given a jumpsuit and searched for contraband using the BOSS chair, a metal detector, and a

medical x-ray.  (*Id.* ¶¶ 239-43.)  The COs reported that the x-ray had detected that Espinal had a

weapon in his body.  (*Id.* ¶ 243.)

The COs next brought Espinal to the SHU, where a nurse said he was "fine."  (*Id.* ¶¶ 244-

45.)  When he got to a cell, the COs again told him to get naked, which he did.  They then

---

[3] The Court considers the SJOs on the motion to dismiss because they are incorporated into the Complaint by reference. *See Tellabs, Inc.*, 551 U.S. at 322.

proceeded to punch and kick him several times, saying that they would get the contraband "out of [him.]" (*Id.* ¶¶ 247-48.) While Defendant Lawson held Espinal down, another CO proceeded to forcefully insert his fingers into Espinal's rectum, causing him great pain and to bleed; the CO said he could not feel anything. (*Id.* ¶ 249-50.) The COs then told Espinal to defecate on the floor to remove the contraband, threatening to beat it out of him if he could not extricate it himself, all while continuing to assault him. (*Id.* ¶ 252.) They then ordered that he stand up, informing him again that they were going to make him "s**t it out" and tased him from a few feet away – even though he had his back to them – causing him to fall to the ground. (*Id.* ¶¶ 254-56.)

Espinal was taken to a shower and then strapped into a restraint chair, a physical restraint device that fastens a detainee to a chair at the wrists, ankles, thighs, arms, and head. (*Id.* ¶¶ 258-59.) While Espinal was in the restraint chair, the COs continued to taunt and assault him. (*Id.* ¶ 260.) He was kept in the chair overnight. (*Id.* ¶ 261.)

When he was released from the chair the next morning, Espinal was bleeding, bruised all over his body, dizzy, and unable to urinate normally. (*Id.* ¶¶ 262-63.) He was taken to Albany Medical Center, where staff documented scratches to his face, tenderness in his neck, midline spine, and suprapubic region, and multiple bruises and abrasions. (*Id.* ¶ 267.) At the hospital, Espinal told the staff he had lost consciousness in a "fight" – he says that he told the staff this lie out of fear that the COs would retaliate against him. (*Id.* ¶ 266.)

After his return from the hospital, Espinal was sent back to the SHU. (*Id.* ¶ 268.) Two days later, on February 16, 2018, Espinal was brought back to the Bronx for a court appearance; the Judge ordered that he be given immediate medical attention. (*Id.* ¶ 269.)

13

Espinal was charged with assaulting staff. (*Id.* ¶ 270.) He was never served with an infraction, although one was generated on February 13, 2018. (*Id.* ¶ 272.) On February 26, 2018, Espinal had a disciplinary hearing, where he had no opportunity to call witnesses. (*Id.* ¶ 275.) Prior to the hearing, a sergeant told Espinal that "no matter what happened," he would remain in punitive segregation. (*Id.* ¶ 274.)

Espinal was sentenced to 600 days in solitary confinement. He remained there for over a year, despite the fact that a state court judge directed that he be released. (*Id.* ¶¶ 276-77.) He was in solitary confinement when both the Complaint and FAC were filed. (*Id.* ¶ 278.) During this time, he did not receive educational services, other than an educational packet. (*Id.* ¶ 282.) He received limited mental health services, which were administered in his cell in the presence of a CO. (*Id.* ¶ 284.) The Albany Defendants also failed to comply with court orders that Espinal be produced in court for attorney's visits, and he twice missed court appearances. (*Id.* ¶¶ 285-86.)

Espinal was assaulted a second time on July 4, 2018. Espinal did not respond to a nurse making medical rounds because he was on medication that made him drowsy. (*Id.* ¶¶ 290-91.) Due to his lack of response, COs entered his cell, pinned him to the bed, handcuffed and shackled him, beat him, and sprayed him with pepper spray. (*Id.* ¶¶ 289-96.) Espinal suffered multiple injuries and again had to be taken to Albany Medical Center. (*Id.* ¶ 300.) He had trouble opening his jaw, which was swollen shut, a deep cut on his face, and was diagnosed with "head trauma" and "left jaw pain and swelling post assault." (*Id.* ¶ 301.)

On April 4, 2019, Espinal was transferred out of ACCF and into state custody to begin serving his sentence for his underlying crimes. (Dkt. No. 91.) He spent almost 14 months in solitary confinement. At all this time, he was less than 22 years old.

### C. John Doe

Doe was arrested in December 2015. (Am. Compl. ¶ 313.)

There is no indication in the FAC that Doe attacked anyone or presented any danger to anyone at Rikers. In January 2018, while Doe was being housed at the Manhattan Detention Complex ("MDC"), Defendant Sullivan told him, "Soon enough we won't have to deal with your bullshit anymore. You're going somewhere good, somewhere that you'll like." (*Id.* ¶ 319.) The next day, Doe was transferred to Ulster County Jail. After about a week at Ulster, he was transferred to ACCF by DOC ESU officers. (*Id.* ¶¶ 321, 326, 328.) Defendant Williams acknowledged in an affidavit submitted in another proceeding that he knew Doe was only in Ulster temporarily, prior to being sent to ACCF, because ACCF indicated that it would not be able to receive the Rikers detainee until January 23, 2018. (*Id.* ¶ 325.)

The SJO for Doe's transfer to ACCF cites "safety considerations" as the reason for his transfer. The SJO was meant to be temporary – from January 24, 2018 through April 1, 2018. (Zuckerman Decl. Ex. E.) Nevertheless, Doe remained at ACCF until he was transferred to state custody after he pled guilty to his underlying crime in October 2018. (Am. Compl. ¶ 401.)

Upon his arrival at ACCF, Doe was greeted by the Green Team, under the command of Defendant Torrisi. (*Id.* ¶¶ 329-30.) These COs escorted him to a booking cell, where he was subjected to a strip search and told to follow confusing instructions as to how to remove his clothes. (*Id.* ¶¶ 331-32.) During this process, COs kicked and hit Doe, causing him to fall to the ground. (*Id.* ¶¶ 333-34.) The COs then brought Doe to the BOSS chair and subjected him to an x-ray; during this process he was again hit by COs. (*Id.* ¶¶ 336-37.) The COs informed Doe that the x-ray detected the presence of a razor in his rectum, and threatened that if he didn't give up the weapon, it would be the "worst day of [his] life." (*Id.* ¶ 339.)

Doe was then taken to the SHU, where he was held naked in a cell along with eight to ten COs. (*Id.* ¶ 342.) He was again told to extricate the razor. (*Id.* ¶ 343.) After removing his handcuffs, six to eight COs assaulted him with fists, batons, and pepper spray; one CO told Doe, in sum and substance, "We kill people here. Is that what you want?" (*Id.* ¶¶ 344-48.) When Doe asked for food and water to stimulate his bowels, Defendant Torrisi slammed his head against the wall and instructed another officer to put a baton in his rectum, causing Doe to bleed. (*Id.* ¶¶ 353-56.) Doe was then tasered multiple times, causing him to urinate and defecate on himself and to lose consciousness multiple times. (*Id.* ¶¶ 358-63.) During the assault, Defendant Torrisi said, in sum and substance, "We're going to kill you. This isn't Rikers anymore." The COs finally told Doe the weapon was no longer inside of him, but tased him a final time as revenge for defecating on one CO's shoes. (*Id.* ¶ 369.)

Doe was brought back to the x-ray room. There, he asked for medical attention, which was refused. (*Id.* ¶¶ 371-72.) He was given clothes, but denied an opportunity to clean and decontaminate himself. (*Id.* ¶ 373.) The next morning, he again requested medical attention for his injuries – which included an open wound on his forehead, two black eyes with one eye swollen shut, bruises to his ribs and chest, and bleeding from his rectum – but Defendant Mylroie denied medical attention, only giving him Motrin. (*Id.* ¶¶ 376-80.) Doe was not examined by a physician until a week after the beating. (*Id.* ¶ 381.)

Doe was written up for assaulting staff during his strip search. (*Id.* ¶¶ 382-83.) A disciplinary hearing was held on February 6, 2018, where Doe denied the charges against him. (*Id.* ¶ 385.) The hearing officer said in sum, "we are still going to find you guilty regardless," and sentenced him to 550 days in solitary confinement. (*Id.* ¶¶ 386-87.) Doe spent ten months in solitary. (*Id.* ¶ 388.) During this time, he was threatened by ACCF staff who said that they

would "kill him" if he snitched; he was also punched by COs on multiple occasions. (*Id.* ¶¶ 395, 97-98.)

In October 2018, Doe pleaded guilty to criminal possession of a controlled substance in the third degree, and he is now serving his sentence in the custody of the state. (*Id.* ¶¶ 401-02.) Doe chose to accept what he believed to be a poor plea offer so he could get out of ACCF and into a different facility. (*Id.* ¶ 403.)

### D. Pariis Tillery

Pariis Tillery was arrested in March 2017 and placed in DOC custody. (*Id.* ¶ 407.) He was detained at Brooklyn Detention Center, where, on August 7, 2018, he was alleged to have assaulted a CO. (*Id.* ¶ 408.) The next day, he was transferred to Rikers Island, and the day after that, he was transferred to ACCF. (*Id.* ¶ 410.) Tillery was given no written notification for the basis of his transfer, and was not told where he was going or even that he was going to be transferred. (*Id.* ¶ 413.) The SJO providing for Tillery's transfer, obtained by Brann and Williams, cited "safety considerations." (*Id.* ¶ 410; Zuckerman Decl. Ex F.)

Upon his arrival at ACCF, Green Team members greeted Tillery and took him into the intake area of the jail; he was accompanied by two to three Rikers ESU officers. (*Id.* ¶¶ 415-16.) The ACCF COs cuffed and shackled him, and brought him into a booking cell where eight to ten ACCF COs and supervisors were waiting. (*Id.* ¶¶ 418-19.) The COs assaulted him by punching him in the face and body and by kicking and stomping on him, even after he fell to the floor. (*Id.* ¶¶ 420-24.) He began to bleed form his nose and Defendants placed a "spit mask" on his face, even though he was not spitting at anyone. (*Id.* ¶ 422.) Once CO told him, "Do the same thing you did on Rikers Island." (*Id.* ¶ 420.) After about ten minutes, the COs brought Tillery to the BOSS chair and metal detector. The scans did not indicate contraband, but the COs were

skeptical, telling Tillery that, "You Rikers guys are always lying" and "If you have something, we're going to beat you until you s**t it out." (*Id.* ¶¶ 425-26.)

The COs then escorted Tillery to a cell in the SHU, where he was instructed to remove his jumpsuit, and told to "take it out of your ass, you monkey" (referring to the alleged contraband), all while being threatened with a taser. (*Id.* ¶¶ 429-31.) The COs punched, kicked and hit Tillery again, and then brought him for another x-ray. (*Id.* ¶¶ 431-33.) When he returned to his cell, Defendant Mylroie came to see him and said he was fine, despite the fact that he was in extreme pain, was bleeding, had two black eyes and a swollen nose, and could not hear out of his left ear. (*Id.* ¶¶ 435-36.)

Tillery requested medical attention the next day, August 10, and told COs that his head hurt and he could not hear from his left ear. (*Id.* ¶ 437.) Yet, it was not until August 13, 2018, four days after the assault, that Tillery was taken for treatment at Albany Memorial Hospital. (*Id.* ¶ 438.) At the hospital, Tillery told personnel that he had been assaulted by the COs. (*Id.* ¶ 439.) He was diagnosed with a ruptured eardrum, a head injury, and a concussion. He continued to suffer from headaches related to the assault for months. (*Id.* ¶¶ 447-49.)

Upon his return from the hospital, Tillery was sent back to solitary. (*Id.* ¶ 444.) Around this time, Defendant Lyons came to his cell and said, "You are not on Rikers anymore, we run this jail." (*Id.* ¶ 451.)

Tillery received an infraction for assaulting staff, and a disciplinary hearing was held on August 24, 2018. (*Id.* ¶¶ 450, 454-55.) Tillery had no opportunity to prepare, and was not given an opportunity to call witnesses; no testimony was taken. (*Id.* ¶ 456.) The hearing resulted in a sentence of 300 days in solitary confinement. (*Id.* ¶ 457.)

Tillery remained in solitary for over five months until January 23, 2019.  (*Id.* ¶ 458.)
During this time, he had limited access to human interaction, education or programming, phone
calls (including to his attorney), and mental health care; it was also extremely difficult for his
family to visit, including his one-year-old son.  (*Id.* ¶¶ 460-66.)  He was also subjected to
taunting by ACCF COs.  (*Id.* ¶ 452.)

On January 23, 2019, four weeks after this lawsuit was filed, Tillery had a court date in
Brooklyn and was told he was being transferred.  (*Id.* ¶ 467.)  After his court appearance, he was
not returned to ACCF, but was instead brought back to Rikers.  He received no explanation for
his transfer.  (*Id.* ¶ 468.)

## VI.    Procedural History

Plaintiffs filed their initial Complaint on December 28, 2018.  (Dkt. No. 1.)  On
January 28, 2019, Plaintiffs filed an Amended Complaint (Dkt. No. 30), and Plaintiff Steven
Espinal filed a motion for a preliminary injunction (Dkt. No. 31).  On February 11, 2019, the
City Defendants moved to dismiss (Dkt. No. 48); Defendant Sullivan joined this motion on
February 25, 2019 (Dkt. No. 66).  On February 15, 2019, the Albany Defendants moved to sever
(Dkt. No. 58); on February 22, 2019, Defendant Mylroie separately moved to sever
(Dkt. No. 61).  On March 28, 2019, Plaintiffs filed a motion to certify the class.  (Dkt. No. 86.)

## THE CITY DEFENDANTS' MOTION TO DISMISS

The City Defendants have filed a Motion to Dismiss pursuant to Rules 12(b)(1), 12(b)(6),
and 12(b)(7).  In an alternative to their 12(b)(7) motion, they have also filed a motion for an
order joining the SCOC as a defendant pursuant to Rule 19(a)(1) and 19(a)(2).

This Motion is denied.

## I.   The City Defendants' Motion to Dismiss the Entire Action Pursuant to 12(b)(7)

The City Defendants argue that they cannot be held liable for constitutional violations related to Plaintiffs' transfer because the SJOs authorizing the transfers were issued "solely" by the SCOC. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss, for Order Joining State Commission of Correction as Def., and in Opp. to Application for Prelim. Inj. of Pl. Steven Espinal ("City Defs.' Br."), Dkt. No. 52, at 7.) They contend that DOC "merely applied" for the SJOs, and that any liability for constitutional violations related to the transfers must be directed at the SCOC, which ultimately issues the SJOs. (*Id.*) The City Defendants request two forms of relief: dismissal for failure to join a necessary party or, in the alternative, an order for Plaintiffs to join the SCOC.

The Court grants neither form of relief. The FAC clearly alleges, in both theory and practice, the City Defendants are the driving force behind the transfer process and can (and should) be held liable for their actions.

### A.  The SCOC Is Not a Necessary Party

Under Rule 12(b)(7), an action may be dismissed for failure to join a necessary party under Rule 19. *See* Fed. R. Civ. P. 12(b)(7). Courts apply a two-part test to determine whether an action must be dismissed for failure to join an indispensable party. "First, the court must determine whether an absent party belongs in the suit, *i.e.*, whether the party qualifies as a 'necessary' party under Rule 19(a)." *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000). If a party does not qualify as necessary under Rule 19(a), the Court does not need to make any further decision with respect to the motion to dismiss. *Id.* If a party does qualify as necessary, the Court looks to whether it is feasible to join that party; if it is not feasible to join the necessary party, the Court determines whether the party is "indispensable." *Id.*

A party is "necessary" under Rule 19(a)(1) if:

(A) in the person's absence complete relief cannot be accorded among those already parties; or (B) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect that interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

Courts assess three factors when determining whether a non-party is required: "(1) whether the court can afford complete relief in the absence of the non-party; (2) whether the non-party's absence will impair or impede its ability to protect its interests; and (3) whether the existing parties would be subject to 'double, multiple, or otherwise inconsistent obligations.'" *Harty v. Spring Valley Marketplace LLC*, No. 15-CV-8190 (NSR), 2017 WL 108062, at *12 (S.D.N.Y. Jan. 9, 2017). If *any* one of the three components is satisfied, the absent party constitutes a required party.

### 1. 19(a)(1)(A) – Complete Relief

Under the first factor of the Rule 19(a)(1) analysis, the court looks to whether complete relief cannot be award among the existing parties without joinder of the party in question. This analysis considers only those already parties to the litigation. *See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 385 (2d Cir. 2006).

First of all, the Court can afford Plaintiffs complete monetary relief without the SCOC being a party. Joint tortfeasors are not *de facto* necessary parties; they do not need to be included in a single lawsuit to afford complete monetary relief. *See, e.g., Grimes v. CBS Corp.*, No. 17 CIV. 8361 (AJN), 2018 WL 3094919, at *2-3 (S.D.N.Y. June 21, 2018). All present and absent defendants are jointly and severally liable, so Plaintiffs can choose to sue a subset of tortfeasors and obtain full damages from only those defendants. *See, e.g., id.* at *2. If the City were to be found liable, it could then seek contribution from the SCOC as a joint tortfeasor. *Id.* The SCOC

is not a necessary party simply because it might share responsibility for the violation of Plaintiffs' rights.

Turning to the injunctive relief, the City Defendants contend that Plaintiffs' request for injunctive relief – including prohibiting the City Defendants from transferring class members to ACCF, ordering that Espinal be returned to a correctional facility in New York, and "nullifying and voiding" any SJOs transferring Espinal out of the City – cannot be fulfilled without joining the SCOC, because the SCOC ultimately approves the SJOs authorizing the transfers.  (City Defs.' Br. at 7.)  As Espinal is no longer at ACCF or in DOC custody, the only remaining request for injunctive relief is the request to prohibit the City Defendants from transferring class members to ACCF.

The core allegations of the FAC are that the City Defendants arranged for detainees aged 21 and younger to be transferred and held in Albany, where they would be subject to "torture" and placed in solitary confinement.  (Am. Compl. ¶ 10.)  Plaintiffs are not challenging any "actions or policies" of the SCOC – the allegations all have to do with actions taken by the City Defendants. *See Brooks v. Roberts*, 251 F. Supp. 3d 401, 434 (N.D.N.Y. 2017).  And Plaintiffs request relief that limits the City Defendants' actions.  In particular, they have requested that the Court issue an injunction "prohibiting Defendants City, Brann, and Williams from transferring class members to the Albany County Correctional Facility."  (Am. Compl., Prayer for Relief, ¶ i.)  Fairly read, the injunction that is sought would prohibit the City officials from invoking the 9 NYCRR 7210.6 procedures in order to transfer class members to Albany – from asking the SCOC to approve their transfers.  The SCOC is not only not a necessary party to state a claim, it is not a proper party Defendant for such a claim.

It is true that the SCOC approves the transfer requests. But nothing in the FAC or the incorporated documents suggest that the SCOC initiates transfer requests or that it plays any role in determining where a detainee will be sent upon transfer. All that is done by the City Defendants. The Court can prohibit the City Defendants from asking the SCOC to approve transfers of young inmates to ACCF without SCOC's being a defendant. *See Harty*, 2017 WL 108062, at *12 (no joinder when possible to obtain adequate relief among named defendants). Nothing suggests that pretrial detainees are permanently transferred to Albany without the City's request; indeed, any such transfer would be contrary to the law. *See* 9 NYCRR § 7210.6(c). The only conduct sought to be enjoined is the conduct of the City Defendants – and an injunction directed solely to their conduct would afford Plaintiffs complete injunctive relief.

### 2. 19(a)(1)(B)(i)

Turning to the second factor under Rule 19, the SCOC's absence from this lawsuit would not prevent it from protecting its own interests. The City Defendants point to no interest that would be impeded because of the SCOC's absence. Moreover, "[f]or a party to be necessary within the meaning of Rule 19(a)(1)(B)(i), the absent party must be the one claiming the interest. A party named in the litigation cannot assert the interest on the absent party's behalf." *See Cont'l Cas. Co. v. Am. Home Assur. Co.*, No. 05 CIV 7874 LTS JCF, 2008 WL 1752231, at *4 (S.D.N.Y. Apr. 14, 2008) (internal citations removed). The SCOC has not claimed an interest in the litigation.

### 3. 19(a)(1)(B)(ii)

Finally, as to the third factor, there is no evidence that any party would face "multiple or inconsistent liability" without the SCOC's presence.

For these reasons, the Court does not find that the SCOC is a necessary party pursuant to Rule 19(a). Accordingly, the Motion to Dismiss the case pursuant to Rule 12(b)(7) is DENIED, as is the motion to direct that Plaintiffs be directed to join the SCOC as a defendant.

## II.    The City's Motion to Dismiss Pursuant to 12(b)(6)

Twenty-two out of the thirty-three causes of action in the FAC implicate the City Defendants. The City Defendants have moved to dismiss all of them.

### A. Legal Standards

#### 1.    Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A plaintiff must plead facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717-18 (2d Cir. 2013).

In considering a motion to dismiss, the Court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the Plaintiff. *See Banks v. Cty. of Westchester*, 168 F. Supp. 3d 682, 687 (S.D.N.Y. 2016); *see also Lopez v. Cipolini*, 136 F. Supp. 3d 570, 579 (S.D.N.Y. 2015). However, it is not bound to accept legal conclusions that are "couched as factual allegation[s]." *Iqbal*, 556 U.S. at 678.

24

The Court may consider any written instrument attached to the complaint as an exhibit; any statement or documents incorporated by reference, as well as documents that are integral to the complaint, which means that the complaint "relies heavily" on the document's "terms and effect." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002).

Ultimately, the motion to dismiss analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678.

### 2. Section 1983

Plaintiffs' claims against the City Defendants – with the exception of the thirteenth and fourteenth causes of action – are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . .

42 U.S.C. § 1983. "Section 1983 does not create any independent substantive rights but rather is a vehicle to 'redress . . . the deprivation of [federal] rights established elsewhere.'" *Perez v. Ponte*, 236 F. Supp. 3d 590, 609 (E.D.N.Y. 2017), *report and recommendation adopted*, No. 16-CV-645 (JFB)(AKT), 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)).

To state a claim under § 1983, the conduct "must have been committed by a person acting under color of state law" and "must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). Section 1983 claims may be brought against individuals and municipalities.

i.   Individual Liability

For an individual to be held liable under § 1983, he must have "personal involvement" in the alleged constitutional deprivation. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006).

There are five ways that a Plaintiff may establish "personal involvement." They are: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)); *see also Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

"'Direct participation' means 'personal participation by one who has knowledge of the facts that rendered the conduct illegal.'" *Doe v. Lima*, 270 F. Supp. 3d 684, 712 (S.D.N.Y. 2017), *aff'd sub nom. Doe v. Cappiello*, No. 17-3027, 2019 WL 368691 (2d Cir. Jan. 30, 2019) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)).

"A complaint asserting a § 1983 claim which does not allege facts establishing the personal involvement 'fails as a matter of law.'" *Ponte*, 236 F. Supp. 3d at 609. It is a "condition precedent" to any award of damages. *Id.* at 610.

ii.   Municipal Liability

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), the Supreme Court found that a municipality can be held liable under § 1983. To establish a municipality's liability under § 1983, "a plaintiff is required to plead and prove three elements:

26

(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

To establish that there was an "official policy or custom," a plaintiff may plead that the constitutional violation was caused by: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) *a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware*; or, (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Calderon v. City of New York*, 138 F. Supp. 3d 593, 611 (S.D.N.Y. 2015), *on reconsideration in part*, No. 14 CIV. 1082 PAE, 2015 WL 6143711 (S.D.N.Y. Oct. 19, 2015) (emphasis added) (citing *Brandon v. City of New York*, 705 F.Supp.2d 261, 276-77 (S.D.N.Y. 2010)).

A municipal policy may be rooted in inaction. A "city's 'policy of inaction' in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) ("[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under § 1983.'" (citing *City of Canton v. Harris*, 498 U.S. 378, 388 (1989)). "*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does

nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). The need to act must be "so obvious" and the "inadequacy of the current practices so likely to result in a deprivation of federal rights" to satisfy the deliberate indifference standard. *Id.*

A municipality may also be liable under § 1983 if a "final municipal policymaker" made a decision that led to the constitutional violation. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). When determining if an official has final policymaking authority, the Court looks to state and municipal law, as well as custom or usage having the force of law. *Gersbacher v. City of New York*, No. 1:14-CV-7600-GHW, 2017 WL 4402538, at *16 (S.D.N.Y. Oct. 2, 2017) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). This determination is a question of law. *Id.*

The "plaintiff must [also] demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury.", 654 F.3d at 333. There must be a direct causal link between the policy or custom and the constitutional violation. A municipality is held accountable only for its own illegal acts – it cannot be held "vicariously liable" under § 1983 for its employees' actions. *Id.*

On a motion to dismiss, "a plaintiff must do more than simply state that a municipal policy or custom exists . . . Rather, a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy of custom exists." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

**B. Procedural Due Process Claims by Washington and Espinal against the City, Brann and Williams (Count 1)**

The first cause of action is brought pursuant to § 1983 by Washington and Espinal against the City, Brann, and Williams, alleging Defendants violated Washington and Espinal's Fourteenth Amendment right to procedural due process.  Washington and Espinal claim that they were deprived of their liberty interest of not being subjected to solitary confinement when they were transferred to Albany without notice of the transfer, notice of the reasons for the transfer, or an opportunity to be heard.

1. Both Plaintiffs Have Properly Pleaded That They Were Deprived of a Constitutionally Projected Interest

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property without due process of law, and 'those who seek to invoke its procedural protection must establish that one of these interests is at stake.'" *Victory v. Pataki,* 814 F.3d 47, 59 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Graziano v. Pataki,* 689 F.3d 110, 114 (2d Cir. 2012)).  To determine whether there is a Fourteenth Amendment procedural due process violation, a court undertakes a two-part analysis: First, it determines "whether there exists a liberty or property interest of which a person has been deprived." *Id.*  If that is the case, the court then looks to whether the State's procedures were "constitutionally sufficient." *Id.*

i.  Plaintiffs' Liberty Interest

Washington and Espinal claim that the City Defendants deprived them of the liberty interest of not being subjected to solitary confinement, which interest was created by 40 RCNY § 1-17. (Am. Compl. ¶ 487.)

An inmate's liberty interest may arise from "statutes, regulations, or policies enacted by the state." *Id.*  The statute, regulation, or policy must "require, in language of an unmistakably

mandatory character, that a prisoner may not suffer a particular deprivation absent specified

predicates." *Vega v. Lantz,* 596 F.3d 77, 83 (2d Cir. 2010) (internal quotation marks and citation

omitted); *see also Hewitt v. Helms,* 459 U.S. 460, 472 (1983).

40 RCNY § 1-17 limits the uses of punitive segregation for DOC inmates, particularly for

young pretrial detainees. The rule says, "[P]unitive segregation represents a serious threat to the

physical and psychological health of adolescents, with respect to whom it should not be

imposed." 40 RCNY at § 1-17(a). In this vein, the rule *mandates* that the "following categories

of inmates *shall* be excluded from punitive segregation: (i) inmates under the age of 18; (ii) as of

January 1, 2016, inmates ages 18 through 21, provided that sufficient resources are made

available to the Department for necessary staffing and implementation of necessary alternative

programming;[4] and (iii) inmates with serious mental or serious physical disabilities or

conditions." *Id.* at § 1-17(b)(1) (emphasis added). The regulation also provides that detainees of

any age may only be sentenced to 30 days in punitive segregation for a single offense, or a 60

day sentence for the more serious infraction of assault on staff. *Id.* § 1-17(d). Moreover, if an

inmate is sentenced to punitive segregation for multiple offenses and receives a cumulative

sentence of greater than 30 days, he must be released from punitive segregation for at least seven

days every 30 days. *Id.* § 1-17(d)(2).

The Court agrees that this rule creates a liberty interest. The language of the rule is of an

"unmistakably mandatory character." *Vega,* 596 F.3d at 83. It says that the designated inmates

"*shall* be excluded from punitive segregation." 40 RCNY § 1-17 (b) (emphasis added); *see also*

*Tellier v. Fields,* 280 F.3d 69, 84 (2d Cir. 2000) ("[T]he use of terms such as 'must' and 'shall'

---

[4] After the regulation was passed in January 2015, DOC requested and received a series of variances from the Board because it required more time to develop "alternative programming." In October 2016, the variances ended, which means that inmates under 22 are not currently permitted to be subject to solitary confinement. (Am. Compl. ¶¶ 44-45.)

in prison regulations give rise to a federally protected liberty interest."). And the rule contains "specified [substantive] predicates" for punitive segregation, *Vega*, 596 F.3d at 83, as it substantially restricts jail officials' authority to place specific inmates in punitive segregation, *cf. Cofone v. Manson*, 594 F.2d 934, 938 (2d Cir. 1979) (finding state statute that outlined required procedural safeguards prior to transferring a prisoner did not create liberty interest). The regulation is not a "mere adoption of procedural guidelines governing day-to-day prison administration, without more." *Butler v. N.Y. Correctional Dep't*, No. 94 CIV. 5054 (AGS), 1996 WL 438128, at *5 (S.D.N.Y. Aug. 2, 1996). It is a substantive mandate as to how DOC must treat its inmates.

Defendants argue that any interest created by 40 RCNY § 1-17 is limited. (*See* City Defs.' Br. 10-12.)

First, they contend that 40 RCNY § 1-17 is a New York City rule meant to apply to "the Department's facilities," rather than a rule that permanently vests a liberty interest in any inmate who is held in DOC custody at any point. *See* 40 RCNY § 1-17 (a) ("As implemented by the Department, punitive segregation is a severe penalty that should not be used under certain circumstances in the Department's facilities. . . ."). It is true that the rule only applies to DOC facilities – the Board's rules can only apply to DOC facilities because the Board has jurisdiction over DOC; it has no authority to impose rules on facilities in other counties. (Am. Compl. ¶ 38.) But it is equally obvious that the Board does not enact standards with the mindset that the City can avoid compliance by transferring inmates to other counties, where their special rules have not been adopted, under the trumped-up guise of "safety considerations." The fact that a state law permits inmates to be transferred under specified, limited circumstances, does not mean that DOC detainees do not have a reasonable expectation that they – who are charged by New York

City District Attorneys with the violation of city or state law, and who will be tried in New York

City courts – will remain at a DOC facility and subject to its rules during their pretrial dentition

(when they are presumed to be innocent).  To find otherwise would be to say that the Board's

rules are meaningless and can be circumvented simply by transferring an inmate out of DOC's

jurisdiction – at least for the period of time the inmate is waiting for trial, sentencing, or transfer

to a state facility.  Such a finding would not be accord with the Board's delegated authority to

oversee DOC.

Defendants also argue that 40 RCNY § 1-17 must coexist with New York State

Correction Law § 504 – and its enabling rules and regulations, including 9 NYCRR § 7210.6 –

which regulates the transfer of inmates between facilities.  The simple fact that the rule must

work alongside state law does not mean that youth held in DOC custody do not have protection

from solitary confinement that is sufficiently definite to create a liberty interest.  This is

especially true here, where it is allegedly possible to protect the liberty interest created by the

New York City Rule and still comply with Correction Law § 504.  For example, an inmate under

age 22 could be transferred to a facility other than ACCF, which clearly does not meet *any* of the

criteria for transfer in that (1) it does not house young offenders "in a manner consistent with

applicable standards" (including that young detainees cannot be subject to solitary confinement);

(2) it is anything but "proximate" to New York City; (3) it is located in an area where family and

friends cannot visit; and (4) it seriously restricts the ability of counsel to serve their clients.  (*See*

9 NYCRR § 7210.6(c).)  Everything in this pleading suggests that the City Defendants are

voluntarily and deliberately ignoring these standards – standards that create a liberty interest for

Plaintiffs while they are at DOC facilities.

32

Finally, the City Defendants assert that continuing to enforce the ban on punitive segregation when an inmate is transferred would undermine the section of 9 NYCRR § 7210.9, which says that any inmate transferred "pursuant to this Part shall be entitled to all rights and privileges available to other inmates of the receiving facility." But this provision simply sets a minimum of rights and privileges to which a transferred inmate is entitled; it does not say that a transferred inmate gives up any additional rights he had at his original facility.

For these reasons, the Court finds that Washington and Espinal have alleged a liberty interest in being free from punitive segregation, given that they were originally in DOC custody and under the age of 22 at the time of their transfers.

### ii. Deprivation of the Liberty Interest

Washington and Espinal allege that they were deprived of their liberty interests when they were transferred from DOC facilities to ACCF, where they were placed in punitive segregation for extended periods of time. (Am. Compl. ¶¶ 180, 278.)

The transfer of a pretrial detainee between facilities generally does not implicate due process. *See Corley v. City of New York*, No. 1:14-CV-3202-GHW, 2015 WL 5729985, at *7 (S.D.N.Y. Sept. 30, 2015). But here, because the FAC fairly alleges that Washington and Espinal were deliberately (and maliciously) transferred from a DOC facility – where they could not be subjected to solitary confinement or extended periods of punishment – to ACCF – where they were subjected to solitary confinement and periods of punishment running into years – the act of transferring is directly tied to the deprivation of the right.

### iii. The City's Procedures with Respect to the Deprivation of Plaintiffs' Liberty Interest

To establish that there was a procedural due process violation for the deprivation of a liberty interest, a plaintiff must demonstrate that the Government's procedures associated with

the deprivation of the right were not "constitutionally sufficient." Generally, a plaintiff must

have been given "notice of the case against him and the opportunity to meet it." *Spinelli v. City

of New York*, 579 F.3d 160, 169 (2d Cir. 2009) (citing *Mathews v. Eldridge*, 424 U.S. 319, 348-

49 (1976)). However, "due process is flexible and calls for such procedural protections as the

particular situation demands." *Spinelli*, 579 F.3d at 169. "In determining what is 'due process'

in the prison context . . . 'one cannot automatically apply procedural rules designed for free

citizens in an open society.'" *Hewitt*, 459 U.S. at 472 (citing *Wolff v. McDonnell*, 418 U.S. 539,

560 (1974)).

To determine whether the State's provided process was constitutionally sufficient, courts

apply a three-part balancing test from *Mathews v. Eldridge*, which weighs: (1) the private interest

affected; (2) risk of erroneous deprivation through the procedures applied and the value of

additional safeguards; and (3) the government's interest. *See Mathews*, 424 U.S. at 335; *see also

Hewitt*, 459 U.S. 460 (applying *Mathews* analysis to prisoner's procedural due process claim).

a.  Private Interest

First, the Court considers Plaintiffs' interest in being free from solitary confinement.

Inmates "held in lawful confinement have their liberty curtailed by definition," so the private

interest "must be evaluated . . . within the context of the [jail] system and its attendant

curtailment of liberties." *Wilkinson v. Austin*, 545 U.S. 209, 225 (2005).

The FAC alleges significant harms attendant to prolonged solitary confinement, and its

absolutely deleterious effects on young people. Consistent with these allegations, as well as

findings from other courts in this Circuit, the Plaintiffs have successfully pleaded that there is a

strong private interest in those aged 21 and younger being free from solitary -- particularly those

young pretrial detainees who are presumed to be innocent. *See Proctor v. LeClaire*, 846 F.3d

597, 610 (2d Cir. 2017) (finding private interest implicated by "extended and indefinite stay" in

solitary to be "weighty"); *A.T. by & through Tillman v. Harder*, 298 F. Supp. 3d 391, 417

(N.D.N.Y. 2018) ("[P]laintiffs have submitted substantial, convincing evidence that defendants'

continued use of solitary confinement on juveniles puts them at serious risk of short- and long-

term psychological damage . . ."); *Brooks v. Terrell*, No. CV 10-4009 AKT, 2010 WL 9462575,

at *11 (E.D.N.Y. Oct. 14, 2010) ("[I]t is well documented that long periods of solitary

confinement can have devastating effects on the mental well-being of a detainee." (internal

citation omitted)); *United States v. Basciano*, 369 F. Supp. 2d 344, 352 (E.D.N.Y. 2005); *see

also Davis*, 135 S. Ct. 2187 (Kennedy, J., concurring) (recognizing that prolonged solitary can

exact a "terrible price").

 Moreover, here, it is telling that the Board passed 40 RCNY § 1-17, forbidding punitive

segregation for specified inmates and for extended periods of time, thereby creating Plaintiffs'

interests. Presumably, the Board determined that the potential harms of such confinement to

Plaintiffs and others similarly situated were great enough to warrant changes in procedures in the

jail system. The Court agrees, and finds that Plaintiffs' interest is strong. This factor favors

Plaintiffs.

### b.  Risk of Erroneous Deprivation

 The second factor involves an examination of the procedures applied at the time of the

deprivation. A pre-deprivation hearing is usually required to satisfy due process requirements,

although post-deprivation process can be sufficient in certain circumstances. *See Spinelli*, 579

F.3d at 170. "[N]ecessity of quick action by the State or the impracticality of providing any

meaningful pre[-]deprivation process, when coupled with the availability of some meaningful

means by which to assess the propriety of the State's action at some time after the initial taking,

can satisfy the requirements of procedural due process." *Id.* (quoting *Catanzaro v. Weiden*, 188

F.3d 56, 61 (2d Cir. 1999)).[5]  For example, in *Spinelli v. City of New York*, the Second Circuit

found that a pre-deprivation hearing was not required when a gun dealer's license was suspended

because (1) the City and the public had a strong interest in security, and (2) the deprivation of

rights was taken pursuant to the proper authority, in accordance with the designated rules and

procedures. *Id.*

Both Plaintiffs have alleged that they did not receive sufficient notice of their transfer

prior to being transferred to Albany, and that post-deprivation process (which they did not

receive in any event) would be insufficient. (Am. Compl. ¶¶ 138, 213.)  The City Defendants

argue that the FAC alleges "exigent circumstances" justifying post-deprivation process,

particularly with respect to Espinal, who was transferred after allegedly assaulting a member of

the Rikers staff. (*See* City Defs.' Br. at 2; Defs.' Mem. of Law in Further Supp. of Mot. to

Dismiss and/or for Order Joining State Commissions of Correction as Def. ("City Defs.' Reply

Br."), Dkt. No. 75, at 3.)  Furthermore, they argue that both Plaintiffs had post-deprivation

process by virtue of "written notification of reasons for the transfer," and therefore, this not a

circumstance in which there was a "total absence of process." *Cf. J.S.R. ex rel J.S.G. v. Sessions*,

330 F. Supp. 3d 731, 741-42 (D. Conn. 2018).

The first question for the Court is whether post-deprivation process – if it were provided

(which it was not) – would be sufficient for each inmate as a matter of law, given the

circumstances surrounding that particular inmate's transfer.  According to the SJOs, Plaintiffs

---

[5] Plaintiffs argue that post-deprivation remedies can suffice only for "random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996).  But the *Hellenic* court stated that, "When the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, *ipso facto*, satisfy due process;" it did not say that post-deprivation procedures can never satisfy due process. *Id.* (emphasis added).  Post-deprivation procedures can be sufficient when there is the "necessity of the quick action of the state." *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *see also Spinelli*, 579 F.3d at 170.

were transferred because of "safety considerations" and because the DOC facilities were "unfit" for their confinement.  (Zuckerman Decl. Exs. C-F.)  Courts give strong deference to safety concerns with respect to jail conditions.  *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979); *Hewitt*, 459 U.S. at 474 ("[A] decision that an inmate or group of inmates represents a threat to the institution's security would not be appreciably fostered by the trial-type procedural safeguards . . . .").

## 1.   Washington

Despite the fact that Washington's SJO says that he was transferred for "safety considerations," the FAC alleges no facts surrounding Washington's transfer that suggest "exigent circumstances" that would warrant forgoing pre-deprivation process.  There are no allegations in the FAC that suggest that Washington was involved in any altercations prior to his transfer.  Rather, the FAC alleges that he was transferred because Legal Aid contacted DOC on his behalf, after he informed them that he was groped by a DOC staff member and denied adequate health care.  (Am. Compl. ¶ 130.)  In other words, the allegation is that he was transferred because he complained about mistreatment – as is his right.  The City Defendants do not explain why Washington's making a complaint creates a "safety consideration" that would warrant Washington's transfer, and why there were "exigent circumstances" that would prevent him from receiving pre-transfer process.[6]  Based on the allegations made in the FAC, Washington should have received pre-deprivation process.

But Washington has alleged that he did not receive sufficient pre-deprivation process. The only notice Washington received was second-hand.  As he was being strip-searched, the step

---

[6] The City Defendants also do not contend that it would be difficult to provide pre-deprivation notice. Moreover, factual allegations suggest that it would be administratively feasible:  In 2017, the New York City Council introduced a bill to amend the New York City Administrative Code to provide detainees with additional notice before transferring them out of the City by SJO.  (Am. Compl. ¶ 57 n.25.)

prior to loading him into the van to take him to Albany, Washington was told that he was going to "Albany because Deputy Walker don't want you." (Am. Compl. ¶ 136.) This off-handed comment is not adequate notice – Washington was given no official explanation for his transfer, including the reasons that DOC provided to the SCOC, which was that Washington was transferred for safety concerns. Upon his arrival in Albany, Washington was also not provided with notice of the reasons for the transfer, as the City Defendants suggest. (*Id.* ¶ 489.) He was never given a hearing or an opportunity to challenge his transfer. If the FAC is believed, he was simply put into solitary after being beaten to a pulp.

Washington has, therefore, sufficiently alleged that post-deprivation process was inadequate and this factor of the *Mathews* test favors him. Furthermore, even if the FAC had alleged facts pointing to "exigent circumstances" surrounding Washington's transfer, warranting lack of a pre-deprivation hearing, Washington has also alleged that he also did not receive post-deprivation notice, so this factor would still favor him.

### 2.  Espinal

The FAC's allegations about Espinal's transfers do contain facts that the transfer was made under "exigent circumstances." Espinal was transferred from Rikers three days after his altercation with the COs. (Am. Compl. ¶¶ 203-04, 210.) From this, the Court can infer that DOC may have needed to take quick action to ensure the safety of inmates, including Espinal, and that pre-deprivation process may not have been constitutionally required.

But there is one other thing to consider before coming to any conclusions. In *Spinelli*, the court found that the State's failure to provide pre-deprivation process may be constitutional when there are exigent circumstances *and* when the State followed appropriate rules and procedures when depriving the individual of his rights. *See Spinelli*, 579 F.3d at 171 (finding pre-deprivation due process was not required when there were exigent circumstances and all rules

were followed); *see also United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 903 (2d Cir. 1992) (following judicial procedures can afford some measure of protection for erroneous deprivation of property). Here, the FAC alleges that the City did not follow the procedures required to authorize Espinal's transfer. Written correspondence is required to authorize a transfer on an emergency basis, and Plaintiffs allege that they have no knowledge of written correspondence from the City to the SCOC. (Am. Compl. ¶¶ 56, 225.)

In any regard, even if the City followed appropriate procedures and the circumstances did not warrant pre-deprivation process, Espinal still had a right to post-deprivation process. Post-deprivation procedures should have included notice of the reasoning for the transfer and an opportunity to file an Article 78 petition challenging the transfer, which would satisfy the requirement of notice and the opportunity to be heard. *See, e.g., Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996). Indeed, 9 NYCRR § 7210.8 requires that "the facility administrator of the receiving facility shall provide him immediately with a written notification of the reasons for his transfer." *Id.* The FAC alleges that Espinal did not receive notice of the reasons for the transfer at all, even upon his arrival at ACCF. (Am. Compl. ¶ 489.) This is sufficient to raise a due process concern, even if Espinal in fact had access to the Article 78 proceeding, an opportunity to be heard. *See McCann v. Phillips*, 864 F. Supp. 330, 339 (S.D.N.Y. 1994) ("The essence of the Due Process Clause is the principle that a person deprived of a protected liberty interest receive notice of the reason for, and some opportunity to be heard with respect to, that deprivation."). Moreover, Espinal's beating and detention in solitary may well have interfered with his ability to file an Article 78 proceeding – something this Court cannot address on a pre-answer motion to dismiss.

Because Espinal has sufficiently alleged that he did not receive sufficient process, this factor favors him as well.

### c. The Government's Interest

The third factor in the *Mathews* analysis is the Government's interest. The Court must weigh "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

Courts continually recognize that the Government has an important interest in maintaining the safety and security of jail facilities and inmates in its custody. As the Supreme Court has said, "The safety of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration." *Hewitt*, 459 U.S. at 473. Nevertheless, while "prison officials are to be afforded deference in matters of institutional security, such deference does not relieve officials from the requirements of due process . . ." *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 56 (2d Cir. 2017), *cert. dismissed*, 139 S. Ct. 49 (2018).

The relevant inquiry here is whether the City had an interest in not providing adequate process to Plaintiffs, whether that be pre-deprivation or post-deprivation. *See Spinelli*, 579 F.3d at 174.

The Court sees no reason why the Government could not have provided Washington with notice and an opportunity to be heard prior to his transfer (or even after his transfer for that matter). None of the allegations in the FAC suggests that Washington's transfer needed to occur quickly, and without any notice to the Plaintiff. This factor favors Washington.

The FAC also contains no allegations that would suggest that there was a reason why Espinal did not receive notice of the reason for his transfer after his transfer. Even though the Government has a strong interest in the safety and security of the jail facilities, this does not

preclude it from providing notice of the reasons for a transfer. Indeed, notice is required by state law, which requires that the administrator of the receiving jail provide immediate notification of the reasons for the transfer. This factor also favors Espinal.

### d. Analysis

Balancing the *Mathews* factors, the Court finds that Washington and Espinal have alleged a procedural due process violation. The State has a strong interest in the safety of the inmate and the jail facilities, and Courts generally defer to the State's reliance on this fact when considering what due process is owed. But that does not excuse a failure to provide *any* notice of the reasons for depriving Plaintiffs of their rights, which is what is alleged to have occurred here for both Plaintiffs (notably, in violation of state law). Accordingly, because the FAC alleges that Plaintiffs received no notice of the reasoning for their transfer, Plaintiffs have successfully alleged that the process was not "constitutionally sufficient."

Since Plaintiffs have plausibly alleged procedural due process violations, I turn to whether the City, Brann, and Williams can be held liable for these violations.

### 2. The City, Brann, and Williams are Proper § 1983 Defendants

The City Defendants first argue that they cannot be held liable for transferring Plaintiffs to Albany because the transfers were taken pursuant to SJOs issued by the SCOC, and the SCOC *alone* should be held responsible for the transfer.

However, the Court will not permit the City Defendants to avoid liability for their role in the transfer by pawning it off to the SCOC (as they try to do consistently throughout their brief). As Plaintiffs have outlined for the Court, it is clear that both in theory and in practice, the City Defendants are the driving force behind the transfer process and so can be held liable for their actions. Indeed, the SCOC appears to be nothing more than a rubber stamp for the Facility Administrator's "recommendation."

A § 1983 action, like its state tort analogs, employs the principle of proximate causation. *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999). "[T]ort defendants, including those sued under § 1983, are 'responsible for the natural consequences of [their] actions.'" *Kerman v. City of New York*, 374 F.3d 93, 126 (2d Cir. 2004) (quoting *Warner v. Orange Cty. Dep't of Probation*, 115 F. 3d 1068, 1071 (2d Cir. 1991)). "The fact that the intervening third party may exercise independent judgment in determining whether to follow a course of action recommended by the defendant does not make acceptance of the recommendation unforeseeable or relieve the defendant of responsibility." *Id.* at 127.

The procedures described by 9 NYCRR § 7210.6 and the practices discussed in Defendant Williams' affidavit confirm that the City is the driving force behind the transfers. It is true that the SCOC approves the request, but there is nothing to suggest that the SCOC does any more than rubber stamp any request submitted by the City. *See id.* at 126 ("[A]n actor may be held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.") (quoting *Warner*, 115 F.3d at 1071)). Neither party has argued that SJOs are ever denied or that there is any rigor to the approval process. The City Defendants make the recommendation for transfer and handle the majority of the logistics in preparation and implementation; thus, they cannot escape liability for the expected result of these actions.

I now turn to whether Plaintiffs have pleaded facts showing that these three defendants were sufficiently involved in Plaintiffs' alleged constitutional deprivation.

i.   Individual Liability

Washington and Espinal have pleaded facts showing that both Williams and Brann had personal involvement in their transfers and thus, directly participated in the alleged constitutional violation. Williams obtained the SJOs transferring Washington and Espinal to ACCF. (Am.

42

Compl. ¶¶ 139, 227; Zuckerman Decl. Exs. C & D.) And Brann, as the facility administrator, formally applied to the SCOC to issue the SJOs. (*Id.* ¶ 54; Zuckerman Decl. Exs. C & D.) It is clear that they both were personally involved in the transfer, which is directly related to the alleged constitutional violation. *See Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010).

### ii. Municipal Liability

Washington and Espinal have also pleaded facts to establish that the City can be held liable for the constitutional deprivation under a *Monell* theory of liability. Plaintiff proposes two theories of municipal liability.

First, Plaintiffs allege that the City has a policy or custom of transferring inmates, who are otherwise subjected to 40 RCNY §1-17, out of DOC custody and into facilities where they will be subjected to the punitive measures and violence – and of doing so without providing notice. The FAC alleges that not only were both Washington and Espinal transferred without notice, but so were Tillery and Doe. (Am. Compl. ¶¶ 138, 213, 322, 413.) The FAC also alleges that these are not the only four young detainees who have been so transferred. (*Id.* ¶¶ 470-78.) Taking these allegations in a light most favorable to Plaintiffs, the Court can infer that the City has a custom of transferring these young inmates to ACCF without notice, which is sufficient to establish *Monell* liability. *See also Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012) (denying motion to dismiss when plaintiffs pointed to specific cases of alleged policy and practice occurring); *cf. Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 536 (S.D.N.Y. 2012) (granting motion to dismiss when plaintiff failed to identify any details about other instances of misconduct for failure to allege municipal policy or practice).

Plaintiffs also argue that the City is liable under *Monell* because Brann is a "final municipal policymaker," and she acted in that capacity when requesting the SJOs pursuant to state law. Pursuant to Corrections Law § 504 and 9 NYCRR § 7210.6, the facility administrator

provides the SCOC with the request and pertinent information for an SJO to be issued and the

SCOC then approves the transfer request.  Taking all allegations in a light most favorable to

Plaintiffs, on a motion to dismiss, the Court finds that it is possible that Brann could be a "final

municipal policymaker" because she ultimately makes the final decision as to whether detainees'

transfer requests are submitted to the SCOC. *See Gersbacher*, 2017 WL 4402538, at *17

(describing relevant materials to consider when determining whether an official is a final

municipal policymaker, including "custom or usage" and state and city laws).

The Motion to Dismiss the first cause of action is DENIED.

### C.  Substantive Due Process Claims by All Plaintiffs Against the City, Brann, and Williams; by Washington Against Walker; and by Doe Against Sullivan (Count 2)

In the second cause of action, all Plaintiffs bring substantive due process claims against

the City, Brann, and Williams pursuant to § 1983.  Plaintiffs allege Defendants City, Brann, and

Williams transferred Plaintiffs outside of the City for the purpose of punishing them.  Plaintiff

Washington also brings this claim against Defendant Walker, and Plaintiff Doe brings this claim

against Defendant Sullivan.

### 1.  Each Plaintiff Has Plausibly Alleged He Was Transferred As Punishment

Pretrial detainees have a due process right to be free from punishment – they cannot be

subject to punishment "neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.

3d 17, 29 (2d Cir. 2017) (internal quotation marks omitted).  One form of punishment is punitive

transfers – correction officials may not use inter-facility transfers to punish a pretrial detainee.

*See, e.g.*, *Perez v. Ponte*, 236 F. Supp. 3d 590, 615 (E.D.N.Y. 2017), *report and recommendation*

*adopted*, No. 16-CV-645 (JFB)(AKT), 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017).

Punitive purpose can be proven subjectively or objectively. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015), *see also Darnell*, 849 F.3d at 35 ("[T]he Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm."). If a condition or restriction "is not reasonably related to a legitimate governmental objective – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted." *Bell*, 441 U.S. at 539.

To survive a motion to dismiss, each Plaintiff must allege that his transfer was "imposed for the purpose of punishment," and that it was not just "an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538; *see also Kingsley*, 135 S. Ct. at 2473.

The City Defendants argue that the substantive due process claim must be dismissed because there is no indication of expressed intent to punish any Plaintiff by any City Defendant by virtue of application to SJOs. They also argue that the City Defendants cannot be held liable for Plaintiffs' transfers because the transfers were made by the SCOC. (City Defs.' Br. at 14-15.)

I first turn to whether each Plaintiff has alleged that his transfer was taken for the purpose of punishment.

### i.  Washington

Plaintiffs contend that Washington was directly informed that he was being transferred as punishment. The FAC states that COs told Washington that he was being taken "Off Rikers" because "Deputy Walker don't [*sic*] want you." (Am. Compl. ¶ 136.) Taking this allegation in a light most favorable to Plaintiff, the Court can infer that Washington could have been transferred because he was not liked by a Rikers CO, an arbitrary reason that is not reasonably related to a government objective. *See Perez,* 236 F. Supp. 3d at 616 (finding fact that CO told Plaintiff that

45

he was going to get treated like an "a**hole" and would be sent "far away where you won't be able to complain" sufficient to find transfer could have taken place with the intent to punish).

The Court can also infer that Washington's transfer was punitive because Washington was transferred within days of complaints being lodged with DOC on his behalf. This quick timeline suggests that the purpose of the transfer was punishment for complaining (which, of course, is retaliation, and is discussed in the context of Washington's First Amendment retaliation claim).

### ii. Doe

Similarly, Plaintiffs argue that Defendant Sullivan's statement to Doe demonstrates that Doe's transfer was punitive. Defendant Sullivan told Doe, "Soon enough we won't have to deal with your bullshit anymore. You're going somewhere good, somewhere that you'll like." (*Id.* ¶ 319.) Drawing all reasonable inferences in favor of Plaintiffs, the Court can infer that Doe was also transferred to Rikers because he had drawn the ire of Rikers COs.

### iii. Espinal and Tillery

With respect to Espinal and Tillery, Plaintiffs recognize that their alleged assaults on staff "could have provided a legitimate safety justification for their transfer," but contend that this justification was in fact pretextual. (Pls.' Consolidated Mem. of Law in Further Supp. of Steven Espinal's Mot. for a Prelim. Inj. and in Opp. to the New York City Defs.' Mot. to Dismiss (Pls.' Br.), Dkt. No. 63, at 17.)

In the alternative, they challenge the City's purported reason for transferring the Plaintiffs: Plaintiffs' own safety. The FAC cites to Mayor Bill de Blasio's statement that, "Occasionally we have to remove a prisoner from our correction system because there is an immediate threat to them and something that requires them being moved to another jurisdiction," as well as the August 2018 letter from DOC to Espinal's attorney in which the City said that

Espinal was transferred for *his* (Espinal's) continued safety and security. (Am. Compl. ¶¶ 65, 206; Rosenfeld Decl. Ex. 19.) Plaintiffs argue that transferring an inmate to protect him from violence by a jail's staff cannot constitute a legitimate governmental purpose. Since the Court finds that Plaintiffs have plausibly alleged punitive intent, it is not necessary at this stage to determine whether transferring an inmate to protect him from the ire of the jail's staff is a "legitimate purpose," although the Court does note that these allegations suggest that there was intense animosity toward Plaintiffs by Rikers COs, which further supports an inference of punitive intent for the transfers.

Several allegations in the FAC point to an inference that the City's justification for the transfers was pretextual, and that Plaintiffs have plausibly alleged punitive intent.

First, the transfers of Espinal and Tillery are alleged to have occurred quickly after these Plaintiffs were allegedly involved in altercations with staff. Taking this allegation in a light most favorable to Plaintiffs, this timeline supports an inference that the transfers were a punitive response to the incident. Of course, this could cut both ways – the transfer could have been because jail staff legitimately deemed their presence in the jail to be a threat to safety and security of the institution – but a motion to dismiss is not the place to make a choice between two plausible inferences.

Second, the FAC alleges that the City's use of SJOs for "safety" or "security" reasons has increased since the passage of the ban on solitary confinement, and the number of detainees under the age of 22 transferred for these purposes has doubled. (Am. Compl. ¶¶ 61-62.) Taking this fact in a light most favorable to Plaintiffs, it suggests that the increase in these SJOs is the result of the ban on solitary confinement, and demonstrates an intent to circumvent the regulation in order to punish inmates.

Third, at the time of Washington and Tillery's transfers, Defendants are alleged to have been on notice of the abuses taking place in Albany, yet continued to transfer detainees there. (Am. Compl. ¶¶ 105-10.) Moreover, Defendant Williams said in a November 2018 affidavit in an unrelated Article 78 proceeding that, only ACCF has shown a "unique willingness" to accept transferred inmates with "violent infraction histories," indicating that he may have had knowledge that transferred inmates were being subjected to punitive treatment at ACCF. (Am. Compl. ¶ 112; Pls.' Br. at 20-21.) Taken together, these allegations suggest the City was aware of what was going on at ACCF and transferred Plaintiffs anyway.

Fourth, Plaintiffs allege that inmates are sent to ACCF, despite the fact that the DOC has ample tools to isolate and control detainees, who can be placed in Enhanced Supervision Housing or restrictive housing at West Facility. (Am. Compl. ¶¶ 47-50.) They argue that this supports their assertion that safety was not the underlying motivation for the transfer.

Finally, Plaintiffs allege that Tillery was returned to Rikers less than four weeks after Plaintiffs commenced this lawsuit. (*Id.* ¶ 467.) He was not told why he was transferred back to Rikers. (*Id.* at ¶ 468.) Plaintiffs argue that this suggests that any initial justifications that he could not be housed in New York County because of "safety" were pretextual.

Considering these allegations together in a light most favorable to Plaintiffs, it is clear that Plaintiffs sufficiently allege facts that support a plausible inference of punitive intent on behalf of the City Defendants. Plaintiffs have alleged facts to support an inference that these transfers were unnecessary for safety reasons, that they were part of a pattern of pretextual transfers taken in response to the solitary confinement ban, and that, at least with respect to Washington and Tillery, the transfers were taken despite the fact that they were on notice of

inhumane treatment at ACCF. This is sufficient for the Court to infer that, at the pre-answer stage, all Plaintiffs, including Espinal and Tillery, were transferred with punitive intent.

I now turn to whether Defendants City, Brann, Williams, Sullivan, and Walker can be held liable for the punitive transfers.

### 2. Plaintiffs Have Plausibly Alleged that Defendants City, Brann, Williams, Walker, and Sullivan are Proper § 1983 Defendants

The City Defendants contend that the City, Brann, Williams, Walker, and Sullivan cannot be held responsible for the transfers, implying that they cannot be held responsible for any constitutional deprivation related to the transfer because of a lack of involvement in the transfer, (although they fail to make this connection in their brief). (City Defs.' Br. at 14-15.) They further argue that, even if the City Defendants can be held responsible for the transfers, the SCOC exercised independent judgment and therefore was an "intervening factor" that destroys the chain of causation. (City Defs.' Reply Br. at 4-5.)

For reasons I have already discussed, I find the City Defendants' attempt to avoid liability for their role in the transfer uncompelling. The City Defendants can be held liable for constitutional violations related to the transfers, despite the fact that the SJOs are apparently routinely approved by the SCOC.

### i. Individual Defendants

Plaintiffs have established that Williams and Brann were personally involved in the each one of Plaintiffs' transfers, and can be held liable under § 1983. As I have already addressed, Plaintiffs have alleged that Brann and Williams were the driving force behind the applications to the SCOC and instrumental in obtaining the transfers; therefore, they can be held liable for violations related to these transfers. (*See infra* II.B.2.i; Zuckerman Exs. C-F.)

There are two additional individual Defendants on this claim. Washington brings a claim against Defendant Walker, and Doe brings a claim against Defendant Sullivan.

Washington alleges that COs told him that he was being transferred to Albany because "Deputy Walker don't want you." (Am. Compl. ¶ 136.) This statement is sufficient for the Court to infer that Defendant Walker played a role in securing Washington's transfer, as it alleges that Walker was the driving force behind the transfer.

Doe alleges that, one day prior to his transfer to Albany, Defendant Sullivan told him, "Soon enough we won't have to deal with your bullshit anymore. You're going somewhere good that you'll like." (*Id.* ¶ 319.) Taking this fact in a light most favorable to Plaintiff, the Court can infer that Defendant Sullivan had a role in driving or enforcing the transfer, which would be sufficient for § 1983 liability. *See Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) ("In this Circuit, a 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally.") At the very least, it is premature to dismiss the claim against Sullivan in a motion to dismiss.

### ii. Municipal Liability

Plaintiffs argue that the City can be held liable because it has an unconstitutional policy or custom of transferring detainees to Albany in order to punish them. As the earlier analysis of the substantive due process claim recognizes, the FAC contains allegations that support four separate instances where young detainees were transferred to Albany for the purposes of punishment. *Cf. T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11 CV 5133 VB, 2012 WL 5992748, at *3 (S.D.N.Y. Nov. 27, 2012) (finding a single instance of misconduct insufficient to support allegations of policy or custom). In addition, Plaintiffs have alleged that, since the ban on solitary confinement for younger detainees went into effect, their transfer upstate has increased dramatically. (Am. Compl. ¶¶ 60-61.) The Court can reasonably infer

from this fact that young detainees are being transferred to Albany so that they can receive punishment they could not receive at a DOC facility. This is not a legitimate reason for transfer. Accordingly, the Court finds that Plaintiffs have successfully alleged *Monell* liability against the City for the punitive transfers.

The Motion to Dismiss the second cause of action is DENIED.

### D. Plaintiffs' Individual Causes of Action Against the City for Excessive Force, Sexual Assault, and Unreasonable Search (Counts 4, 5, 6, 9, 10, 11, 17, 21, 22, 23 & 27)

Each Plaintiff brings multiple claims against the City related to individual constitutional violations he suffered upon his arrival in Albany. Plaintiffs argue that the City is liable for each of these claims because the City has a policy or custom of transferring inmates – particularly those under 22 – to Albany, with the "knowledge and expectation" that these inmates will be subjected to sexual assault, unreasonable manual body cavity searches, excessive and unlawful force, and violent torture in violation of their constitutional rights. (*See* Am. Compl. ¶¶ 508, 514, 520, 525, 534, 540, 546, 551, 576, 591, 596, 602, 607, 622, 627.)

Washington brings claims of excessive force (count 4), sexual assault (count 5), and unreasonable search (count 6). Espinal brings claims of excessive force (count 9), sexual assault (count 10), unreasonable search (count 11), and an additional claim of excessive force related to his July 4 incident (count 17). Doe brings claims of excessive force (count 21), sexual assault (count 22), and unreasonable search (count 23). Finally, Tillery brings an excessive force claim (count 27).

The City Defendants make three main arguments as to why all of these claims should be dismissed. First, they argue that the SCOC, not the City, was responsible for the transfers. Second, they argue that Plaintiffs have not plausibly alleged that the City knew of these abuses, such that any policy of transfers was taken with the knowledge and expectation that they would

be subject to abuse.  Third, they argue that there is no causal connection between the City's action and the deprivation of constitutional rights.  (City Defs.' Br. at 18-19.)

Twice now I have addressed and rejected the City's first argument: the City can be held responsible for the transfers.  (*See infra* II.B.2.ii; II.C.2.ii.)

Thus, I turn to the City's second argument – that Plaintiffs have not plausibly alleged that the City had a policy of transferring detainees to Albany with the knowledge that they would be subject to abuse.

Plaintiffs argue that the City has failed to act to stop these transfers, despite the fact that Rikers detainees have repeatedly informed the City that ACCF guards abuse Rikers detainees upon their arrival in Albany.  Indeed, Plaintiffs allege that the City continues to consistently send young detainees to ACCF, as demonstrated by the increase in the transfer rate.  (Pls.' Br. at 21-22.)

To succeed on their claims, Plaintiffs must allege that the City policymakers who "speak with final policymaking authority . . . concerning the action alleged to have caused the particular constitutional violation at issue" knew of the abuses in Albany at the time Plaintiffs were transferred. *Jett*, 491 U.S. at 737.  Plaintiffs cannot show that the City was deliberately indifferent to what was occurring in Albany unless City officials knew what was occurring in Albany. *See Reynolds*, 506 F.3d at 192 ("*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).

To establish that the City knew of the misconduct, Plaintiffs point to the cumulative effect of the following alleged facts: a February 16, 2018 letter from a criminal defense attorney

to DOC's general counsel explaining that his client had been beaten upon arrival at ACCF; Espinal's March 3, 2018 Notice of Claim; an April 12, 2018 Article 78 petition challenging an inmate's transfer to ACCF and alleging that the inmate was beaten and sexually assaulted upon arrival in Albany; a July 2018 letter from Ruben Fernandez (Espinal's defense counsel) to Brann explaining that Espinal had been subject to beatings and mistreatment at ACCF; a July 22, 2018 *New York Times* articles describing the treatment of Rikers detainees at ACCF; and, an October 31, 2018 Article 78 petition in which a detainee alleges he experienced assault without any provocation upon his arrival in Albany.  (Am. Compl. ¶¶ 106-111.)

Doe was transferred to Albany on January 17, 2018; Espinal was transferred on February 13, 2018.  (*See id.* ¶¶ 210, 321, 324.).  It is true that earliest form of official notice to the City that is identified in the Complaint – the February 16, 2018 letter – occurred shortly after Doe and Espinal had been transferred.

Nevertheless, on a motion to dismiss, taking all allegations in favor of Plaintiffs, the Court cannot conclude that the City did not have knowledge of what was going on in Albany prior to transferring Doe and Espinal because Plaintiffs have alleged that Defendant Williams – who procured Plaintiffs' SJOs, as well as SJOs transferring other pretrial detainees – allegedly had knowledge of the abuses in Albany, but continuously requested the SJOs anyway. Defendant Williams stated in an affidavit in an unrelated Article 78 proceeding that "only Albany County Correctional Facility would be willing to house [inmates with histories of infections and violence], due to the facility's willingness in the past to accept and house inmates with similar violent infraction histories" and that he "believed" that no other closer jail would be "equipped to house and supervise dangerous, violent inmates." (Williams Aff. ¶¶ 8-9.)   Taking this statement in a light most favorable to Plaintiffs, the Court can infer that Williams

consistently sent a subgroup of pretrial detainees to ACCF, detainees who were purportedly difficult to manage, without fully considering whether other facilities might house these inmates, and that it is very likely that he knew (and supported) what was being done at ACCF to "manage" these individuals. (Williams Aff. ¶¶ 5-6, 9.) Until the facts about what Williams knew and considered in each instance are developed, I cannot discount the possibility that Williams would have been able to house inmates at facilities closer to New York City, where there was no history of violent reception in the presence of DOC officers – all of which would have been more consistent with the letter and spirit of the regulation than sending them to ACCF was.

Moreover, since the FAC suggests that Williams makes the decisions about whether to apply for the transfers, I cannot reach a conclusion about whether Williams' knowledge could or could not be attributed to the City or that he did not communicate what he knew to others, such as Brann. *See Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 431 (S.D.N.Y. 2012) (denying motion to dismiss *Monell* claim when "high-ranking prison officials" were aware of DOJ report detailing systemic constitutional failures similar to plaintiff's claim).

Furthermore, specifically with respect to Washington and Tillery, it is clear that the City had received formal notice such that it was "faced with a pattern of misconduct" as required for a deliberate indifference claim. *Reynolds*, 506 F.3d at 192. At the time of Washington's transfer, high-ranking City officials had two forms of notice, the February 16, 2018 letter and Espinal's March 3, 2018 Notice of Claim. By the time of Tillery's transfer on August 9, 2018, not only had the City received multiple individual complaints – directed at Brann, who was responsible for requesting the transfers – but a story had run in the *New York Times*, on which the Mayor's office commented. (Am. Compl. ¶¶ 61, 65.) Defendant Tillery was sent to ACCF three weeks

after the article was published.  Taking these allegations in a light most favorable to Plaintiffs, they are sufficient for the Court to find that at the time of Washington and Tillery's transfers, the City could have been on notice that their transferred inmates would be abused  *See Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (finding "consistent pattern of failing to adequately respond to [] complaints" and failing to act lawfully sufficient was sufficient basis for *Monell* claim).

As to the City's third argument, Plaintiffs have also sufficiently pled causation.  In the context of *Monell* liability, "proximate cause" "fairly describes a plaintiff's causation burden with respect to a municipal liability claim under § 1983." *Cash*, 654 F.3d at 342.  Here, Plaintiffs have alleged that the City was on notice that detainees were likely to be beaten when they were transferred to ACCF; thus, it was clearly foreseeable that such beatings would occur.  If this be proved, the City can be held proximately liable for injuries suffered as a result of these beatings. *Kerman*, 374 F.3d at 127.

Finally, in their reply, the City Defendants raise two additional arguments, neither of which is persuasive.  (City Defs.' Reply at 5-6.)  The first is that Albany COs were not "subordinates" such that the City cannot be held responsible for "acquiescing" to their action.  However, the City Defendants cite no law that suggesting that Albany COs were not acting as "subordinates" of the City; furthermore, they appear to ignore the fact the City is paying ACCF to house these inmates. (Am. Compl. ¶¶ 55, 58.)  The second argument is that there can be no constitutional violation for applying under established state law for a transfer to an "accredited institution."  Here, too, the City Defendants cite no law supporting this argument, which fails on its face – the fact that ACCF is an accredited institution does not mean that its staff cannot

commit unconstitutional acts of which the City was aware (and allegedly, of which it took advantage).

Accordingly, the Motion to Dismiss the fourth, fifth, sixth, ninth, tenth, eleventh, seventeenth, twenty-first, twenty-second, twenty-third, and twenty-seventh causes of action against the City is DENIED.

### E. Plaintiffs Failure to Intervene Claims Against the City and Frank Foe COs (Counts 7, 12, 24 & 28)

Plaintiffs each bring a failure to intervene claim pursuant to § 1983 against both the City (under *Monell*) and the particular DOC ESU COs responsible for transporting Plaintiffs to Albany: Washington brings his claim against Frank Foes #1-3 and the City (count 7); Espinal against Frank Foes #4-6 and the City (count 12); Doe against Frank Foes #7-9 and the City (count 24); and, Tillery against Frank Foes #10-12 and the City (count 28).

Plaintiffs argue that the Frank Foe COs knew the Albany Defendants were going to violate Plaintiffs' constitutional rights and that they had the opportunity to intervene to prevent them from doing so, but they failed to take reasonable steps to intervene. Plaintiffs argue that the City is liable for failing to intervene because it had a policy or custom of transferring Plaintiffs with the knowledge that they would be subject to excessive and unlawful force.

The City Defendants do not argue that Plaintiffs have not been subjected to constitutional violations; rather, they claim the City Defendants are not proper defendants.

#### 1. Individual Claims Against Frank Foe COs

The City Defendants raise their opposition to the claims against the Frank Foe COs for the first time in their reply. (City Defs.' Reply Br. at 10.) First, they appear to be arguing that Plaintiffs should not be allowed to bring these claims, because they did not mention them at the conference this Court held on February 8, 2019. But these claims were pleaded in Plaintiffs'

Complaint and FAC, both of which were filed prior to the February 8, 2019 conference.

Moreover, the fact that Plaintiffs have not yet identified the Frank Foe Defendants is not

problematic – "It is proper for a section 1983 plaintiff to use a 'Doe' pleading until such time as

her identity can be learned through discovery or through the aid of the trial court." *Cole v. Artuz*,

No. 97 CIV. 0977 (RWS), 2000 WL 760749, at *6 (S.D.N.Y. June 12, 2000).

Second, the City Defendants argue that these claims should be dismissed because they are

"conclusory." But they provide no argument explaining why the claims are "conclusory,"

merely citing *Bouche v. City of Mount Vernon*, No. 11 CIV. 5246 SAS, 2012 WL 987592

(S.D.N.Y. Mar. 23, 2012). (City Defs.' Reply at 10.) In *Bouche*, the court dismissed a failure to

intervene claim as "vague and conclusory" when Plaintiff alleged that "defendants" had an

affirmative duty to intervene but did not make clear which defendants he was referring to.

*Bouche*, 2012 WL 987592 at *7. Here, Plaintiffs have pointed to unnamed but particular officers

who "failed to intervene," so *Bouche's* reasoning is inapplicable. The Court will not dismiss the

claims against the Frank Foe COs based on these grounds.

### 2. Municipal Liability

Plaintiffs each bring a failure to intervene claim against the City, alleging that the City

has a policy or custom of transferring detainees to Albany with the knowledge and expectation

that they would be subject to excessive and unlawful force there. This is the same theory

underlying Plaintiffs' excessive force, sexual assault, and unreasonable search claims, which I

have already addressed.

For the reasons discussed in the context of these claims, Plaintiffs' claims for failure to

intervene survive the motion to dismiss.

Accordingly, the Motion to Dismiss the seventh, twelfth, twenty-fourth, and twenty-

eighth causes of action is DENIED.

### F. Espinal's Claims for Assault and Battery Against the City and Frank Foes #4-6 (Counts 13 & 14)

In the thirteenth and fourteenth causes of action, Espinal brings state law claims of assault and battery, respectively, against the City and Frank Foes #4-6, the DOC ESU COs responsible for transferring Espinal from Rikers to Albany. Again, the City Defendants do not argue that Espinal has not pleaded assault and battery, only that the Frank Foes and the City cannot be held liable.

#### 1. Individual Liability of Frank Foes #4-6

The City Defendants argue that Espinal's claims against Frank Foes #4-6 are not meritorious or plausible, but provides no reasoning or case law to support their argument.

"Under New York law, an assault is 'an intentional placing of another person in fear of imminent harmful or offensive contact.' A battery is 'an intentional wrongful physical contact with another person without consent.'" *Rivera v. Puerto Rican Home Attendants Servs., Inc.*, 930 F. Supp. 124, 132-33 (S.D.N.Y. 1996).

The FAC alleges that Frank Foes #4-6 had knowledge of the Albany Defendants' intention to assault and batter Espinal, and that they provided substantial assistance by uncuffing Espinal and handing him over to be assaulted and battered. (Am. Compl. ¶¶ 218-19, 556, 561.) It also alleges that Espinal was assaulted and battered when he was threatened and physically abused by the Albany Defendants. (*Id.* ¶¶ 228-263, 553, 558.) This is sufficient to state a claim that Frank Foes #4-6 participated in the commission of these intentional torts. *See Herman v. Wesgate*, 94 A.D. 938, 316 (4th Dep't 1983) (liability for tortious acts extends to all who actively take part in the act or lend aid or encouragement to the wrongdoer).

2.   The City's Liability

The City mistakenly identifies these claims as *Monell* claims, but they are not.  *Monell*

liability attaches only to § 1983 claims.  On these common law claims, Plaintiffs argue that the

City can be held liable under a theory of *respondeat superior.*

Plaintiffs provide two theories of *respondeat superior* liability.  First, they allege that the

City is liable for the conduct of Frank Foes #4-6, its employees who committed the battery and

assault.  Second, Plaintiffs allege that the City is liable for the ACCF COs' conduct, because

these COs were acting as agents and servants of the City.

"According to well-established New York law, an employer is only liable for the actions

of an employee where the employee was engaged in the furtherance of the employer's business

and the employer was, or could have been, exercising some control, directly or indirectly, over

the employee's activities." *Mahmood v. City of New York*, No. 01 CIV. 5899 (SAS), 2003 WL

21047728, at *2 (S.D.N.Y. May 8, 2003).  "Under New York law, the City, just like any other

private entity, is answerable for the conduct of its officers who commit common-law torts, such

as assault and false imprisonment, when they are acting in the course of their employment."

*Williams v. City of New York*, 121 F. Supp. 3d 354, 376 (S.D.N.Y. 2015) (internal quotations

omitted).  However, the City will not be liable for "torts committed by the employee solely for

personal motives unrelated to the furtherance of the [City's] business." *Vega v. Northland Mktg.*

*Corp.*, 289 A.D.2d 565, 566 (2d Dep't 2001).

It is perfectly clear that the City is potentially liable under a theory of *respondeat*

*superior* for the actions of Frank Foes #4-6.  At the time Frank Foes #4-6 engaged in the conduct

alleged, they were City employ acting in the course of their employment.

The more complicated question is whether the City can also be held liable under

*respondeat superior* for the actions of the Albany Defendants.

When Espinal was assaulted and battered, he had been turned over to the Albany Defendants.  But Plaintiffs argue that the City can still be liable for Espinal's damages resulting from these intentional torts because, at the time, Espinal was in the legal custody of the DOC. Plaintiffs have alleged that in an August 15, 2018 letter to Espinal's attorney, the City represented that it transferred Espinal to ACCF pursuant to 9 NYCRR § 7210.6(e) (rather than 9 NYCRR § 7210 (a-c)).  Transfers under 9 NYCRR § 7210.6(e) occur when there are "extraordinary circumstances" and involve slightly different procedures for effectuating the transfer.  Significantly, when a transfer is effected pursuant to subsection (e), the inmate remains in the legal custody of the facility administrator of the originating facility, even though he is in the physical custody of the new facility, until he is permanently transferred.

Defendants argue that 9 NYCRR § 7210.6(e) applies only to "extraordinary circumstances," and that Espinal's transfer did not meet this criterion.  That may well prove true, but, taking the factual allegations of the FAC as true – and since the Court has seen the letter in which an assistant general counsel for the City informed Espinal's attorney that he was transferred to ACCF pursuant to this part of the statute – I find that Plaintiffs have sufficiently alleged that Espinal was in the City's custody when he was subject to the abuses in Albany.

The question then becomes whether the Albany COs were acting as agents and servants of the City when they perpetrated an assault and battery on Espinal, such that the City can be held responsible for their behavior.

A principal-agent relationship may be established by evidence of the "consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act." *See Fils-Aime v. Ryder TRS, Inc.*, 40 A.D.3d 917, 918 (2007) (internal quotation omitted).  By requesting that Espinal be transferred to ACCF pursuant to 9 NYCRR §

7210.6(e), the City knew (or should have known) that Espinal would remain in its legal custody but would be transferred to another facility. By asking for this specific type of transfer, the City plausibly consented to permit staff at the destination facility to act on its behalf, and conferred authority to Albany with respect to Espinal's care, which Albany accepted by taking Espinal into its custody. *See Sauter v. New York Tribune*, 305 N.Y. 442, 444-45 (1953) (describing delegation of authority in master-servant relationship). Moreover, the ACCF COs were undoubtedly acting in the course of their employment when they assaulted Espinal, and the City could have reasonably anticipated that the COs would commit an assault in these circumstances. *See Ramos v. Jake Realty Co.,* 21 A.D.3d 744, 745 (1st Dep't 2005). It is, therefore, presumable that, in these unique circumstances, the City could be held liable for the Albany Defendants' actions under a theory of *respondeat superior*. It would certainly not be appropriate to dismiss this claim until the facts have been fleshed out in discovery.

Accordingly, the Motion to Dismiss the thirteenth and fourteenth causes of action is DENIED.

### G. Plaintiffs' Claims of Deliberate Indifference to Detainee Safety Against the City, Brann, and Williams (Count 33)

In the thirty-third cause of action, all Plaintiffs claim, pursuant to § 1983, that the City, Brann, and Williams exhibited deliberate indifference to their safety in violation of their Fourteenth Amendment rights by transferring them to Albany. With respect to Brann and Williams, Plaintiffs allege that when transferring them to Albany, Brann and Williams acted intentionally to risk Plaintiffs' safety or recklessly failed to act with reasonable care to mitigate the risk to Plaintiffs' safety. With respect to the City, Plaintiffs allege that there was an official policy or custom of transferring selected detainees to ACCF with the knowledge and expectation that they would be subject to an unreasonable risk to their safety there.

61

The City Defendants rely on the same arguments that they claim prohibit liability against them for the abuses that occurred in Albany – that they did not transfer Plaintiffs, that Plaintiffs have not alleged individual or municipal knowledge of the abuses, and that there was no causation. Those arguments are no more persuasive in this context than they were in the context in which they were initially raised.

1. Individual Liability

"Allowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances." *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009) (internal citation omitted). Allegations that defendants have failed to provide detainees with reasonable safety are evaluated under a deliberate indifference standard. *See Milo v. City of New York*, 59 F. Supp. 3d 513, 524 (E.D.N.Y. 2014). This is a two-prong test: "First, the Plaintiff must show that the challenged conditions of confinement were 'sufficiently serious to constitute objective deprivations of the right to due process;'" second, the plaintiff must show that the defendant "'acted with at least deliberate indifference to the challenged conditions.'" *Harris v. City of New York*, No. 15-CV-6341 (NG) (JO), 2018 WL 1997974, at *4 (E.D.N.Y. Apr. 27, 2018) (quoting *Darnell*, 849 F.3d at 29). "To establish a claim for deliberate indifference . . . , the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

i. Williams

All Plaintiffs have sufficiently alleged a deliberate indifference claim against Williams. As I have already discussed, as part of the FAC, Plaintiffs relied on an affidavit in which

Williams explained that ACCF was continually willing to accept City inmates with "violent infractions histories" when no other jail would, and that he often sent such inmates to Albany. (Am. Compl. ¶ 112.) Given the validity of the alleged facts, viewed in a light most favorable to Plaintiffs, the Court cannot conclude on a motion to dismiss that Williams was unaware that Albany was using force and other unconstitutional tactics to manage these detainees that other facilities did not want to accept. This is all the more true because of the allegations that the "Frank Foe" defendants – who were New York City COs – witnessed, and so understood, at least some of what occurred at ACCF upon arrival. Thus, Plaintiffs have sufficiently alleged that Williams should have known that Plaintiffs were being subjected to unreasonable risk to their safety by being transferred to Albany. *Cf. Stewart*, 2018 WL 1633819, at *7 (granting motion to dismiss when complaint did not allege any individual defendant "was are or should have been aware" of the possibility of "excessive risk" to safety).

### ii. Brann

Plaintiffs also claim that Brann acted intentionally to endanger Plaintiffs' safety, or, in the alternative, that she failed to mitigate risk that she should have known about. Taking all allegations in favor of Plaintiffs, the Court cannot conclude on a motion to dismiss that Brann was unaware of what was going on in Albany, given the alleged knowledge of the Frank Foe COs as well as Williams, who worked with Brann to request the SJOs.

### 2. Municipal Liability

For the reasons already discussed in the context of Plaintiffs' *Monell* claims against the City for abuses Plaintiffs experienced at ACCF, Plaintiffs' deliberate indifference claims against the City will not be dismissed – Plaintiffs have plausibly alleged that the City was on notice of what was occurring in Albany prior to the transfers, and nevertheless, subjected Plaintiffs to conditions that posed a risk to their safety. (*See infra* II.D, II.E.2)

63

All of these issues will undoubtedly be raised again in post-discovery motions. For now, however, the Motion To Dismiss the thirty-third cause of action is DENIED.

### H. Washington's First Amendment Claim against the City, Brann, Williams, and Walker (Count 3)

In the third cause of action, Plaintiff Washington alleges a First Amendment retaliation claim pursuant to § 1983 against the City, Brann, Williams, and Walker. He alleges that he was transferred as punishment for the fact that he lodged repeated complaints with the Legal Aid Society Prisoners' Rights Project. (Am. Compl. ¶¶ 130-31, 501, 503.)

"To sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

The first and third factors are at issue here. The City Defendants argue that Washington has failed to plausibly identify an exercise of free speech and that he has not demonstrated an adequate causal connection between the speech and the transfer. The City Defendants do not argue that they did not take adverse action against the Plaintiff, or that these particular Defendants cannot be held liable.

Turning to the first factor, Washington has successfully pleaded an exercise of protected speech. In the prison context, the filing of a grievance is a protected activity. *Gill*, 398 F.3d at 384; *see also Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003). So is the filing of a lawsuit. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). Furthermore, case law suggests that a prisoner's oral complaint may serve as the basis of a First Amendment claim. *See Tirado v.*

*Shutt*, No. 13 CIV. 2848 LTS AJP, 2015 WL 774982, at *9 (S.D.N.Y. Feb. 23, 2015), *report and recommendation adopted in part*, No. 13CV2848-LTS-AJP, 2015 WL 4476027 (S.D.N.Y. July 22, 2015) (citing cases); *see also, e.g.*, *Varela v. Demmon*, 491 F. Supp. 2d 442, 451-52 (S.D.N.Y. 2007).

Plaintiffs argue that Washington's complaints to the Legal Aid Society, which were passed on to DOC, were the "functional equivalent" of filing a grievance and an oral complaint, the only difference being that a third-party conveyed the complaint to DOC. (Pls.' Br. at 23.) The Court agrees. Washington lodged a complaint with Legal Aid, and Legal Aid contacted DOC on his behalf. This is akin to Plaintiff's filing an oral complaint himself. *See Meriwether v. Coughlin*, 879 F.2d 1037, 1046 (2d Cir. 1989) (finding prisoners participated in speech when, among other activity, they corresponded with public interest organizations).

Legal Aid's complaint to DOC on behalf of Washington also shares key characteristics with a lawsuit, which is also a form of protected speech. In both instances, the complaint is made in a plaintiff's name, but is articulated by a third-party advocate in a better position to communicate the inmate's needs.

Turning to the third factor, to allege a causal connection, the plaintiff must demonstrate that the protected conduct was "a substantial or motivating factor for the adverse actions taken by prison officials." *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (summary order). Temporal proximity can be sufficient to establish causation if a plaintiff demonstrates that the protected activity was "close in time" to the adverse action. *Espinal*, 558 F.3d at 129. There is no "bright line" for temporal proximity and a court exercises judgment based on the case at issue. *Id.* However, in the Second Circuit, "two to three months" is generally the limit. *See*

*Adams v. Ellis*, No. 09 CIV. 1329 PKC, 2012 WL 693568, at *16 (S.D.N.Y. Mar. 2, 2012) (citing cases), *aff'd*, 536 F. App'x 144 (2d Cir. 2013).

Here, Plaintiff alleges that Legal Aid communicated his complaints to DOC on or about March 16 and March 26, 2018, and that he was transferred on March 28, 2018. The temporal proximity between the lodging of Washington's complaints and his transfer is sufficient to allege a causal connection between the speech and the adverse action.

For the reasons, the City Defendants' Motion to Dismiss the third cause of action is DENIED.

## I.   Plaintiffs' Right to Counsel Claims Against the City, Brann, and Williams (Count 32)

In the thirty-second cause of action, Plaintiffs bring § 1983 claims against the City, Brann, and Williams, alleging that their transfer to ACCF violated their Sixth Amendment right to counsel.

The City Defendants make four arguments as to why these claims should be dismissed: (1) the City Defendants cannot be held responsible for the transfers (an argument that I have repeatedly rejected); (2) the SCOC made findings that "safety concerns" justified the transfer, which makes them a reasonable restriction on the Sixth Amendment right (also rejected, since we cannot at present know what the SCOC did and did not do other than stamp the requests approved); (3) distance itself is insufficient for a Sixth Amendment claim; and, (4) Plaintiffs have not plausibly alleged that they were harmed or prejudiced by the distance. (City Defs.' Br. at 15-17.)

Pretrial detainees have a "constitutionally protected right to the effective assistance of counsel," which attaches at the initiation of criminal proceedings. *Cobb v. Aytch*, 643 F.2d 946, 957 (3d Cir. 1981) (citing *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)). Jail regulations that

"unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid," but all regulations must be evaluated "in light of the central objective of prison administration, safeguarding of institutional security." *Benjamin v. Fraser*, 264 F.3d 175, 184, 187 (2d Cir. 2001) (internal quotations omitted).

Courts have found the transfer of pretrial detainees between facilities that significantly interferes with access to counsel to violate the Sixth Amendment. *See, e.g., Cobb,* 643 F.2d at 957. In *Cobb v. Aytch*, the Third Circuit found that the transfer of pretrial detainees from Philadelphia to facilities ranging from 90-300 miles away from the city violated the Sixth Amendment. *Id.* at 949, 957. In making its decision, the *Cobb* court relied on "extensive findings" made by the district court with respect to the detainees' access to legal representation. *Id.* at 957. These findings included that interviews – both pre-trial and pre-sentencing – were "essential" to the detainees' defenses and that local public defenders lacked "resources of money and time" to effectively conduct these interviews at locations distant from the city. *Id.* at 951. The Second Circuit has twice recognized the validity of the Third Circuit's finding in *Cobb*, and has remanded a case to the district court to determine whether a transfer to a facility 56 miles away violated a detainees' Sixth Amendment Rights. *See Covino v. Vermont Dep't of Corr.*, 933 F.2d 128, 130 (2d Cir. 1991); *see also Benjamin*, 264 F.3d at 187.

In support of their Sixth Amendment claim against the City Defendants, Plaintiffs allege that ACCF's location – 160 miles from New York City – makes it extremely difficult for Plaintiffs' criminal defense attorneys to visit their clients. (Am. Compl. ¶ 114.) The affidavit of Ruben Fernandez, Plaintiff Espinal's attorney,[7] explains why the distance and the circumstances of the Albany facility make it "effectively impossible" for appointed criminal defense attorneys

---

[7] The Court may consider the Ruben Affidavit as it was incorporated into the Complaint and the FAC. *Tellabs, Inc.*, 551 U.S. at 322 (2007).

to effectively counsel their clients. (*Id.* ¶ 115; Aff. of Ruben Dario Fernandez ("Fernandez Aff."), Dkt. No. 37.)

As the City Defendants have pointed out, distance – even with the added hardships faced by a public defender – is not necessarily dispositive; adequately administered alternatives that allow an inmate to communicate with counsel despite him or her being located far from the court might ameliorate any interference with the detainee's Sixth Amendment right (even if they are not ideal). *See United States v. Lucas*, 873 F.2d 1279, 1280 (9th Cir. 1989). Plaintiffs have presented allegations that the "practical alternatives" available at ACCF are not sufficiently implemented to allow inmates the required assistance of counsel. (Fernandez Aff. ¶ 10; *see also* Am. Compl. ¶¶ 115-23.) Fernandez's affidavit details that the alternatives provided by ACCF – including videoconferencing and inmates' production in the Bronx – are inadequate because of poor quality of the videoconferences, a potential lack of privacy, lack of face-to-face contact to establish trust, and the fact that inmates are not produced for conferences and court dates when they are supposed to be. (Fernandez Aff. ¶¶ 10, 13.) Plaintiffs have also alleged that there is no access to unrecorded legal telephone calls. (Am. Compl. ¶¶ 118-23.)

Considering these allegations in a light most favorable to Plaintiffs, I find that they are sufficient to survive a motion to dismiss. The alleged distance from New York City to ACCF is greater than cases in which courts have found Sixth Amendment violations plausible. *See Covino*, 933 F.2d at 130; *Cobb*, 643 F.2d at 951. Fernandez's affidavit describes why the travel at issue in this case is not an insignificant burden on Plaintiffs' criminal defense attorneys, who are typically public defenders with large caseloads and a myriad of responsibilities, and also why the alternative forms of communication offered by ACCF are inadequate to ameliorate this burden. (Fernandez Aff. ¶ 11.)

Plaintiffs have also sufficiently alleged that they were harmed or prejudice. The FAC alleges that Plaintiffs were all housed significant distances from their attorneys, and in solitary confinement, where they were deprived of confidential legal phone calls. *Cf. McFadden v. Solfaro*, No. 95 CIV. 1148 (LBS), 1998 WL 199923, at *9 (S.D.N.Y. Apr. 23, 1998) (denying Sixth Amendment claim based on far away transfer when Plaintiff offered no specific facts as to how and when he was denied access to counsel).

Of course, to win their case, Plaintiffs will have to establish that "safety issues" did not justify their transfers, despite the fact that the transfer may have burdened their right to counsel. They will also have to provide in more detail the injuries suffered by each Plaintiff as a result of their inadequate access to counsel. But at this stage, Plaintiffs have alleged facts sufficient to support their claim.

The Motion to Dismiss the thirty-second cause of action is DENIED.

## III.   The City Defendants' Motion to Dismiss Pursuant to 12(b)(1)

The City Defendants also moved to dismiss Plaintiffs' claim for permanent injunctive relief for lack of subject matter jurisdiction.[8]

The City Defendants argue Plaintiffs lack standing to sue for injunctive relief as a class or otherwise. They contend that Plaintiff Espinal – the only Plaintiff who was still being housed at ACCF at the time the City Defendants filed their motion – failed to exhaust his administrative remedies, which would preclude him from bringing a claim for injunctive relief. But the City Defendants waived the PLRA exhaustion affirmative defense (*see* Dkt. No. 81), so if Espinal

---

[8] The Court notes that there is not one claim that is specifically tied to the request for permanent injunctive relief. One would assume that the City is referring to counts one, two, thirty-two, and thirty-three, the claims brought by all Plaintiffs against the City, Brann, and Williams, which can be remedied with injunctive relief.

were still in ACCF custody, the Motion to Dismiss for lack of standing would have been denied on this basis.

Since the filing of the briefs related to the Motion to Dismiss, Plaintiff Espinal was sentenced and (quite expediently) transferred to state custody. He is no longer being housed at ACCF. As a result, there is no basis to impose an injunction against Defendants with regard to his housing at ACCF.

This does not, however, mean that this action cannot be maintained – Espinal still has claims for damages – or that it cannot proceed as a class action. The fact that there was standing and a controversy when the case was filed is "sufficient . . . to enable the suit to proceed as a class action." *White v. Mathews*, 559 F.2d 852, 857 (2d Cir. 1977); *see also Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975); *Swisher v. Brady*, 438 U.S. 204, 214 n. 11 (1978)*; Goetz v. Crosson*, 728 F. Supp. 995, 1000 (S.D.N.Y. 1990) ("In instances where a named plaintiff's claim has become moot after a motion for class certification has been filed, the relation-back doctrine provides an exception to the mootness rule . . . particularly when there is a 'particular concern' of the potential ability of the defendant to purposefully moot the named plaintiffs' claims after the class action complaint had been filed but before the class had been properly certified.").

In a footnote in their brief and then in one sentence in their reply, the City Defendants argue that class treatment would be improper in this case. The issue of class certification will be addressed in response to the Plaintiffs' Motion for Class Certification, which was filed on March 28, 2019, and which will be briefed after the release of this opinion.

Accordingly, the City Defendants' Motion To Dismiss pursuant to 12(b)(1) is DENIED.

## THE ALBANY DEFENDANTS' AND DEFENDANT MYLROIE'S MOTIONS FOR SEVERANCE AND TRANSFER TO THE NORTHERN DISTRICT OF NEW YORK

Both the Albany Defendants and Defendant Mylroie have moved to sever the claims against them from the claims against the City Defendants, and transfer these claims to the Northern District of New York.

For the purpose of this motion, the Court relies on the facts taken from the FAC, discussed at the beginning of this opinion, which are assumed to be true. In addition, the Court considers additional material submitted by the parties in support of the severance motion. *See Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 23 n.1 (S.D.N.Y. 2016).

### I.      Legal Standard

Federal Rule of Civil Procedure 21 provides that the court may "sever any claim against a party." Fed. R. Civ. P. 21. A trial court has "broad discretion" as to whether to grant a motion to sever. *Oram v. SoulCycle LLC*, 979 F. Supp. 2d 498, 502 (S.D.N.Y. 2013). A court appropriately exercises this discretion when severance "furthers the aims of justice, promotes judicial economy and efficiency, and avoids prejudicing the rights of any party." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 214 F.R.D. 152, 155 (S.D.N.Y. 2003).

Nevertheless, severance is "a procedural device to be employed only in exceptional circumstances." *Wausau Bus. Ins. Co. v. Turner Const. Co.*, No. 86017, 2001 WL 963943, at *1 (S.D.N.Y. Aug. 23, 2001) (internal quotation omitted). The moving party "bears the burden of demonstrating that 'severance is required to avoid prejudice or confusion and to promote the ends of justice.'" *N. Jersey Media Grp. Inc. v. Fox News Network, LLC*, 312 F.R.D. 111, 114 (S.D.N.Y. 2015) (quoting *Agnesini v. Doctor's Assoc., Inc.*, 275 F.R.D. 456, 458 (S.D.N.Y. 2011)).

Second Circuit courts consider the following factors when determining whether to sever a claim: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *N. Jersey Media Grp. Inc.*, 312 F.R.D. at 114 (citing *Oram*, 979 F. Supp. 2d at 502-03). Some courts have granted severance when only one of these factors is present but generally, severance is granted when more than one condition is met. *Id.* (collecting cases); *see also Oram*, 979 F. Supp. 2d at 503.

If a court decides to sever some of the claims, it then considers whether the claims should be transferred – "Where certain claims are properly severed, the result is that there are then two or more separate 'actions,' and the district court may, pursuant to § 1404(a), transfer certain of such separate actions while retaining jurisdiction of others." *Wyndham Assocs. v. Bintliff,* 398 F.2d 614, 618 (2d Cir. 1968).

## II.   Discussion

The Albany Defendants submit that Plaintiffs have attempted to "bootstrap" their claims against the Albany Defendants to those against the City Defendants in order to establish venue in the Southern District of New York. They contend that the claims against them are separate and distinct causes of action, and that the two sets of claims should be tried in separate fora. They also argue that severance would further justice and judicial economy, as well as avoid prejudice, but they provide almost no reasoning as to why this is the case. (Mem. of Law in Supp. of Defs.' Mot. for Severance and Transfer to the Northern District of New York ("Albany Defs.' Sev. Br."), Dkt. No. 59, at 5-6.)

Plaintiffs argue that their structural reform case regarding the City's decision to send detainees to Albany is entwined with what actually occurred in Albany, and that their choice of forum should not be disturbed.  They also argue that the parties, witnesses, and proof overlap substantially, and that piecemeal litigation would prejudice plaintiffs.  (Pls.' Consolidated Mem. of Law in Opp. to the Albany County Defs. And Def. Mylroie's Mots. To Sever and Transfer the Case ("Pls.' Sev. Br."), Dkt. No. 69, at 6-12.)

The Court considers these arguments in the context of the five factors used by the Second Circuit to determine if severance is warranted.

### A.  Arise Out of the Same Transaction or Occurrence

"While '[t]here is no rigid rule as to what constitutes the same series of transactions or occurrences,' courts 'repeatedly have interpreted the phrase "same transaction" to encompass "all logically related claims."'" *N. Jersey Media Grp. Inc.*, 312 F.R.D. at 115 (quoting *Agnesini*, 275 F.R.D. at 458-59); *see also Todaro v. Siegel Fenchel & Peddy, P.C.*, No. 04-CV-2939JSWDW, 2008 WL 682596, at *2 (E.D.N.Y. Mar. 3, 2008) ("Applying this standard to motions to sever trials, district courts in this Circuit generally 'permit all logically related claims by or against different parties to be tried in a single proceeding.'" (quoting *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1421 (S.D.N.Y. 1989)).  Courts take a "case-by-case" approach to determine whether the circumstances constitute one transaction or occurrence. *See Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263 (D. Conn. 2012).

The Court finds that all of Plaintiffs' claims are logically related because they are all part of the single "transaction" of transferring Plaintiffs to ACCF with the intention – and result – that Plaintiffs would be subjected to punitive treatment upon their arrival.  Plaintiffs have alleged that actions taken by the Albany Defendants are one part of the City Defendants' larger plan to punish Plaintiffs and others.  Plaintiffs' claims depend both on what the City Defendants

believed would occur in Albany, what actually occurred, and any coordination between the City and Albany Defendants. It is clear that there is a significant relationship between the two sets of claims.

Notably, this case is unlike prisoner cases in which courts have found severance desirable because claims arose out of unrelated transactions or occurrences. For example, in *James v. Osbourne*, No. 11 CV 4182 NGG, 2012 WL 4849131, (E.D.N.Y. Apr. 18, 2012), *report and recommendation adopted*, No. 11-CV-4182 NGG CLP, 2012 WL 4849160 (E.D.N.Y. Oct. 11, 2012), a prisoner brought claims against COs at multiple correctional facilities. *Id.* at *5. The court severed the claims because the "incidents alleged to have occurred at these three facilities appear[ed] discrete," aside from a general allegation of conspiracy, which had no factual basis. *Id.* In *Melendez v. Wilson,* No. 04 CIV. 0073(PKC), 2006 WL 2621083, (S.D.N.Y. Sept. 12, 2006), plaintiff brought claims against 46 defendants and six "John Does," which arose out of 17 individual incidents occurring over two years at two facilities. *Id.* at *1. The Court severed the claims arising out of incidents that occurred at a facility outside of its jurisdiction, and transferred them to the Northern District, where venue was proper. *Id.* at *10. And, in *Salgado v. NYS Dep't of Corr. & Cmty. Supervision*, No. 13-CV-01108-RJA-MJR, 2018 WL 1663255, (W.D.N.Y. Apr. 6, 2018), the court severed allegations of excessive force, retaliation, religious discrimination, and deliberate indifference that occurred at one correctional facility from those that occurred at two other facilities, both of which were located in a different district, because "they involve different defendants, locations and time periods as well as separate allegations of wrongdoing." *Id.* at *3.

Unlike these cases, Plaintiffs' claims are not "discrete" and do not allege "separate allegations of wrongdoing." This case alleges a general scheme of transferring young prisoners

out of New York County, where they cannot be kept in solitary confinement, to Albany, where they can be – the City's intent being to punish them and ensure they can be placed solitary confinement. The Albany Defendants are alleged to have acted as the City Defendants' agents for the purpose of punishing the young detainees. Thus, the claims against the City Defendants and the Albany Defendants should be kept together. While not all causes of action are brought against all Defendants, this does not mean that the claims may not be part of the same "transaction" or that they are "indirectly" related. *Cf. Wyndham*, 398 F.2d at 618 (severance is appropriate when "defendants as to whom venue would not be proper in the transferee district are alleged to be only indirectly connected to the manipulations which form the main subject matter of the action").

### B. Common Questions of Law or Fact

It is clear that there are common issues of fact between the two sets of claims. The details of what happened upon Plaintiffs' arrival at ACCF will be instrumental for both the claims against the City Defendants and the claims against ACCF Defendants.

Information about the assaults on Plaintiffs is relevant to the Plaintiffs' substantive due process claims against the City (count 2), the deliberate indifference claims against Defendant the City, Williams, and Brann (count 32), the failure to intervene claims against the City, Brann, and Frank Foe COs (counts 7, 12, 24, & 28), and Plaintiff Espinal's assault and battery claims (counts 13 & 14). And information as to why and how ACCF administrators determined to place Plaintiffs in punitive segregation – i.e., whether it was pretextual – is probative of Plaintiffs' substantive due process claims against the City Defendants and its procedural due process claims against the Albany Defendants (counts 1, 8, 20, 26 & 30).

Plaintiffs' claims against both the City Defendants and the Albany Defendants for denial of adequate access to legal counsel (counts 31 & 32) are another area of factual overlap. The

adequacy of the legal services that Plaintiffs had access to at ACCF is relevant to potentially mitigate the hardships caused by the distance between the Bronx and Albany, and of course, is the underlying issue in the claim against the Albany Defendants.

### C. Judicial Economy and Overlap of Evidence

This factor turns on whether the Court believes that one trial is more efficient than two. "[O]ne trial is usually more efficient than two." *N. Jersey Media Grp. Inc.*, 312 F.R.D. at 117. The ultimate question is whether "separate trials will result in *substantial* overlap of witnesses or documentary proof." *Costello*, 888 F. Supp. 2d at 264 (emphasis in original) (internal citation omitted).

Given that there are overlapping issues of fact, it is not surprising that there is also commonality of witness and evidence, despite the fact that the Albany Defendants' claim that "none of the New York City defendants would even take part in the litigation as it pertains to the Albany Defendants." (Albany Defs.' Sev. Br. at 6.)

Plaintiffs have identified witnesses – such as Plaintiffs' criminal defense attorneys and the Albany County Defendants – whose testimony would be relevant to claims against both sets of Defendants, particularly those related to access to counsel. Plaintiffs contend that they will require evidence from Albany Defendants to determine the details of coordination between ACCF and Williams (and any other City Defendants involved in the transfer process) to support their substantive due process claims against the City Defendants (count 2), as well as for the "failure to intervene" claims against the Frank Foe COs and the City Defendants (counts 7, 12, 24 & 28). Evidence from Frank Foe COs responsible for transporting Plaintiffs from DOC custody to ACCF are also like to be necessary for Plaintiffs to support their abuse claims against the Albany Defendants. (Pls.' Sev. Br. at 8-9.)

Defendants provide very limited evidence as to why severance would benefit judicial economy. Defendant Mylroie contends that her claims require different evidence and witnesses than the claims against the City Defendants, and that all of this evidence is located either at ACCF or the surrounding facilities. (Mem. of Law in Supp. of Def. Mylroie's Mot. to Sever and Transfer ("Mylroie Br."), Dkt. No. 61-2, at 6-7.) Yet, medical records and any related testimony are likely to be relevant evidence in claims against ACCF and the City to demonstrate Plaintiffs' injuries.

Since there is at least some overlap of witnesses and evidence, which favors judicial economy, these factors favor Plaintiffs. *See Kirk v. Metro. Transp. Auth.*, No. 99 CIV. 3787 (RWS), 2001 WL 25703, at *3 (S.D.N.Y. Jan. 10, 2001) ("The possibility of duplicate presentation of evidence at each trial weighs against severance."); *German by German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1401 (S.D.N.Y. 1995) (denying motion for severance when proof of many points would "in significant part require the testimony of the same witnesses and presentation of the same evidence as [would] be required in proving them against the other defendants").

### D. Avoidance of Prejudice

Courts consider how severance might avoid or generate prejudice to the Parties. "Severance is appropriate where a joint trial 'could lead to confusion of the jury.'" *Costello*, 888 F. Supp. 2d at 265 (quoting *Deskovic v. City of Peekskill*, 673 F. Supp.2d 154, 171 (S.D.N.Y. 2009). The Court balances the effect of severance on both Plaintiffs and Defendants. *See, e.g., S.E.C. v. Parnes*, No. 01 CIV 0763 LLS THK, 2001 WL 1658275, at *9 (S.D.N.Y. Dec. 26, 2001).

Plaintiffs argue that "piecemeal" litigation would be both impractical and prejudicial. Specifically, they assert that the Court should not transfer the excessive force and other abuse-

related damages claims against the Albany Defendants to the Northern District of New York and apply collateral estoppel to the underlying facts, determining the City Defendants' liability for Plaintiffs' injuries at trial in the Southern District only if Plaintiffs prevail in Albany.[9]  Plaintiffs argue that they cannot, and should not, have to pause their pursuit of injunctive relief while waiting for the Northern District to litigate, because they would then have to conduct discovery into the events at ACCF in two different cases simultaneously, which would be "costly and cumbersome." (Pls.' Sev. Br. at 10.)

The Albany Defendants have failed to address prejudice in the context of severance, aside from suggesting that it would be inconvenient for Defendants to travel to the Southern District of New York.  But as Plaintiffs have pointed out, efficient discovery practices can limit this inconvenience, with the exception of travel for trial. (Pls.' Sev. Br. at 11 (suggesting depositions could be taken in Albany during designating period of time).)

Defendant Mylroie has argued that the case will prejudice her not only because of the distance but also because jurors will be confused between the claims of deliberate indifference and the constitutionality of Plaintiffs' transfer.  She argues that her role will be "lost in the weeds" and the factual issues "significantly clouded." (Mylroie Br. at 8.)

This is not a circumstance where the claims against Mylroie are so unrelated to the claims against the other Defendants to demonstrate that the jury would be significantly confused.  Any potential prejudice could be ameliorated by specific instructions to the jury.  *See Tee Vee Toons, Inc. v. Rep Sales, Inc.*, No. 03 CIV. 10148 (JGK), 2009 WL 1422610, at *1 (S.D.N.Y. May 20, 2009) ("Careful instructions and limiting instructions can easily make clear the specific issues that the jury is called upon to decide."); *see also Lutz v. Buono*, No. 05 CIV. 4879 (GAY), 2009

---

[9] This possibility was initially raised by the Court at the February 8, 2019 conference.

WL 3364032, at *1 (S.D.N.Y. Oct. 16, 2009) ("Juries in this District routinely decide cases involving multiple plaintiffs and multiple claims, and any risk that the jury may become confused can be addressed by clear jury instructions." (internal quotation removed)). Ultimately, the Albany Defendants have not established that they will experience prejudice if the claims are kept together.

### E.  Severance Is Not Warranted At This Time

Based on these factors, the Court concludes that severance is not warranted at the stage of this litigation.  The FAC alleges a scheme that, while driven by the City Defendants, was implemented by both the City and the Albany Defendants.  As a result, there are significant overlapping issues of fact (and therefore, witnesses and evidence) between the claims that warrant keeping them together in one forum in order to promote judicial efficiency and avoid significant prejudice.

Discovery in this case will likely provide insight as to whether the evidence and witnesses necessary to support Plaintiffs' claims against the City Defendants and the Albany Defendants are in fact as intertwined as Plaintiffs have alleged.  Accordingly, while the Court denies the motion to sever, it does so without prejudice to renewal if, after additional discovery, "such relief appears appropriate." *United States v. Yonkers Bd. of Ed.,* 518 F. Supp. 191, 197 (S.D.N.Y. 1981); *see also Lyons v. Litton Loan Servicing LP*, No. 1:13-CV-513 ALC GWG, 2014 WL 5039458, at *6 (S.D.N.Y. Sept. 29, 2014) (concluding that "Rule 21 analysis suggests that severance is not warranted at this stage of the litigation" but finding it may be later in the action prior to trial).

## PLAINTIFF STEVEN ESPINAL'S MOTION FOR A PRELIMINARY INJUNCTION

Espinal filed a motion for preliminary injunctive relief on January 28, 2019, asking that the Court order that he be held in a DOC facility in New York City during the pendency of his case and until he was released from DOC Custody.

On March 27, 2019, Espinal was sentenced in his criminal case, after accepting an offer from the trial judge to plead guilty to the underlying criminal charges against him. (Dkt. No. 89.) On April 4, 2019, Espinal was (very quickly) transferred into state custody. As he is no longer being held at ACCF and is no longer in DOC custody, his preliminary injunction application is moot and is denied. (Dkt. No. 91.)

The Court recognizes, as Plaintiffs have pointed out, that while the transfer may moot Espinal's individual application for a preliminary injunction, it does not impact the pending motion for class certification, which may be deemed to relate back to the filing of the complaint. *See Samele v. Zucker*, 324 F Supp 3d 313, 330 (E.D.N.Y. 2018).

## ADDITIONAL ORDERS

In addition to denying the various motions that are disposed of in this opinion, the Court issues the following separate orders.

### I.    Valentin Order

To the extent that this has not already occurred, the Defendant City of New York has fifteen days from the date of this opinion to provide counsel for Plaintiffs with the names and addresses of any and all COs who were involved in the transfer of the four named Plaintiffs to ACCF, including the "Frank Foe" defendants who accompanied Plaintiffs when they were taken to Albany. This Valentin order also extends to all COs who were involved in the altercation with Espinal at Rikers Island and the altercation with Tillery at the Brooklyn Detention Center.

Defendant Albany County also has fifteen days to provide the names and addresses of any and all COs who are alleged to have been involved in the assaults on Plaintiffs, including any "Frank Foe" defendants. *See Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997) (per curiam).

## II.     Reference to Law Enforcement

This lawsuit will play out in the ordinary course, with discovery, further motion practice (which I view as inevitable), and, quite possibly, a trial. However, the Court is deeply troubled by the allegations of the FAC. Many of the actions pleaded therein would, if proved, constitute crimes under federal or state law, or both – whether as deprivations of civil rights or assaults. Barbarity of the sort alleged in the FAC cannot be tolerated in a civilized society; and when such conduct is plausibly alleged, it should be investigated by those responsible for enforcing the criminal law, not just litigated in a civil court.

I recognize that we are at the pre-answer motion stage in this lawsuit. But from the allegations of the FAC, there is reason to conclude, even at this early stage, that at least some of the horrors that are described in that pleading actually took place. Plaintiffs plausibly plead that a Justice of the New York State Supreme Court directed that Espinal be given medical attention when he was brought into the Bronx from Albany for a court date, and that another Justice of that same court mandated that he be released from punitive segregation. It does not seem to me appropriate that such allegations should remain solely in the purview of civil litigation.

Accordingly, this Court hereby refers the allegations underlying the transfer and subsequent alleged mistreatment of the four named Plaintiffs to the following law enforcement agencies: the United States Attorney for the Southern District of New York; the United States Attorney for the Northern District of New York, the Albany County District Attorney, the New York County District Attorney, and the Queens County District Attorney.

## CONCLUSION

For the above reasons, the City Defendants' Motion to Dismiss is DENIED.

The Albany Defendants' Motion to Sever and Transfer and Defendant Mylroie's Motion to Sever are DENIED without prejudice.

Plaintiff Steven Espinal's Motion for a Preliminary Injunction is DENIED.

The Clerk of Court is respectfully directed to terminate the motion at Docket Numbers 31, 48, 58, 61 & 66 from the list of open motions.

Dated: April 30, 2019

_____

Chief Judge

BY ECF TO ALL COUNSEL